**FILED**

JAN - 6 2004

CLERK, U S DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID ANTHONY BREAUX,

        Petitioner,

    v.

ARTHUR CALDERON, Warden of
the California State Prison
at San Quentin,

        Respondent.

_____/

NO.  CIV.S-93-0570 DFL DAD DP

FINDINGS AND RECOMMENDATIONS

**DEATH PENALTY CASE**

166

**TABLE OF CONTENTS**

Page

FACTUAL OVERVIEW . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . 5

SUMMARY JUDGMENT STANDARDS . . . . . . . . . . . . . . 8

HABEAS CORPUS STANDARDS . . . . . . . . . . . . . . . 12

NEW RULE UNDER <u>TEAGUE V. LANE</u> . . . . . . . . . . . . . 13

ANALYSIS . . . . . . . . . . . . . . . . . . . . . . 16

    A.   Coercion of Penalty Phase Verdict . . . . . . . 16

    B.   Prosecutorial Misconduct During Closing Argument . . . 26

        1.  Lack of Notice Under State Law . . . . . . . . 31

        2.  Griffin Error . . . . . . . . . . . . . . . . 32

        3.  False Allegation of a Lack of Remorse . . . . . . 33

    C.   Ineffective Assistance of Trial Counsel (Claim C, T & W) . . . . . . . . . . . . . . . . . . . . 35

        1.  Strickland Standard . . . . . . . . . . . . . 36

        2.  Arguments of the Parties . . . . . . . . . . 40

        3.  Analysis . . . . . . . . . . . . . . . . . . 44

    D.   Juror Misconduct During Penalty Phase Deliberations . . 49

    E.   Jury Instruction Re Mitigation Evidence . . . . . . . 56

    F.   Trial Court's Denial of Pitchess Discovery . . . . . . 65

    G.   Trial Court's Failure To Recuse the District Attorney's Office and the Assigned Deputy District Attorney . . . . . . . . . . . . . . . 70

    H.   Systematic Underrepresentation of Hispanics in the Jury Panel . . . . . . . . . . . . . . . . 79

    I.   Admission of Petitioner's Post-Arrest Statements . . . 83

J.  Prosecutorial Misconduct/Comment on Defense
    Tactics . . . . . . . . . . . . . . . . . . . . . . 99

K.  Consciousness of Guilt Jury Instruction . . . . . . . 106

L.  Petitioner's Competence to Stand Trial . . . . . . . . 111

M.  Death Qualification of Jury . . . . . . . . . . . . . 116

N.  Defense Counsel's Concession of Non-Homicide
    Counts Without Petitioner's Waiver of His Right
    to a Jury Trial . . . . . . . . . . . . . . . . . . . 117

O.  Petitioner's Absence From Certain Court
    Proceedings . . . . . . . . . . . . . . . . . . . . . 127

P.  Exclusion of Jurors For Cause Based Upon Death
    Penalty Views . . . . . . . . . . . . . . . . . . . . 132

Q.  Discriminatory Imposition of the Death Penalty . . . . 158

R.  Prosecution's Use of Peremptory Challenges . . . . . . 182

S.  California Death Penalty Statutory Scheme . . . . . . . 192

    1.  Jury Instruction Regarding
        Consideration of Aggravating and
        Mitigating Factors . . . . . . . . . . . . . . . . 194

    2.  Jury Instruction as to Factor (b)
        Aggravating Factors . . . . . . . . . . . . . . . 194

    3.  Facts of Prior Felony Convictions as
        Aggravating Evidence . . . . . . . . . . . . . . . 194

    4.  Consideration of Petitioner's Capital
        Offense as an Aggravating Factor Under
        Both Factor (a) and Factor (b) . . . . . . . . . . 195

    5.  Aggravating Factors Relied Upon and
        Proof Beyond a Reasonable Doubt . . . . . . . . . 195

    6.  Designation of the Aggravating Factors
        Relied Upon . . . . . . . . . . . . . . . . . . . 197

    7.  No Requirement of Unanimous Agreement
        As to the Aggravating Factors Relied
        Upon . . . . . . . . . . . . . . . . . . . . . . . 197

8.   Penalty Phase Instructions Adequately
     Conveyed the Meaning of Mitigation . . . . . . . . 198

9.   The 1978 California Death Penalty Law
     and the Power of the District Attorney
     In Making the Charging Determination . . . . . . . 199

10.  The 1978 California Death Penalty Law
     and Equal Protection with Respect to
     Disparate Sentence Review . . . . . . . . . . . . 200

11.  The California Supreme Court and the
     Fair and Meaningful Review of Capital
     Cases . . . . . . . . . . . . . . . . . . . . . . 200

12.  California Law and a Uniform Standard
     for the Jury's Death Penalty
     Determination . . . . . . . . . . . . . . . . . . 202

13.  Whether California Law Genuinely
     Narrows the Class of Death-Eligible
     Offenders . . . . . . . . . . . . . . . . . . . . 203

14.  Petitioner's Death Sentence Predicated
     Upon the Use of the Felony-Murder
     Doctrine . . . . . . . . . . . . . . . . . . . . . 205

T.   Bias and Prejudice of Trial Jurors . . . . . . . . . . 205

     1.   Legal Standards Governing Claims of Juror
          Bias . . . . . . . . . . . . . . . . . . . . . 208

     2.   Juror Peinado . . . . . . . . . . . . . . . . 211

     3.   Jurors Alvarado, Wight, and Long . . . . . . . 216

     4.   Unidentified Juror Who Killed in the Line of
          Duty . . . . . . . . . . . . . . . . . . . . . 223

     5.   Conclusion . . . . . . . . . . . . . . . . . . 227

U.   Incompetence of Trial Juror . . . . . . . . . . . . . 228

V.   Jury's Consideration of Extraneous Evidence . . . . . 237

     1.   Map . . . . . . . . . . . . . . . . . . . . . 241

     2.   Bailiff's Demonstration . . . . . . . . . . . 244

     3.   Jury Comments . . . . . . . . . . . . . . . . 248

iii

4.   Newspaper . . . . . . . . . . . . . . . . . . . 250

5.   Consultations with Ministers . . . . . . . . . 252

6.   Remorse . . . . . . . . . . . . . . . . . . . . 256

W.   Ineffective Assistance of Counsel/Petitioner's
     Mental Condition, Family History, Upbringing and
     Injuries . . . . . . . . . . . . . . . . . . . . . . 258

X.   Cumulative Error . . . . . . . . . . . . . . . . . . 258

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . 259

This action, a petition for a writ of habeas corpus challenging a capital conviction and sentence pursuant to 28 U.S.C. § 2254, came before the court for hearing on respondent's motion for summary judgment or to dismiss and petitioner's cross-motion for partial summary judgment. Deputy Attorney General George M. Hendrickson and Supervising Deputy Attorney General Harry J. Colombo appeared on behalf of respondent. Richard C. Neuhoff and Deputy Federal Defender Connie Alvarez appeared on behalf of petitioner. After hearing oral argument, the court took the cross-motions under submission. For reasons explained below, the court will recommend that respondent's motion be granted in part and denied in part, and that petitioner's cross-motion be denied.

## FACTUAL OVERVIEW

On June 17, 1984, petitioner robbed liquor store cashier Greg Hardy of $200 at gunpoint. Petitioner forced Hardy into a nearby vehicle and released him several blocks away. Hardy ran back to the liquor store, told his employer and called police identifying and describing petitioner and his car.

Later that day petitioner was seen driving a 1982 maroon Corvette into a gas station with a young woman passenger. While petitioner was pumping gas, an assistant manager saw the young woman at a phone booth mouthing "help me" before petitioner grabbed her by the hand, took her to the car and sped away. The assistant manager wrote down the license plate and called police, who determined that the car was registered to Connie Decker, License No. CONNI 82. Ms. Decker's body was found the next morning in a field that was

1

surrounded by a chain link fence in Rancho Cordova.  It was
determined by crime scene investigators that Ms. Decker had been
killed at another location the afternoon of June 17, with gunshot
wounds to the head identified as the cause of death.

Although petitioner had earlier borrowed another vehicle,
he appeared the afternoon of June 17 with Ms. Decker's maroon
Corvette and told a companion that he had pulled a gun on a lady at a
liquor store and dumped her off at the outskirts of town.  Petitioner
also told the companion that he did not think the lady would be
crying about her car anymore and that he was going to change the
license plates.  Petitioner had the Corvette, now bearing license
plates taken from a laundry truck, the remainder of the day and
attempted to pay for gas with Ms. Decker's credit card.

On June 19 police on surveillance approached petitioner
near his mother's home.  Petitioner ran away to a park clubhouse,
barricaded himself in and threatened to shoot.  Petitioner refused to
surrender during a forty-five minute stand-off and was eventually
shot in the arm and leg by police, arrested and taken for treatment
at an emergency hospital.  A hypodermic injection kit and a .32
caliber automatic pistol later identified as the murder weapon were
recovered at the time of petitioner's arrest.  After treatment,
petitioner purportedly waived his Miranda rights and agreed to talk
to a deputy sheriff.  Petitioner stated that he had shot up with
heroin the afternoon of June 17.  He admitted that thereafter he had
taken the Corvette at gunpoint for a joyride but contended that Ms.
Decker was killed by a "Mexican hitchhiker" he had picked up.

Petitioner claimed that he dropped the hitchhiker and Ms. Decker off to go joyriding and that when he returned, Ms. Decker had been shot and put in a nearby dumpster.  He told the deputy that he and the hitchhiker had changed the license plates on the Corvette, shown the car off to family and friends and returned the next day moving the body to the location where it was found.  Police searched the identified dumpster, finding the victim's clothing and a bullet casing matching the murder weapon.

At trial the defense case focused solely on the theory that due to heavy cocaine use and lack of sleep petitioner did not intend or premeditate the shooting of Ms. Decker but rather had reacted impulsively and irrationally in a frightened and paranoid mental state that was inconsistent with deliberation and premeditation.  In support of this defense they presented testimony from persons who had known petitioner over the years and had witnessed the effects of his drug (cocaine and heroin) use during the relevant time period.  The defense also presented evidence of petitioner's drug-induced increasingly irrational behavior in the days leading up to June 17, 1984.  Finally, the defense introduced expert testimony in support of its theory that petitioner was acting under the influence of cocaine at the time of the killing and with neither deliberation or premeditation.

The jury convicted petitioner of the murder, robbery and kidnapping for robbery of Connie Decker; the robbery and kidnapping for robbery of Greg Hardy; assault with a deadly weapon on a police officer; and being an ex-felon in possession of a firearm.  The jury

1  also found that the murder was committed under the special

2  circumstances of kidnapping and robbery and that petitioner had

3  personally used a firearm in the commission of the offense.

4          At the penalty phase the prosecution, through stipulation,

5  established that petitioner had previously been convicted of

6  assaulting a police officer, misdemeanor battery and armed robbery.

7  The defense presented mitigating evidence through the testimony of

8  family and friends of petitioner.  Petitioner's father testified,

9  characterizing the family as "very close."  The father testified that

10  he had a good relationship with his children although he had left the

11  family in 1976 and knew the children were "unhappy" but did not know

12  why.  Petitioner's father also stated that he never knew his son to

13  use drugs.

14          On the other hand, petitioner's mother testified that her

15  marriage with petitioner's father went through stressful periods,

16  eventually deteriorating, and that she suspected her husband was

17  sexually abusing their daughter.  She related that the daughter had

18  run away from home and that petitioner became very angry with his

19  father at that point.  Petitioner's sister testified that the father

20  had molested her beginning at age nine and that both she and

21  petitioner began using drugs at an early age as an escape from their

22  father's abuse.  She testified that her father had sexually abused

23  her brother Michael and that she suspected he had abused petitioner

24  as well.  When, in 1982, she discussed the sexual abuse with

25  petitioner, he became angry and rageful.  She recounted that

26  petitioner's abuse of drugs was getting worse at that time.  Defense

4

counsel also presented testimony from a priest who was a family friend in support of petitioner and from a woman who recounted that while she was on a raft trip in 1973, petitioner, who was a stranger to her, jumped into the rapids in a heroic but unsuccessful attempt to help her rescue a friend who was drowning.

The jury returned a sentence of death.  Thereafter the state trial court imposed the death sentence and a consecutive sentence of ten years, eight months.  On direct appeal the judgment and sentence was affirmed by the California Supreme Court.  People v. Breaux, 1 Cal. 4th 281 (1991).  Petitioner's petition for rehearing was denied by that court on February 26, 1992.  A petition for writ of certiorari was denied by the United States Supreme Court on October 5, 1992.[1]  Breaux v. California, 506 U.S. 874 (1992).

## PROCEDURAL HISTORY

This case commenced on April 6, 1993, with the filing of a petition and a motion for the court to appoint counsel.  On June 7, 1993, respondent filed motions to strike or disregard specified allegations, to dismiss for lack of exhaustion, and to dismiss a specified claim due to procedural bar.  On February 28, 1994, the assigned district judge granted respondent's motion to dismiss with respect to those claims identified in the order as unexhausted and denied the motion in all other respects.  On August 25, 1994, the action was stayed pending exhaustion of the unexhausted claims in

---

[1]  Petitioner's first state petition for writ of habeas corpus was filed with the California Supreme Court while the direct appeal was pending.  That state habeas petition was summarily denied on November 20, 1991.

state court.  On July 7, 1995, petitioner submitted to the court an amended petition for writ of habeas corpus, including all claims pleaded in the original petition (both exhausted and unexhausted), plus two new claims, Claims V and W.  The court filed the document upon its receipt.  However, on August 8, 1995, the court issued an order directing the clerk to "de-file" and lodge the amended petition, stating that the court would take up the question of its filing after the exhaustion of state remedies.

On October 3, 1997, petitioner's counsel filed a letter advising the court that on September 24, 1997, the California Supreme Court had denied his second petition for writ of habeas corpus.  On October 10, 1997, the stay of this litigation was lifted.  On November 12, 1997, the undersigned issued an order stating that the amended petition was deemed filed.  On February 10, 1998, respondent filed a motion for summary judgment and motion to dismiss specified claims in the amended petition.  On April 14, 1998, the undersigned issued an order requiring the motion to be addressed in stages, with the first stage limited to the questions of: (1) whether the AEDPA applies to the amended petition or any claims therein; (2) what date should be deemed the effective filing date of the amended petition; (3) exhaustion; and (4) certain aspects of procedural bar.

On June 16, 1999, the undersigned issued findings and recommendations recommending that respondent's motion to dismiss for failure to exhaust and procedural default be denied, that the effective filing of the amended petition be November 12, 1997.  The court also recommended that the AEDPA be found inapplicable to the

amended petition in its entirety.  In an order filed September 29, 1999, the assigned district judge adopted the conclusions reached in those findings and recommendations, with certain clarifications and exceptions.  That order denied respondent's motion to dismiss, determined the date of filing of the amended petition to be November 12, 1997, and found the AEDPA inapplicable to the amended petition in its entirety.

In light of these rulings, on December 29, 1999, respondent filed an alternative motion for summary judgment and motion to dismiss specified claims in the amended petition.  On June 21, 2000, petitioner filed opposition to that motion and took the unusual step of filing a cross-motion for summary judgment.  Respondent's sweeping motion seeks dismissal or judgment in his favor as to all claims in the amended petition, including the inadequate assistance of counsel claims.  In turn, petitioner seeks judgment in his favor as to claims A-E, F (in part), G, H, I, J, K, L, N, O, P, Q, R, S (in part), T, U, V and W (in part).[2]

----

[2]  As indicated to the parties prior to the filing of these voluminous motions, the undersigned has serious reservations regarding the usefulness of all-encompassing motions for summary judgment in death penalty habeas corpus actions.  Every judicial officer to address a capital habeas action struggles with the effective management of the litigation.  No matter the procedure followed, one is left with doubt that the action is being optimally managed.  Nonetheless, the early filing of a summary judgment motion seeking disposition of all claims appears particularly inefficient.  First, the motion is unlikely to dispose of all claims, particularly those raising inadequate assistance of counsel.  Thus, as to those claims remaining after the motion is ruled upon, both the parties and the court will address the merits at least twice.  Second, unnecessary delay is of concern to all involved in capital cases.  Rather than expediting resolution, such summary judgment motions merely bring about additional lengthy delay.  Third, counsel for

Below the court will first address the standards for both summary judgment and the granting of habeas relief before turning to the arguments of the parties as to each claim of the amended petition.

### SUMMARY JUDGMENT STANDARDS

The Rules Governing Section 2254 Cases in the United States District Courts establish that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent with these rules, may be applied, when appropriate, to petitions filed under these rules." Rule 11, Rules Governing § 2254 Cases (emphasis added). Thus, summary judgment motions have been found appropriate in habeas corpus proceedings. Blackledge v. Allison, 431 U.S. 63, 80 (1977); Clark v. Johnson, 202 F.3d 760, 764-65 (5th Cir. 2000) ("As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."). Nonetheless, the court is not bound in habeas proceedings to "systematically apply traditional rules

_____

petitioners, particularly those inexperienced in death penalty habeas litigation, are lured into concentrating on the early-filed motion, while failing to complete the necessary work that the court assumes is being undertaken concurrently. Fourth, to the extent that the cost of capital litigation is a concern to many, such motions drastically increase that cost. In this regard, anyone familiar with the practice of law is aware that extensive briefing in connection with law and motion results in a significant increase in legal fees charged. Fifth, because the law in this area is often unsettled, there is a great risk that the resources expended on the motion will, at least in part, be wasted should the law change prior to the ultimate disposition of the case. This is not to say that there is never a place for summary judgment motions in the effective management of these cases. However, for the reasons stated above, the undersigned will continue to discourage the filing of all-encompassing summary judgment motions in most cases.

1  governing civil proceedings when to do so would be inconsistent with

2  the overriding purpose of the federal habeas corpus statute." Brown

3  v. Vasquez, 952 F.2d 1164, 1169 (9th Cir. 1991).

4           Summary judgment is appropriate in a civil case when it is

5  demonstrated that there exists no genuine issue as to any material

6  fact, and that the moving party is entitled to judgment as a matter

7  of law.  Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co.,

8  398 U.S. 144, 157 (1970); Owens v. Local No. 169, 971 F.2d 347, 355

9  (9th Cir. 1992).

10          The party moving for summary judgment

11               always bears the initial responsibility of
                 informing the district court of the basis for its
12               motion, and identifying those portions of "the
                 pleadings, depositions, answers to
13               interrogatories, and admissions on file, together
                 with the affidavits, if any," which it believes
14               demonstrate the absence of a genuine issue of
                 material fact.

15

16  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the

17  nonmoving party will bear the burden of proof at trial on a

18  dispositive issue, a summary judgment motion may properly be made in

19  reliance solely on the 'pleadings, depositions, answers to

20  interrogatories, and admissions on file.'"  Id.  Indeed, summary

21  judgment should be entered, "after adequate time for discovery and

22  upon motion, against a party who fails to make a showing sufficient

23  to establish the existence of an element essential to that party's

24  case, and on which that party will bear the burden of proof at

25  trial."  Id. at 322.  "[A] complete failure of proof concerning an

26  essential element of the nonmoving party's case necessarily renders

                                      9

all other facts immaterial." Id. at 323.  In such a circumstance,
summary judgment should be granted, "so long as whatever is before
the district court demonstrates that the standard for the entry of
summary judgment, as set forth in Rule 56(c), is satisfied." Id.

If the moving party meets its initial responsibility, the
burden then shifts to the opposing party to establish that a genuine
issue as to any material fact actually does exist.  Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also
First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89
(1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th
Cir. 1979).

In attempting to establish the existence of this factual
dispute, the opposing party may not rely upon the denials of its
pleadings, but is required to tender evidence of specific facts in
the form of affidavits, and/or admissible discovery material, in
support of its contention that the dispute exists.  Rule 56(e);
Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank, 391 U.S.
at 288-89; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  The
opposing party must demonstrate that the fact in contention is
material, i.e., a fact that might affect the outcome of the suit
under the governing law, and that the dispute is genuine, i.e., the
evidence is such that a reasonable jury could return a verdict for
the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors
Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).
/////

1    In seeking to establish the existence of a factual dispute,

2  the opposing party need not establish a material issue of fact

3  conclusively in its favor.  It is sufficient that "the claimed

4  factual dispute be shown to require a jury or judge to resolve the

5  parties' differing versions of the truth at trial." First Nat'l

6  Bank, 391 U.S. at 289.  See also T.W. Elec. Serv., 809 F.2d at 630.

7  Thus, the "purpose of summary judgment is to 'pierce the pleadings

8  and to assess the proof in order to see whether there is a genuine

9  need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ.

10  P. 56(e) Advisory Committee Note to 1963 Amendment).  See also Int'l

11  Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin

12  Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

13    In resolving the summary judgment motion, the court

14  examines the pleadings, depositions, answers to interrogatories, and

15  admissions on file, together with the affidavits, if any.  Rule

16  56(c); see also SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th

17  Cir. 1982).  The evidence of the opposing party is to be believed,

18  Anderson, 477 U.S. at 255, and all reasonable inferences that may be

19  drawn from the facts placed before the court must be drawn in favor

20  of the opposing party, Matsushita, 475 U.S. at 587-88 (citing United

21  States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also United

22  States v. First Nat'l Bank of Circle, 652 F.2d 882, 887 (9th Cir.

23  1981).  Nevertheless, inferences are not drawn out of the air, and it

24  is the opposing party's obligation to produce a factual predicate

25  from which the inference may be drawn.  See Richards v. Nielsen

26  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

810 F.2d 898, 902 (9th Cir. 1987). Moreover, a scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact precluding summary judgment. <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000); <u>Summers v. A. Teichert & Son, Inc.</u>, 127 F.3d 1150, 1152 (9th Cir. 1997).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 586-87 (citations omitted).

### HABEAS CORPUS STANDARDS

As noted above, petitioner filed his original petition prior to the enactment of the AEDPA and pre-AEDPA standards of review therefore govern. <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997). Under those standards a writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. <u>See</u> <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1994); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)). It is not available for alleged error in the interpretation or application of state law. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085.

/////

1        However, "a claim of error based upon a right not

2   specifically guaranteed by the Constitution may nonetheless form a

3   ground for federal habeas relief where its impact so infects the

4   entire trial that the resulting conviction violates the defendant's

5   right to due process." Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir.

6   1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)). See

7   also Lisenba v. California, 314 U.S. 219, 236 (1941); Henry v.

8   Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).   In order to raise such

9   a claim in a federal habeas corpus petition, the error alleged must

10  have resulted in a complete miscarriage of justice. See Hill v.

11  United States, 368 U.S. 424, 428 (1962). See also Henry, 197 F.3d at

12  1031; Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968).

13       State court factual findings are presumed correct unless

14  one of eight enumerated exceptions apply. See 28 U.S.C. §

15  2254(d)(1994).   The state courts' application of law to historical

16  facts is reviewed de novo. Belmontes v. Woodford, 350 F.3d 861, 878

17  (9th Cir. 2003) (citing Thompson v. Borg, 74 F.3d 1571, 1573 (9th

18  Cir. 1996)).

19                  **NEW RULE UNDER TEAGUE V. LANE**

20       With respect to nine of petitioner's claims (A, D, F, K, M,

21  O, P, R & S) respondent argues that, if adopted, petitioner's

22  position would constitute a "new rule" which could not be applied to

23  his case under the Supreme Court's decision in Teague v. Lane, 489

24  U.S. 288 (1989).   In each instance petitioner contests respondent's

25  assertion, arguing that respondent's application of the Teague bar is

26  overbroad.   The court finds it appropriate to briefly address this

                                    13

1   disputed point before proceeding to a claim-by-claim analysis of the

2   cross-motions.

3          In Teague the Supreme Court held that new rules of criminal

4   procedure are generally not applicable on habeas review. 489 U.S. at

5   301, 310; Gonzalez v. Pliler, 341 F.3d 897, 904 (9th Cir. 2003).

6   Thus, "[w]ith few exceptions, the Teague non-retroactivity doctrine

7   prohibits courts from announcing new rules of law in federal habeas

8   proceedings." Hoffman v. Arave, 236 F.3d 523, 537 (9th Cir.), cert.

9   denied, 534 U.S. 944 (2001). However, a decision announces a "new

10  rule" only if it "'breaks new ground or imposes a new obligation on

11  the States or the Federal Government [or] if the result was not

12  dictated by precedent existing at the time the defendant's conviction

13  became final.'" Jones v. Smith, 231 F.3d 1227, 1236 (9th Cir.

14  2000)(quoting Teague, 489 U.S. at 301). See also Hoffman, 236 F.3d

15  at 537. Thus, "'[t]o determine what counts as a new rule, Teague

16  requires courts to ask whether the rule a habeas petitioner seeks can

17  be meaningfully distinguished from that established by binding

18  precedent at the time his state court conviction became final.'"

19  Hoffman, 236 F.3d at 537 (quoting Wright v. West, 505 U.S. 277, 304

20  (1992) (O'Connor, J., concurring)). See also Gonzalez, 341 F.3d at

21  904. Finally, courts assessing whether a decision would announce a

22  "new rule" must survey their own case law for guidance. Graham v.

23  Collins, 506 U.S. 461, 469 (1993); Belmontes, 350 F.3d at 884 ("[W]e

24  have held that circuit court holdings suffice to create a 'clearly

25  established' rule of law under Teague."); Gonzalez, 341 F.3d at 904.

26  /////

1        The requisite legal principles upon which petitioner relies

2   in support of Claims A (coercion of jury verdict), D (juror

3   misconduct), F (denial of discovery with respect to citizen

4   complaints against police officers), K (challenging the consciousness

5   of guilt jury instruction), M (death qualification of the jury), O

6   (petitioner's absence from various court proceedings), P (improper

7   excusing of prospective jurors for bias against the death penalty), R

8   (prosecutor's improper and discriminatory use of peremptory

9   challenges) and S (constitutional challenges to the California death

10  penalty scheme) are, for the most part, clearly established.   The

11  question presented by those claims is whether the state courts

12  reasonably applied those well-established principles.

13        Accordingly, unless otherwise specifically indicated below,

14  the court finds that petitioner's claims are not barred by the

15  holding in Teague.  See Wright v. West, 505 U.S. 277, 308 (1992)

16  (Kennedy, J., concurring) ("If the rule in question is one which of

17  necessity requires a case-by-case examination of the evidence, then

18  we can tolerate a number of specific applications without saying that

19  those applications themselves create a new rule."); Gonzalez, 341

20  F.3d at 904; Brown v. Poole, 337 F.3d 1155, 1161 (9th Cir. 2003);

21  Hoffman, 236 F.3d at 538; Torres v. Prunty, 223 F.3d 1103, 1110 (9th

22  Cir. 2000) ("[T]he district court merely applied the rule . . . to a

23  new set of facts.").

24  /////

25  /////

26  /////

## <u>ANALYSIS</u>

**A.   Coercion of Penalty Phase Verdict**

In his first claim petitioner asserts that the trial court's rejection of the jury's declaration of a deadlock in the penalty phase and its order that the jury deliberate further upon learning that the jury was split 10-2, was coercive in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Am. Pet. at 42.)

The jury trial in petitioner's case commenced on October 7, 1986. (Clerk's Transcript (CT) at 1104.) The jurors were sworn and the taking of evidence with respect to the guilt phase trial commenced on December 1, 1986. (CT at 1289.) On December 18, 1986, the jury was instructed and began their guilt phase deliberations. (CT at 1422.) On December 19, 1986, the jury returned their guilt phase verdicts. (CT at 1451-56.)

The penalty phase commenced on December 22, 1986. (CT at 1457.) On December 29, 1986, the jury was instructed and at 2:35 p.m. commenced deliberations in the penalty phase of the trial. (CT at 1547.) The jury recessed at 4:20 p.m. and returned at 10:00 a.m. the following day to resume deliberations. (<u>Id.</u>) Deliberations continued on December 30 and 31. (CT at 1549-50.)

On January 5, 1987, the jury sent out a note reporting that after taking several polls and discussing the evidence, they were unable to reach a verdict. (CT at 1551; Reporter's Transcript (RT)

/////

/////

at 7425, 7437.)  After conferring with counsel,[3] the trial judge

inquired of the foreperson whether with further deliberations there

was a chance that the jury might come to a decision.  (RT at 7437.)

The foreperson expressed a belief that "perhaps" there was a chance

that the jury could come to decision with further deliberation.

(Id.)  Three other jurors were then polled by the trial judge with

one stating he believed a verdict could be reached, another stating

that perhaps a verdict could result and a third expressing the belief

that there was not any chance that further deliberations would

resolve the jurors' differences.  (RT at 7437-38.)  The trial judge

then terminated the polling and instructed the jury "to go back once

more and resume your deliberations in the matter."  (RT at 7438.)

The jury resumed their deliberations at approximately 11:30 a.m.  (RT

at 7444.)

At 1:45 p.m. on January 5, the court received a note from

the jury stating that they were "not able to reach a unanimous

/////

/////

---

[3]  The prosecutor first requested that the trial court request
that the jurors resume their deliberations without inquiring into
their numerical split out of concern that a reviewing court might
interpret such an inquiry as coercive with respect to those in the
minority.  (RT at 7430-33.)  The trial judge rejected the request,
stating that he would first determine if the jurors agreed they were
deadlocked and that if he inquired as to the split, he would do so in
such a way that the jury did not reveal which way the majority was
standing.  (RT at 7431-32, 7434.)  It was defense counsel's request
that the court at the outset inquire as to the numerical split and
how many votes were cast in favor of death and how many in favor of
life without the possibility of parole.  (RT at 7435.)  The defense
request was also denied.  (RT at 7436, 7439.)

17

decision." (RT at 7440; CT at 1551, 1553.)[4] The jury foreperson reported that in the approximately two hours since they last reported to the court, the jury had taken one poll with no change in the vote division. (RT at 7444.) The jurors were polled and each confirmed that they did not believe there was a chance of reaching a penalty phase verdict through further deliberations.[5] (RT at 7444-46.) Upon inquiry by the trial judge that she provide only the numerical split and not reveal the numbers for and against either penalty, the foreperson reported that the numerical split on the last ballot taken was two to ten. (RT at 7446-47.) The trial judge then asked the jury to attempt further deliberations, stating:

> I'm going to ask the jury, regardless of what you said, to attempt to deliberate further.
>
> I'm going to instruct you and remind you once more, however, that both sides are entitled to the individual opinion of each juror and no juror should vote in a particular fashion just because of a majority vote in that fashion or any vote in that fashion.
>
> In other words, your vote shall be an independent individual vote.
>
> However, I'm going to ask you for a short period of time to try once more and see if you think there is a chance of reaching a verdict and,

---

[4] Before addressing the jury on this occasion the trial judge expressed concern that he did not wish to inquire into how the jury was split in such a way as to suggest that the minority should give more thought to giving up to the majority but that he also was reluctant to declare a mistrial of the penalty phase after what he viewed as only a day and one half of penalty phase deliberations. (RT at 7442-43.)

[5] One juror answered that he believed the possibility that further deliberations would change the views of any jurors to be "extremely slight at this point." (RT at 7445.)

18

1    well, shortly from now, if (sic) won't be too
     long from now, I'll call you back in and see
2    where you stand, if any progress has been made.

3        Thank you.

4  (RT at 7447.)[6]

5        Approximately one-half hour after receiving this

6  instruction the jury requested that the guilt phase testimony of

7  three prosecution witnesses be re-read.  (RT at 7448-49; CT 1552,

8  1554.)  The requested testimony was re-read to the jury during the

9  afternoon of January 5 and the morning of January 6.  At 2:20 p.m. on

10  January 6, 1987, the jury returned a verdict of death.  (RT at 7458-

11  60; CT at 1556-58.)

12        Respondent moves for summary judgment on this claim,

13  arguing that the trial court did not abuse its discretion under

14  California Penal Code § 1140 in failing to declare a mistrial of the

15  penalty phase of petitioner's trial.[7]  (Alt. Mot. for Summ. J. at 42-

16  43, 47.)  Respondent argues that the jury deliberations were not

17  lengthy in light of the complexity of the case and given the large

18  amount of evidence, including mitigating evidence presented by

19  petitioner.  Under these circumstances, respondent asserts, the trial

20  _____

21        [6]  After so instructing, the trial judge expressed his intent to
     call the jury back within an hour and if there was no change to
22  seriously consider declaring a mistrial.  (RT at 7448.)  He again
     noted the length of the overall trial, the relatively short
23  deliberation and the fact that he had reminded the jurors of their
     obligation to vote as individuals.  (Id.)
24

25        [7]  Respondent argues that this claim is an attack on the
     decision of the trial court and is therefore limited to consideration
     of the trial court record and is not subject to factual development
26  in this habeas proceeding.  (Alt. Mot. for Summ. J. at 43, 46.)

19

1    court's refusal to declare a mistrial was not coercive and was within

2    the court's properly exercised discretion.  (Id. at 51-53 (citing

3    Illinois v. Somerville, 410 U.S. 458 (1973), and Rodriguez v.

4    Marshall, 125 F.3d 739 (9th Cir. 1997).)

5            Petitioner not only opposes respondent's motion for summary

6    judgment as to this claim but also moves for summary judgment in his

7    own favor.  (Opp'n & Cross-Mot. for Summ. J. at 62-63.)  Petitioner

8    contends that the trial judge's ordering of further deliberations

9    after unequivocally being informed that the jury was unable to reach

10   a penalty phase verdict was inherently coercive under the totality of

11   the circumstances.  In this regard, petitioner argues that the record

12   reflects that the jury had deliberated for at least thirteen and one-

13   half to nineteen hours, approximately three times longer than was

14   consumed hearing the penalty phase testimony, when it sent out the

15   second note reporting that it was deadlocked.  (Id. at 71.)

16   Petitioner argues that by that point the jurors had already followed

17   the trial court's first directive to deliberate further.  (Id.)

18   After doing so, the jury took another vote with the same result as

19   the previous one.  (Id.)  Petitioner notes that all of the jurors

20   unequivocally informed the trial judge that further deliberations

21   would not be fruitful.  (Id. at 72.)  The judge then asked the

22   foreperson to reveal the numerical split and, upon learning that it

23   was 10 to 2, immediately ordered deliberations to resume and directed

24   the jurors to try and make "progress" in "a short period of time."

25   (Id.)  Petitioner notes that although the trial judge advised the

26   /////

1  jury he would shortly call them back in to see if any progress had

2  been made, he never did so.  (Id. at 75.)

3         Petitioner argues that inquiring into the jury's numerical

4  division was inherently coercive.  (Id. at 72 (citing Brasfield v.

5  United States, 272 U.S. 448, 450 (1926), and Lowenfield v. Phelps,

6  484 U.S. 231, 239 (1988).)  Petitioner asserts that, given the

7  totality of the circumstances, the trial judge sent a clearly

8  coercive message that the two holdout jurors should change their

9  votes.  (Id. at 72-76.)  Finally, petitioner argues that because the

10  penalty phase decision is inherently more subjective than a guilt

11  phase determination, any coercion of jurors in the minority by the

12  trial judge must be subject to special scrutiny.  (Id. at 75-76.)

13         The factual basis for this claim is fully developed in the

14  record before the court and has been fairly summarized above.[8]

15         Whether to declare a mistrial is normally left to the sound

16  discretion of the trial court, which is in the best position to

17  assess the likelihood of a jury being able to reach a verdict.

18  Rodriguez v. Marshall, 125 F.3d 739, 748 (9th Cir. 1997), overruled

19  in part on other grounds by Payton v. Woodford, 299 F.3d 815 (9th

20  Cir. 2002).  Of course, a criminal defendant has a constitutional

21  _____

22     [8]  Contrary to respondent's claim, to the extent petitioner has
   presented additional evidence in support of this claim, that evidence
23  may properly be considered by this court.  That evidence is limited
   simply to declarations which clarify the record regarding the length
   of penalty phase jury deliberations prior to the court's receipt of
24  the jury's notes reporting a deadlock.  While the length of
   deliberations is a relevant consideration, whether those
25  deliberations precisely spanned "approximately eight," thirteen and
   one-half, or nineteen hours does not affect the resolution of the
26  issue before this court.

right to an uncoerced jury verdict. <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 241 (1988). As the Ninth Circuit Court of Appeals has observed:

> Whether the comments and conduct of the state trial judge infringed defendant's due process right to an impartial jury and fair trial turns upon whether "the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision."

<u>Jiminez v. Myers</u>, 40 F.3d 976, 979 (9th Cir. 1994) (quoting <u>Locks v. Sumner</u>, 703 F.2d 403, 406 (9th Cir. 1983)). Whether a court's actions were coercive must be assessed in light of the context and under all of the circumstances of the case. <u>Lowenfield</u>, 484 U.S. at 237; <u>Jiminez</u>, 40 F.3d at 979-80; <u>Locks</u>, 703 F.2d at 406-07. However, a state trial court's inquiry into the numerical split of the jury absent other circumstances of coercion does not deprive a defendant of due process. <u>Jiminez</u>, 40 F.3d at 980; <u>Locks</u>, 703 F.2d at 407; <u>see also Lowenfield</u>, 484 U.S. at 240 n.3 (citing cases).[9] Finally, in determining whether a supplemental jury instruction is improperly coercive it is appropriate to consider: (1) the form of the jury charge; (2) the length of deliberation following the charge; (3) the total time of deliberation; and (4) other indicia of coerciveness or pressure. <u>Weaver v. Thompson</u>, 197 F.3d 359, 366 (9th Cir. 1999) (citing <u>United States v. Wills</u>, 88 F.3d 704, 717 (9th Cir. 1996)).

/////

---

[9] The rule is different on direct review of a federal criminal conviction, where such an inquiry into the numerical division of the jury requires reversal. <u>See Brasfield v. United States</u>, 272 U.S. 448 (1926). However, that per se rule rests on the supervisory power of the court rather than upon constitutional grounds. <u>See Lowenfield</u>, 484 U.S. at 239-40; <u>Jiminez</u>, 40 F.3d at 980 n.3.

1    Considering all the circumstances in this case, the court

2    concludes that the state trial judge's actions did not deprive

3    petitioner of due process.  When the jury first indicated that it was

4    not able to come to a unanimous penalty phase decision, the trial

5    court merely inquired as to whether further deliberations might prove

6    helpful.  Three of the four jurors polled indicated in one way or

7    another that further deliberations might assist in resolving the

8    juror's differences.  Certainly, the trial judge committed no error

9    in directing the jury to resume their deliberations at that point.

10    It was little more than two hours later[10] when the jury

11    communicated that they were unable to reach a unanimous penalty phase

12    decision.  Upon inquiry, the trial court learned that only one poll

13    had been taken by the jury since they last appeared in court, albeit

14    with the same result as before.  The court polled the entire jury for

15    the first time and was told that none of the jurors believed that

16    additional deliberations would assist.  Only then did the court

17    inquire as to the numerical split of the jury.  Upon learning that

18    the split was two to ten the trial judge asked the jury to attempt

19    further deliberations but specifically instructed them that both

20    sides were entitled to the individual opinion and vote of each juror

21    and reminded them that no juror should vote in a particular fashion

22    just to succumb to the majority.  The trial judge told the jury that

23    he would call them back in shortly to see if any progress had been

24    made.  This proved to be unnecessary when only one-half hour later

25    _____

26    [10]   It appears that during that two hours and fifteen minutes
the jury may well have had lunch. (RT at 7444.)

the jury requested that the testimony of three guilt phase
prosecution witnesses be re-read, thus indicating that deliberations
were once again progressing.  The verdict was returned the afternoon
of January 6 after the completion of the re-reading of the requested
testimony.

As recognized above, however, the state trial court's
inquiry into the numerical split of the jury does not deprive a
defendant of due process.  Nor do the other surrounding circumstances
establish coercion in this case.  The trial judge took precaution to
avoid learning whether the jury was ten to two in favor of a death
verdict or a verdict of life without the possibility of parole.  He
did not attempt to identify the jurors in the minority.  His
instruction neither urged the jurors to reach a unanimous verdict nor
criticized any position taken by a juror.  The trial judge did not
send a message to the jury that the jurors in the minority should
succumb to the will of the majority to reach a verdict.  In fact, he
specifically instructed the jury to the contrary.  This is not a case
in which upon an announced impasse the trial judge inquired of the
number of ballots taken, learned of movement over time in those
ballots from a division of seven to five to eleven to one and then,
without cautionary instruction that the minority should not succumb
to the majority for the sake of reaching a verdict, directed the jury
to resume deliberations in light of the substantial movement.  See
Jiminez, 40 F.3d at 980-81.

Petitioner takes issue with respondent's estimate of the
length of penalty phase deliberations, arguing that at the point the

1  jury announced an impasse deliberations had gone on at least three

2  times longer than the penalty phase of the trial itself.   The

3  argument is too narrowly focused and misses the mark.   The jury in

4  petitioner's case heard eleven days of testimony in the guilt phase

5  of the trial, followed by closing arguments that spanned two days.

6  The fact that the defense penalty phase case included six witnesses

7  testifying for approximately four hours over the course of only two

8  day (RT at 7005-7148) is not dispositive.   When the jury resumed

9  their penalty phase deliberations on January 5 they asked for the re-

10  reading of testimony of prosecution guilt phase witnesses who had

11  testified on December 1, 3, 11 and 12.   Given the overall length of

12  the trial the jury's penalty phase deliberations were not

13  particularly lengthy.   Consideration of this factor does not lead to

14  the conclusion that the trial court's action were coercive.

15  Moreover, the jury did not immediately return a verdict after being

16  asked by the court to return to their deliberations on January 5.

17  Rather, despite the fact that it was suggested by the court that

18  their deliberations might end if no progress was made, they requested

19  the re-reading of the testimony noted above, deliberated further and

20  did not return their penalty verdict until the following day at 2:20

21  p.m.   This set of circumstances indicates that the verdict was not

22  the product of coercion.   See United States v. Hernandez, 105 F.3d

23  1330, 1334 (9th Cir. 1997).

24       Finally, petitioner argues that because the jurors' penalty

25  phase decision is inherently moral and not factual, the actions of

26  the trial court in directing the jury to deliberate further should be

25

1  subject to particular scrutiny for coercion.  Petitioner cites no

2  authority for this heightened standard of review.  Even if the

3  actions of the trial court were reviewed under the suggested

4  standard, for the reasons set forth above, this court concludes that

5  under these circumstances no juror on the panel would have felt

6  pressured to reach any verdict.

7        Accordingly, respondent's motion for summary judgment

8  should be granted and petitioner's cross-motion denied as to this

9  claim.

10  **B.    Prosecutorial Misconduct During Closing Argument**

11        As transcribed, the prosecutor's opening argument to the

12  jury at the conclusion of the penalty phase of the trial spanned

13  approximately twenty-eight pages.  After addressing the law, the jury

14  instructions, and the penalty phase testimony, the prosecutor turned

15  to the 1984 murder for which the petitioner had just been convicted.

16  (RT at 7326-28.)  At that point the prosecutor argued to the jury:

17              And you know what the defendant did in 1984 as to
             Greg Hardy and as to Connie Decker.  As he took
18              the victims from their locations around, as he
             moved Greg Hardy around at gunpoint, the
19              defendant displayed for you a degree of
             callousness that I hope you never see again.  As
20              he took Connie Decker around Sacramento, he
             displayed for you a degree of callousness, a
21              baseness that I hope you never see again.  What
             do you think, honestly, now?  You know, what do
22              you think about the mitigating circumstances of
             the defendant?  Specifically, what do you think
23              about sympathy for someone who commits those
             crimes, who commits things like that, who kills
24              without any justification for it?  I'm not
             talking about legal justification only.  I'm
25              talking about moral justification.  Any excuse
             whatsoever.  Anything at all that kind of makes
26              it, although not a defense, makes the defendant

1
    less culpable in some way?  What is it?  There
    isn't.  There simply isn't.  It's despicable what
2
    the defendant did.  There is no way around it,
    and it's not -- it's not because I say it and
3
    it's not because you see it that way, it's simply
    because that's the way he did it.  It's simply
4
    the way he did his crimes.

5
                      * * *

6
    After he killed Connie Decker, you saw at no time
    under any circumstance through any witness, any
7
    expression by the defendant of remorse for what
    he did, a human feeling for what he did.
8

9
(RT at 7327-29.)[11]  Later, just before concluding, the prosecutor

10
argued:

11
    It was simply consistent, totally consistent with
    the defendant, totally consistent with his
12
    actions, with his actions of violence and
    disregard for everyone and everything
13
    He basically does not care.  That's all.  He
    really, simply does not care.
14

15
(RT at 7330.)

16
    At the next recess, petitioner's trial counsel moved for a

17
mistrial on the grounds that the prosecutor's "lack of remorse

18
argument" was: erroneous as a matter of law, untrue based upon

19
information provided to the defense by the prosecution, an improper

20
comment on petitioner's reliance on his Fifth Amendment right not to

21
testify and made without the required notice to the defense.  (RT at

22
7357-59.)  In response, the prosecutor argued that he was commenting

23

24
    [11]  Defense counsel objected following this comment, requesting
to be heard outside the presence of the jury after the prosecutor's
25
argument. (RT at 7329.)  Immediately after the objection the
prosecutor continued with his argument, focusing on the petitioner's
26
actions immediately after the killing.

solely on the evidence at trial, focusing on the manner in which the killing was carried out and on petitioner's actions immediately following the murder.  (RT at 7359-60.)  The prosecutor also questioned whether petitioner was ever remorseful. (Id.)  The trial court denied the motion for a mistrial finding that the prosecutor's comment was a fair comment on the evidence admitted at trial and finding that the facts and circumstances of the crime were at issue rather than whether petitioner lacked remorse.  (RT at 7361-62.)  On appeal the California Supreme Court rejected petitioner's position, finding the lack of notice argument to be without merit as a matter of state law and concluding that the comment was not an improper reference to petitioner's failure to testify but rather was simply a proper reference to petitioner's callous behavior after the killing based upon the evidence presented at trial.  People v. Breaux, 1 Cal. 4th 281, 312-14 (1991).

Before this court petitioner claims that the prosecutor engaged in prejudicial misconduct by arguing to the jury a fact that the prosecutor knew to be untrue.  In this regard, petitioner asserts that a police report provided to the defense by the prosecution prior to trial established that petitioner had expressed remorse for the killing.  In that report, a sheriff's deputy stated that while awaiting his arraignment on the murder charge in the medical detention facility within the Sacramento Medical Center, petitioner became upset, his face turned red and with tears in his eyes he said:

/////

/////

28

1     I'm real sorry about the girl, that she died and
2     her parents too. [five second pause] All these
      people who are here, the trouble, I'm real, real
3     sorry.

4 (Am. Pet., Ex. A.)

5    Petitioner asserts that in addition to constituting

6 misconduct, the prosecutor's actions also violated petitioner's right

7 to a fair trial because no notice was given, as required under state

8 law, of the intent to rely on lack of remorse as an aggravating

9 factor.  Petitioner also argues that reliance on lack of remorse as

10 an aggravating factor is not authorized by California law.  Finally,

11 petitioner claims that because there was no affirmative evidence of

12 his lack of remorse, the prosecutor's argument improperly penalized

13 petitioner for the exercise of his constitutional right not to

14 testify in his own defense.  See <u>Griffin v. California</u>, 380 U.S. 609

15 (1965).

16    Respondent moves for summary judgment on this claim.  In

17 doing so respondent disputes neither the actual closing argument made

18 by the prosecutor nor the police report of Deputy Clegg reflecting

19 petitioner's statement just prior to his arraignment.  Rather,

20 respondent argues that he is entitled to judgment as a matter of law

21 because: (1) the state courts' determination that the prosecutor's

22 comment related only to the evidence of events surrounding the murder

23 and was not an assertion that petitioner had never expressed remorse,

24 is a factual finding that must be deferred to; (2) the comment was

25 not improper because the prosecutor could have believed that

26 petitioner's statement in Deputy Clegg's presence was not a genuine

1 expression of remorse; (3) the argument was not an improper comment
2 on petitioner's right to remain silent; and (4) in any event, the
3 prosecutor's statement neither infected the trial with unfairness nor
4 had a substantial and injurious effect on the jury's verdict in light
5 of the evidence.

6      Petitioner also moves for summary judgment in his favor on
7 this claim.  He argues that the prosecutor's argument was knowingly
8 false in light of Deputy Clegg's report, constituted <u>Griffin</u> error
9 and was improperly made without notice.  Citing a number of studies
10 on the subject, petitioner argues that lack of remorse is the single
11 most important factor in a jury's decision to impose the penalty of
12 death over life without the possibility of parole.  Thus, he
13 concludes, given the closeness of the jury's vote on the penalty
14 verdict it cannot be said that the error had no substantial or
15 injurious effect.

16      A criminal defendant's due process rights are violated when
17 a prosecutor's misconduct renders a trial fundamentally unfair.
18 <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986).  However, such
19 misconduct does not, per se, violate a petitioner's constitutional
20 rights.  <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1191 (9th Cir. 1993)
21 (citing <u>Darden</u>, 477 U.S. at 181, and <u>Campbell v. Kincheloe</u>, 829 F.2d
22 1453, 1457 (9th Cir. 1987)).

23      Claims of prosecutorial misconduct are reviewed "'on the
24 merits, examining the entire proceedings to determine whether the
25 prosecutor's [actions] so infected the trial with unfairness as to
26 make the resulting conviction a denial of due process.'"  <u>Johnson v.</u>

1  Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted).  See

2  also Greer v. Miller, 483 U.S. 756, 765 (1987); Donnelly v.

3  DeChristoforo, 416 U.S. 637, 643 (1974); Turner v Calderon, 281 F.3d

4  851, 868 (9th Cir. 2002).  Relief on such claims is limited to cases

5  in which the petitioner can establish that prosecutorial misconduct

6  resulted in actual prejudice.  Johnson, 63 F.3d at 930 (citing Brecht

7  v. Abrahamson, 507 U.S. 619, 637-38 (1993)); see also Darden, 477

8  U.S. at 181-83; Turner, 281 F.3d at 868.  Put another way,

9  prosecutorial misconduct violates due process when it has a

10  substantial and injurious effect or influence in determining the

11  jury's verdict.  See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th

12  Cir. 1996).  Finally, it is the petitioner's burden to state facts

13  that point to a real possibility of constitutional error in this

14  regard.  See O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990).

15          1.  Lack of Notice Under State Law

16          Petitioner is not entitled to relief to the extent he

17  claims that he was not provided notice of the prosecution's intent to

18  rely on lack of remorse as an aggravating factor in violation of

19  California Penal Code § 190.3.  On direct appeal the California

20  Supreme Court rejected this contention, concluding that under § 190.3

21  a defendant is entitled to pretrial notice of evidence to be

22  presented in aggravation, not to notice of argument to be presented.

23  Breaux, 1 Cal. 4th at 313.  Of course, federal habeas relief is not

24  available for alleged error in the interpretation or application of

25  state law.  See Estelle, 502 U.S. at 67-68.

26  /////

1       2.  <u>Griffin Error</u>

2       Next is the question of whether the prosecutor's remark

3  violated <u>Griffin</u> by using language that was intended to comment on

4  petitioner's failure to testify or was of such a character that the

5  jury would naturally and necessarily take it to be such.  As noted,

6  the California Supreme Court rejected this claim on direct appeal,

7  concluding that the comment was not a clear reference to petitioner's

8  failure to testify and, when considered in the context of the

9  prosecutor's closing argument as a whole, was simply a reference to

10  his callous behavior after the killing.  <u>Breaux</u>, 1 Cal. 4th at 313.

11       The Fifth Amendment prohibits a prosecutor from commenting

12  to the jury regarding the defendant's failure to testify at trial.

13  <u>See</u> <u>Griffin</u>, 380 U.S. at 615.  This rule applies equally to both the

14  guilt phase and penalty phase of a trial.  <u>Estelle v. Smith</u>, 451 U.S.

15  454, 462-63 (1981); <u>Beardslee v. Woodford</u>, 327 F.3d 799, 825 (9th

16  Cir. 2003); <u>see</u> <u>also</u> <u>Lesko v. Lehman</u>, 925 F.3d 1527, 1544 (3d Cir.

17  1991).  A prosecutorial comment in argument runs afoul of the rule

18  "if it is manifestly intended to call attention to the defendant's

19  failure to testify, or is of such a character that the jury would

20  naturally and necessarily take it to be a comment on the failure to

21  testify."  <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir. 1987).

22  However, relief is to be granted on such a claim only "'where such

23  comment is extensive, where an inference of guilt from silence is

24  stressed to the jury as a basis for the conviction, and where there

25  is evidence that could have supported acquittal.'"  <u>Beardslee</u>, 327

26  F.3d at 825 (quoting <u>Lincoln</u>, 807 F.2d at 809).  <u>See</u> <u>also</u> <u>Jeffries</u>, 5

1  F.3d at 1192.   Conversely, relief will not be granted where the

2  prosecutorial comment is a single, isolated incident, does not stress

3  the inference of guilt from silence as a basis for the verdict and is

4  followed by a curative instruction.   <u>Lincoln</u>, 807 F.2d at 809.

5        The comment by the prosecutor in his penalty phase argument

6  upon which this claim is based was brief, isolated and not of such a

7  character that the jury would necessarily take it to be a comment on

8  the failure to testify.   Certainly, the comment did not stress

9  defendant's failure to testify as a basis for a verdict of death.

10 Under these circumstances, the prosecutor's comments do not justify

11 the granting of relief for <u>Griffin</u> error.   See <u>Beardslee</u>, 327 F.3d at

12 825.

13        3.  <u>False Allegation of a Lack of Remorse</u>

14        Finally, petitioner argues that in his penalty phase

15 argument the prosecutor stated that petitioner had never expressed

16 remorse, knowing that the statement was untrue in light of Deputy

17 Clegg's report.   This question is more difficult than those addressed

18 immediately above.   The California Supreme Court first avoided the

19 issue by finding that the Clegg report was not in the record and thus

20 not properly before the court on appeal and then addressed it by

21 suggesting that the "prosecutor's comment was clearly limited to the

22 evidence presented at trial."[12]   <u>Breaux</u>, 1 Cal. 4th at 314.

23 /////

24

25        [12]  This suggestion was supported by reference only to the
   prosecutor's subsequent explanation provided in opposing the motion
26 for a mistrial.  <u>Breaux</u>, 1 Cal. 4th at 314.

1   The undersigned does not find the comment in question to be

2 so clearly limited.  The precise words spoken were somewhat broad -

3 "you saw at no time under any circumstances through any witness, any

4 expression by the defendant of remorse for what he did."  (RT at

5 7329.)  In addition, in responding to the defense mistrial motion the

6 prosecutor argued in part that he believed that petitioner had not

7 been remorseful and instead may merely "have felt sorry for himself

8 having been caught."  (RT at 7359-60.)  On the other hand, considered

9 in the context of the entire argument, the comment was not of such a

10 specific character that the jury would necessarily have taken it to

11 be an assertion that petitioner had never expressed remorse to

12 anyone.  See United States v. Robinson, 485 U.S. 25, 33 (1988)

13 ("[P]rosecutorial comment must be examined in context. . . .");

14 Donnelly, 416 U.S. at 647 ("[A] court should not lightly infer that a

15 prosecutor intends an ambiguous remark to have its most damaging

16 meaning or that a jury, sitting through lengthy exhortation, will

17 draw that meaning from the plethora of less damaging

18 interpretations."); Williams v. Borg, 139 F.3d 737, 745 (9th Cir.

19 1998)(quoting Donnelly, 416 U.S. at 647).  In this regard, both

20 immediately prior to and after the comment in question the prosecutor

21 was addressing the manner in which petitioner carried out his crimes

22 of conviction.  (See RT at 7326-30.)  Moreover, the reference to

23 "through any witness" in the challenged comment focused somewhat on

24 the evidence adduced at trial.

25   In considering claims of prosecutorial misconduct involving

26 allegations of improper argument the court is to examine the likely

1  effect of the statements in the context in which they were made and

2  determine whether the comments so infected the trial with unfairness

3  as to make the resulting conviction a denial of due process.  <u>Turner</u>,

4  281 F.3d at 868; <u>Sandoval v. Calderon</u>, 241 F.3d 765, 778 (9th Cir.

5  2001), <u>cert</u>. <u>denied</u>, 534 U.S. 943 (2001); <u>see also</u> <u>Donnelly</u>, 416 U.S.

6  at 643; <u>Darden</u>, 477 U.S. at 181-83.

7        In this case, the challenged comment was brief, isolated

8  and somewhat vague in that it could have been taken to refer only to

9  petitioner's conduct at the time of the killing.  While lack of

10  remorse is no doubt a potentially important factor in a jury's

11  decision to impose the penalty of death, the defense had available to

12  it in pretrial discovery Deputy Clegg's report and could have

13  presented evidence at trial of petitioner's statement just prior to

14  his arraignment had counsel believed it to be strong evidence on the

15  issue of remorse.  For whatever reason, defense counsel elected not

16  to do so.  Considered in this context the undersigned concludes that

17  the prosecutor's brief remark regarding petitioner's failure to

18  express remorse for the killing did not render the penalty phase of

19  the trial fundamentally unfair.  Accordingly, respondent's motion for

20  summary judgment should be granted as to this claim.

21     **C.   Ineffective Assistance of Trial Counsel (Claims C, T &**
           **W)**
22

23        In Claim C, petitioner alleges that he was denied his

24  constitutional right to the effective assistance of counsel because

25  his trial counsel failed to: (1) introduce available and substantial

26  evidence of his remorse for the killing; (2) investigate and present

1 │ evidence regarding his use of steroids and Ritalin shortly before the

2 │ killing; (3) adequately investigate his background, history and

3 │ mental condition; and (4) consult and present testimony from

4 │ appropriate experts regarding the above.  (Am. Pet. at 54-60.)

5 │      In Claim T, petitioner alleges that his trial counsel was

6 │ ineffective in failing to: (1) undertake reasonably adequate voir

7 │ dire, and (2) adequately use the defense allotment of peremptory

8 │ challenges.  (Am. Pet. at 118-20.)

9 │      In Claim W, which incorporates the allegations of Claim C,

10 │ petitioner alleges that ineffective assistance of trial counsel

11 │ resulted in the denial of his constitutional rights in that his

12 │ lawyers failed to: (1) have appropriate diagnostic testing of

13 │ petitioner conducted; (2) consult with mental health experts

14 │ specializing in child abuse and trauma; (3) conduct an adequate

15 │ investigation into his background; and (4) discover evidence

16 │ favorable to the defense.

17 │      Below, the court will first address the legal standards

18 │ applicable to these ineffective assistance of counsel claims before

19 │ turning to the arguments advanced by the parties in support of their

20 │ cross-motions for summary judgment as to these claims.  As explained

21 │ below, in the end the undersigned concludes that summary judgment in

22 │ favor of either party on the ineffective assistance claims is

23 │ premature.

24 │     1.  <u>Strickland Standard</u>

25 │      To support a claim of ineffective assistance of counsel, a

26 │ petitioner must first show that, considering all the circumstances,

counsel's performance fell below an objective standard of reasonableness.  See Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally, competent assistance.  Id. at 690; Wiggins v. Smith, ___ U.S. ___, 123 S. Ct. 2527, 2535 (2003).  Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id. See also Williams v. Taylor, 529 U.S. 362, 391-92 (2000); Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).

In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).  However, that deference "'is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound

37

1  judgments.'" Williams v. Woodford, 306 F.3d 665, 711 (9th Cir. 2002)

2  (quoting Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir. 2001)(en

3  banc)).

4       Defense counsel has a "duty to make reasonable

5  investigations or to make a reasonable decision that makes particular

6  investigations unnecessary." Strickland, 466 U.S. at 691.  "This

7  includes a duty to . . . investigate and introduce into evidence

8  records that demonstrate factual innocence, or that raise sufficient

9  doubt on that question to undermine confidence in the verdict."

10 Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing Hart v.

11 Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)).  In this regard, it has

12 been recognized that "the adversarial process will not function

13 normally unless the defense team has done a proper investigation."

14 Siripongs v. Calderon (Siripongs II), 133 F.3d 732, 734 (9th Cir.

15 1998)(citing Kimmelman, 477 U.S. at 384).  Therefore, counsel must,

16 "at a minimum, conduct a reasonable investigation enabling him to

17 make informed decisions about how best to represent his client."

18 Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995)(quoting

19 Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994)(internal

20 citation and quotations omitted).  On the other hand, where an

21 attorney has consciously decided not to conduct further investigation

22 because of reasonable tactical evaluations, his or her performance is

23 not constitutionally deficient.  See Siripongs II, 133 F.3d at 734;

24 see also Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998);

25 Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not

26 to investigate thus 'must be directly assessed for reasonableness in

all the circumstances.'"  Wiggins, 123 S. Ct. at 2541 (quoting

Strickland, 466 U.S. at 691).  See also Kimmelman, 477 U.S. at 385

(counsel "neither investigated, nor made a reasonable decision not to

investigate"); Babbitt, 151 F.3d at 1173-74.  A reviewing court must

"examine the reasonableness of counsel's conduct 'as of the time of

counsel's conduct.'"  United States v. Chambers, 918 F.2d 1455, 1461

(9th Cir. 1990) (quoting Strickland, 466 U.S. at 690).  Furthermore,

"'ineffective assistance claims based on a duty to investigate must

be considered in light of the strength of the government's case.'"

Bragg, 242 F.3d at 1088 (quoting Eggleston v. United States, 798 F.2d

374, 376 (9th Cir. 1986)).  See also Hayes v. Woodford, 301 F.3d

1054, 1070 (9th Cir. 2002).

In the context of a penalty phase trial, counsel has been

found ineffective when he or she "fails to conduct more than a

cursory investigation of a defendant's background and makes no

attempt to humanize him before the jury."  Babbitt, 151 F.3d at 1176

(citing Siripongs v. Calderon (Siripongs I), 35 F.3d 1308, 1316 (9th

Cir. 1994))).[13]  "To perform effectively in the penalty phase of a

capital case, counsel must conduct sufficient investigation and

engage in sufficient preparation to be able to 'present[] and

explain[] the significance of all the available [mitigating]

---

[13]  Of course, "the duty to investigate and prepare a defense is
not limitless: it does not necessarily require that every conceivable
witness be interviewed."  Hendricks, 70 F.3d at 1040 (citation and
quotation omitted).  When the record clearly shows that the lawyer
was well informed of the relevant facts and circumstances and the
defendant fails to state what additional information would be gained
by the discovery he now claims was necessary, an ineffective
assistance claim fails.  Eggleston, 798 F.2d at 376.

1   evidence.'"   Mayfield, 270 F.3d at 927 (quoting Williams, 529 U.S. at

2   393, 399).

3          The court will now turn to the cross-motions with respect

4   to petitioner's specific claims of ineffective assistance of counsel.

5              2.   Arguments of the Parties

6          Respondent prefaces his argument by stating that if his

7   motion for summary judgment is denied as to this claim, an

8   evidentiary hearing is necessary to resolve the truth of petitioner's

9   allegations.   Respondent then argues that petitioner's trial counsel

10  was not ineffective in failing to introduce available evidence of

11  petitioner's expression of remorse for the killing to Deputy Clegg,

12  family members and a Catholic priest since those expressions of

13  remorse would ring hollow in light of the callousness of petitioner's

14  conduct and would have opened the door to comparisons between

15  petitioner's expression of remorse and his actual conduct.

16  Respondent also argues that counsel did not render deficient

17  assistance in failing to present evidence of petitioner's use of

18  steroids and Ritalin prior to the killing because there is no

19  evidence with respect to the amount of those substances petitioner

20  ingested and, in any event, counsel fully explored petitioner's use

21  of cocaine and heroin and the effects of that drug usage at trial.

22  Likewise, respondent contends that petitioner's counsel did not

23  render ineffective assistance in the jury selection process but

24  rather made reasonable tactical decisions both in questioning the

25  prospective jurors and in exercising the defense challenges.

26  Finally, respondent contends that petitioner has failed to establish

1    that the alleged inadequacy of performance on the part of counsel

2    prejudiced him in any way.[14]

3            In opposing respondent's motion for summary judgment and

4    arguing that judgment should be entered in his favor petitioner first

5    argues that there is strong evidence that counsel provided

6    ineffective assistance in failing to introduce available evidence of

7    petitioner's expressions of remorse for the killing.  In this regard,

8    petitioner points to the declaration of attorney James S. Thomson

9    stating the expert opinion that defense counsel's performance was

10   deficient under prevailing professional norms in failing to introduce

11   Deputy Clegg's testimony into evidence on the critical issue of

12   remorse. (Opp'n & Cross-Mot. for Summ. J., Ex. D.)  Petitioner also

13   relies upon the declarations of his trial counsel, both of whom state

14   that they do not recall ever considering calling Deputy Clegg to

15   testify, that they had no tactical reason for failing to call him as

16   a witness since they knew a lack a remorse would weigh heavily with

17   the jurors and that if they were to make the decision today they

18   would call Deputy Clegg as a penalty phase witness as well as the

19   other available witnesses on the issue of petitioner's remorse.

20   (Opp'n & Cross-Mot. for Summ. J, Exs. E & F.)  Petitioner contends

21   that trial counsel's deficiencies in this regard obviously undermine

22   /////

23

_____

24      [14]   Respondent also asserts that petitioner's contention that
     the California Supreme Court's refusal to authorize funds for habeas
25   investigation prevented him from investigating and fully pursuing
     this claim and in violation of his constitutional rights fails to
26   state a cognizable claim.

1  confidence in the death penalty verdict in light of the importance of

2  evidence of remorse and the closeness of the jury's penalty decision.

3         Petitioner also contends that his trial counsel was

4  ineffective in failing to discover available evidence regarding his

5  use of steroids and Ritalin and therefore failed to prepare the

6  defense experts to render opinions regarding the combined effects of

7  these drugs along with cocaine.  In this regard, petitioner points

8  to: (1) the declarations of witnesses who could have testified to

9  petitioner's steroid use; (2) the declarations of trial counsel

10  stating that they were aware of petitioner's steroid use and inquired

11  of experts regarding that use but did not obtain an opinion regarding

12  the effects of steroids upon one's mental state either alone or in

13  conjunction with the other drugs and that although they became aware

14  during trial that petitioner also used Ritalin prior to the killing

15  they did not seek or obtain an expert opinion regarding the effect

16  the Ritalin might have had on petitioner; (3) the declaration of the

17  Strickland expert, attorney Thomson, stating that reasonably

18  competent counsel acting under prevailing professional norms would

19  have presented expert testimony regarding the effect that steroids

20  and Ritalin taken before the killings had upon petitioner; and (4)

21  the declarations of Ronald Siegel, Ph.D., a psychopharmacologist,

22  stating that experts regarding the effect of various steroids and

23  Ritalin on the mental state of petitioner were available at the time

24  of petitioner's trial and his preliminary opinion that the combined

25  use of steroids, heroin and cocaine impaired petitioner's cognitive

26  abilities to the point where his thinking was confused or suspended

1  resulting in his commission of this murder.  (Opp'n & Cross-Mot. for

2  Summ. J., Exs. AAA, PP, QQ, RR, YY, D, E, F & G.)

3       Petitioner also argues in summary fashion that his trial

4  counsel rendered ineffective assistance by failing to conduct an

5  adequate voir dire of the prospective jurors and in failing to use

6  still available peremptory challenges to excuse two jurors that the

7  defense had unsuccessfully challenged for cause.  (Opp'n & Cross-Mot.

8  for Summ. J. at 151-56.)

9       Finally, petitioner contends that counsel was deficient in

10  failing to investigate and present evidence regarding the sexual

11  abuse suffered by petitioner as a child and the correlation between

12  that sexual abuse and his subsequent use of drugs and in failing to

13  prepare and present a proper social history of petitioner that would

14  have revealed evidence of these mitigating factors.

15       In reply respondent focuses on the declarations of

16  petitioner's trial counsel, characterizing them as "simply not

17  believable" in their averments that they overlooked presenting

18  evidence of petitioner's remorse and had no tactical reason for

19  failing to do so.  With respect to petitioner's showing that trial

20  counsel provided inadequate assistance in failing to present evidence

21  of petitioner's use of steroids and Ritalin prior to the killing and

22  expert testimony regarding the effects of that usage, respondent

23  tellingly contends that the matters stated in the declarations

24  submitted by petitioner are the subject of dispute.  Respondent also

25  argues that the decision not to present this evidence but to instead

26  focus on petitioner's heroin and cocaine use was a tactical decision

1   by counsel.  Finally, respondent argues that any claim that

2   petitioner was abused sexually as a child is speculative and that, in

3   any event, evidence of such abuse as well as preparation of a

4   complete social history would not have had any significant effect on

5   the jury verdict.

6       In reply, petitioner argues that summary judgment must be

7   granted in his favor on these ineffective assistance of counsel

8   claims due to respondent's failure to present evidence in opposition

9   to his cross-motion for summary judgment.  Specifically, petitioner

10  contends that no disputed issue of material fact is raised merely by

11  respondent stating that trial counsel's declarations are not

12  believable or that the matters set forth in petitioner's declarations

13  are the subject of dispute.  He also notes that the assertion that

14  petitioner was sexually abused as a child is not speculative but

15  rather is supported by a preliminary showing in the form of the

16  declaration from Dr. June M. Clausen, Ph.D.  (<u>See</u> Opp'n & Cross-Mot.

17  for Summ. J., Ex. AAA.)

18          3.  <u>Analysis</u>

19      Petitioner's ineffective assistance of counsel claims are

20  not susceptible to resolution on motion for summary judgment.  By way

21  of the declarations of his prior counsel, a <u>Strickland</u> expert and

22  medical and psychiatric experts, petitioner has presented evidence in

23  support of his claim that his trial counsel rendered ineffective

24  assistance in the investigation and presentation of his defense and

25  that but for counsel's unprofessional errors there is a reasonable

26  probability that the result of the proceeding would certainly have

                                    44

1  been different.  While some of the alleged errors of counsel may have

2  had an impact upon the guilt phase verdict, if established and

3  unexplained as tactical decisions those errors would certainly appear

4  to provide potential doubt with respect to the reliability of the

5  jury's penalty phase verdict.[15]  See Wiggins, 123 S. Ct. at 2541-44

6  (concluding that trial counsel's inadequate investigation into

7  petitioner's background was unreasonable and that given the nature

8  and extent of the abuse suffered by petitioner there was a reasonable

9  probability that the jury would have returned a different sentence

10  had it been confronted with mitigating evidence); Williams, 529 U.S.

11  at 395-99 (granting habeas relief due to counsel's failure to present

12  mitigation evidence during the penalty phase of petitioner's trial

13  that "might well have influenced" the jury's determination); Douglas

14  v. Woodford, 316 F.3d 1079, 1087-91 (9th Cir.) (holding that

15  counsel's penalty phase investigation into petitioner's childhood,

16  alcoholism, military career and exposure to toxic solvents was

17  inadequate and that if counsel had conducted a proper investigation

18  there was a reasonable possibility that the additional evidence would

19  have altered the outcome of the jury's penalty phase verdict), cert.

20  denied, ___ U.S. ___, 124 S. Ct. 49 (2003); Caro v. Woodford, 280

21  F.3d 1247, 1255-58 (9th Cir.) (affirming the granting of habeas

22  relief upon finding that counsel's failure to fully investigate and

23  present mitigating evidence regarding the effects of exposure to

24  pesticides and toxic chemicals on petitioner's brain and the effects

25

26  ───────────────
    [15]   The difficulty that the jury had in reaching its penalty
    phase verdict has been thoroughly discussed in Section A above.

45

1   of physical, emotional and psychological abuse suffered as a child

2   was a constitutionally deficient performance by counsel and rendered

3   the results of the penalty phase trial unreliable), cert. denied, 536

4   U.S. 951 (2002); Silva v. Woodford, 279 F.3d 825, 843 (9th Cir.)

5   (discussing cases "illustrative but not exhaustive of the breadth of

6   a criminal defendant's constitutional protection against his

7   attorney's failure to investigate mitigating evidence when defending

8   his client against a capital sentence"), cert. denied, 537 U.S. 942

9   (2002); Mayfield, 270 F.3d at 928-933 (reversing denial of habeas

10  relief finding that counsel was deficient in failing to present

11  mitigating evidence and finding prejudice "[e]ven in the face of []

12  strong aggravating evidence" since the court could not "conclude with

13  confidence that the jury would unanimously have sentenced

14  [petitioner] to death if [counsel] had presented and explained all of

15  the available mitigating evidence"); Ainsworth v. Woodford, 268 F.3d

16  868, 873-78 (9th Cir. 2001) (inadequate investigation and failure by

17  counsel to introduce available evidence of defendant's troubled

18  childhood, suicidal father and drug and alcohol abuse was ineffective

19  assistance that cast doubt on the penalty phase verdict).  Here,

20  petitioner's initial showing precludes the granting of summary

21  judgment on these claims in favor of respondent.

22          On the other hand, petitioner's initial showing is not

23  sufficient to establish his entitlement to judgment as matter of law.

24  For instance, left unanswered are questions as to why petitioner's

25  trial counsel chose not to conduct further investigation into the

26  effect of their client's steroid use and its effects, why they

46

elected not to present all available evidence of petitioner's remorse[16] and why they elected not to fully investigate and present evidence of petitioner's social history, including sexual abuse suffered as a child.[17] Thus, petitioner has not met the burden imposed upon him under Rule 56(c) of showing that he is entitled to judgment as a matter of law on his ineffective assistance of counsel claims. See Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (moving party who bears the burden of proof must make a showing in support of summary judgment "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party").

/////

/////

/////

/////

/////

/////

/////

---

[16] Although counsel have declared that they never considered calling Detective Clegg as a witness and that there was no tactical reason involved, neither counsel address why they never considered presenting such evidence nor do they address in their declarations their failure to present the other available evidence of remorse identified by petitioner. (Opp'n & Cross-Mot. for Summ. J., Exs. E & F.)

[17] In this regard, it has been recognized that even "'if a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial.'" Douglas, 316 F.3d at 1086 (quoting Silva, 279 F.3d at 847).

Resolution of these claims is, therefore, likely to require an evidentiary hearing.[18]   In this regard, under the applicable pre-AEDPA law "'[a] habeas petitioner is entitled to an evidentiary hearing as a matter of right on a claim where the facts are disputed if two conditions are met: (1) the petitioner's allegations would, if proved, entitle him to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts.'"  Silva, 279 F.3d at 853 (quoting Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir. 1997)).   Under these circumstances a petitioner's motion for evidentiary hearing must be granted "'unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (quoting 28 U.S.C. § 2255).  See also Phillips v. Woodford, 267 F.3d 966, 973 (9th Cir. 2001) ("In these circumstances, a petition may be dismissed without a hearing only when it consists solely of conclusory, unsworn statements unsupported by any proof or offer thereof.").   Thus, where a claim of ineffective assistance of counsel has been made it is generally likely that a hearing will be required on the issue of prejudice.  Babbitt, 151

_____

[18]   The same is true with respect to petitioner's claim that counsel provided inadequate assistance by failing to conduct meaningful voir dire and by failing to properly exercise the defense peremptory challenges.  Petitioner may have difficulty in establishing that his counsel's performance in this regard was deficient, rather than a series of reasonable tactical decisions, and in proving prejudice.  Nonetheless, trial counsel's thinking has not been explored and ultimately the question of whether counsel was ineffective will turn in large part on the determination of petitioner's claims of juror bias and prejudice in Claim T.  See Fields, 309 F.3d at 1107-08.

F.3d at 1177; <u>Siripongs I</u>, 35 F.3d at 1314; <u>see also</u> <u>Hoffman v.</u>
<u>Arave</u>, 236 F.3d 523, 536 (9th Cir. 2001) (remanding for evidentiary
hearing on ineffective assistance of counsel claims because without
the benefit of an evidentiary hearing "it is impossible" to evaluate
the strength of the defense at trial and sentencing, as required to
make the prejudice determination).  Moreover, it has been recognized
that an evidentiary hearing may be "extremely helpful" in reviewing
aspects of a capital trial involving strategic decisions made by
defense counsel.  <u>Siripongs II</u>, 133 F.3d at 737.  Because reviewing
courts require a sufficient record to rule on ineffective assistance
of counsel claims such as this, a full hearing is likely to be
required to determine what happened, why it happened and the effect
thereof.  <u>See</u> <u>Guy v. Cockrell</u>, 343 F.3d 348, 354-55 (5th Cir. 2003)
(reversing grant of summary judgment on ineffective assistance of
counsel claims in light of existence of unresolved factual issues).

For these reasons the court will recommend that the cross-
motions for summary judgment on claims C, T (to the extent it
presents an ineffective assistance of counsel claim) and W be
denied.[19]

**D.   Juror Misconduct During Penalty Phase Deliberations**

In Claim D, petitioner asserts that during their penalty
phase deliberations, jurors considered information that was

---

[19]   The court has been compelled to discuss the initial showing
presented by petitioner in support of these claims in order to
address the cross-motions for summary judgment.  Of course, no
opinion regarding the appropriate final resolution of the claims
following a full hearing is intended to be expressed by this
discussion.

inaccurate, irrelevant, unreliable, and prejudicial, in violation of

his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  (Am. Pet.

at 61.)  Specifically, petitioner argues that the jurors should not

have considered: (1) that if petitioner was sentenced to life without

the possibility of parole, he might still be released from prison and

commit another crime; and (2) petitioner's demeanor during the trial,

which some jurors believed showed a lack of remorse and contempt

toward some witnesses.  (<u>Id.</u> at 61-65.)

Petitioner relies upon several juror declarations submitted

as exhibits to his amended petition in support this claim.  In these

declarations several of the jurors state that during the penalty

phase deliberations jurors discussed whether life without parole

really meant no possibility of parole and whether, despite what the

trial judge stated in his instructions, there was a possibility that

if petitioner was not sentenced to death, he might someday be

released.  (Am. Pet., Ex. D (Schroeder Decl.) ¶ 3; Ex. B (Visscher

Decl.) ¶ 3; Ex. E (Bruley Decl.) ¶ 2; and Ex. C (McEnerney Decl.) ¶

4.)  In those same declarations jurors Schroeder, McEnerney, Bruley,

and Visscher state that during penalty phase deliberations some

jurors discussed that petitioner sat expressionless through much of

the trial, did not appear remorseful for what he had done, did not

seem to care and showed contempt for certain of the witnesses during

the trial.   ( Schroeder Decl. ¶ 2; McEnerney Decl. ¶ 2; Bruley

Decl., ¶ 3; and Visscher Decl. ¶ 2.)

In his motion for summary judgment, respondent argues that

the juror declarations submitted in support of this claim by

petitioner, are inadmissible under Rule 606(b) of the Federal Rules

of Evidence.   (Alt. Mot. for Summ. J. at 80-84.)     Respondent

contends that the declarations are inadmissible because they describe

discussions during the jury's deliberation, jurors' feelings and

opinions, and speculation about the effect of the discussions on the

verdict.   (Id.)

Petitioner argues that Rule 606(b) provides that such

evidence may be used to show that a juror considered extraneous

information, which is the situation here.   (Opp'n & Cross-Mot. for

Summ. J. at 96-97.)   Petitioner argues that if the declarations

contain some inadmissible matter, only those portions should be

deemed inadmissible.   (Id. at 98-99.)   Petitioner also argues that

the admissibility of juror evidence should be governed by state law,

rather than Rule 660(b), because of the state's interest in fair and

accurate verdicts by its juries.   (Id. at 103-04.)

Petitioner's position on this point is a policy argument

that must be rejected.   The Federal Rules of Evidence apply to

federal habeas proceedings.[20]  Fed. R. Evid. 1101(e); see also

Bibbins v. Dalsheim, 21 F.3d 13, 16-17 (2d Cir. 1994) (applying Fed.

R. Evid. 606(b) rather than state law in determining whether evidence

was admissible to impeach a state court verdict); Silagy v. Peters,

905 F.2d 986, 1008-09 (7th Cir. 1990) (same); Stockton v.

---

[20]   "In the following proceedings these rules apply to the
extent that matters of evidence are not provided for in the statutes
which govern procedure therein . . . habeas corpus under sections
2241 - 2254 of title 28, United States Code . . . ."   Fed. R. Evid.
1101(e).

_Commonwealth of Virginia_, 852 F.2d 740, 743-44 (4th Cir. 1988)

(same); _Bloom v. Vasquez_, 840 F. Supp. 1362, 1377 n.23 (C.D. Cal.

1993)(holding that pursuant to Federal Rule of Evidence 1101(e), the

Federal Rules of Evidence apply to federal habeas cases), _rev'd on_

_other grounds by_ _Bloom v. Calderon_, 132 F.3d 1267 (9th Cir. 1997).

Rule 606(b) of the Federal Rules of Evidence provides:

> **Inquiry into validity of verdict or indictment.**
> Upon an inquiry into the validity of a verdict or
> indictment, a juror may not testify as to any
> matter or statement occurring during the course
> of the jury's deliberations or to the effect of
> anything upon that or any other juror's mind or
> emotions as influencing the juror to assent to or
> dissent from the verdict or indictment or
> concerning the juror's mental processes in
> connection therewith, except that juror may
> testify on the questions whether extraneous
> prejudicial information was improperly brought to
> the jury's attention or whether any outside
> influence was improperly brought to bear upon any
> juror.  Nor may a juror's affidavit or evidence
> of any statement by the juror concerning
> a matter about which the juror would be precluded
> from testifying be received for these purposes.

Fed. R. Evid. 606(b).

The admissibility of a juror's testimony is a threshold

question the court must address before reaching the merits of

petitioner's jury misconduct claim.  See _United States v. Maree_, 934

F.2d 196, 201 (9th Cir. 1991).  As discussed in _Sassounian v. Roe_,

230 F.3d 1097 (9th Cir. 2000), juror testimony may be considered to

demonstrate that extraneous evidence or information was introduced

during the jury's deliberation, but not to show the subjective impact

of that extraneous information:

/////

> A long line of precedent distinguishes between juror testimony about the consideration of extrinsic evidence, which may be considered by a reviewing court, and juror testimony about the subjective effect of evidence on the particular juror, which may not. . . . Therefore, although we may consider testimony concerning whether the improper evidence was considered, we may not consider the jurors' testimony about the subjective impact of the improperly admitted evidence.

Id. at 1108-09.  See also Tanner v. United States, 483 U.S. 107, 127 (1987) ("[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry.").

Generally, information acquired from a third party or from outside reference during deliberation is considered extrinsic and evidence that the jury received such information is admissible under Rule 606(b) to impeach the verdict.  See United States v. Navarro-Garcia, 926 F.2d 818, 821 (9th Cir. 1991) ("Evidence not presented at trial, acquired through out-of-court experiments or otherwise, is deemed 'extrinsic.'"); Marino v. Vasquez, 812 F.2d 499, 505-06 (9th Cir. 1987) (finding admissible as an "outside influence" information that a juror consulted a dictionary to define the word "malice"); Gibson v. Clanon, 633 F.2d 851, 855 (9th Cir. 1980).

Jurors may rely on their personal experiences in deliberating and in doing so are not exposed to extrinsic evidence. See Price v. Kramer, 200 F.3d 1237, 1255 (9th Cir.), cert. denied, 531 U.S. 816 (2000) (finding that there was no improper extraneous evidence when, during deliberation, two jurors shared past personal experiences which were of a general nature); Navarro-Garcia, 926 F.2d at 821; Casey v. United States, 20 F.2d 752, 754 (9th Cir. 1927).

1  The shared personal experiences of jurors become extraneous
2  information if the "juror has personal knowledge regarding the
3  parties or the issues involved in the litigation that might affect
4  the verdict." Navarro-Garcia, 926 F.2d at 821.  Such information may
5  also be deemed extraneous "if the jury considers a juror's past
6  personal experiences in the absence of any record evidence on a given
7  fact, as personal experiences are relevant only for purposes of
8  interpreting the record evidence." Id. at 822.

9        Here, the jurors' discussions regarding the meaning and
10 consequences of a life sentence without the possibility of parole did
11 not involve extraneous information.  None of the declarations
12 submitted by petitioner indicate that the jurors received information
13 regarding the meaning of a sentence of life without the possibility
14 of parole from a non-juror.  Moreover, identical claims have been
15 found to involve only intrinsic jury processes which are not subject
16 to collateral attack. Belmontes, 350 F.3d at 891; Bloom, 840 F.
17 Supp. at 1377-78; see also Fullwood v. Lee, 290 F.3d 663, 684 (4th
18 Cir. 2002), cert. denied, 537 U.S. 1120 (2003) (holding that the
19 jury's discussion about the defendant's eligibility for parole "does
20 not qualify as an extraneous matter since virtually every juror will
21 have preconceived notions about the legal process which the defendant
22 can uncover and examine during jury selection"); Silagy, 905 F.2d at
23 1008-09.

24        As to petitioner's other sub-claim involving the jury's
25 consideration of his demeanor, respondent argues that there is no
26 United States Supreme Court precedent supporting this claim and that

1    the defendant's demeanor is one of several factors the jury may

2    consider in determining the appropriate penalty.[21]  (Alt. Mot. for

3    Summ. J. at 88-89.)  In his opposition and cross-motion, petitioner

4    acknowledges that the Ninth Circuit has indicated that a capital

5    sentencing authority may consider a defendant's in-court demeanor.

6    See Williams v. Calderon, 52 F.3d 1465, 1483 (9th Cir. 1995).

7    However,  petitioner argues that the court's observation to this

8    effect in Williams is dictum.  Nonetheless, in light of the decision

9    in Williams petitioner concedes that further argument to this court

10   on the point would be futile.  (Opp'n & Cross-Mot. for Summ. J. at

11   120.)

12        The concession is appropriate.  A defendant's courtroom

13   demeanor is evidence that a jury may properly consider.  Williams, 52

14   F.3d at 1483; United States v. Schuler, 813 F.2d 978, 981 n.3 (9th

15   Cir. 1987); see also Bates v. Lee, 308 F.3d 411, 421 (4th Cir. 2002)

16   (defendant's demeanor at trial was before the jury at all times and

17   it was not improper for the prosecutor to comment on it in closing

18   argument), cert. denied, ___ U.S. ___, 123 S. Ct. 2223 (2003).

19        Accordingly, because with respect to the matters raised in

20   this claim the jury did not improperly consider extraneous evidence

21   or information in their penalty phase deliberations, respondent's

22   motion for summary judgment on this claim should be granted and

23   petitioner's cross-motion should be denied.

24   _____

25        [21]  Respondent appears to raise an exhaustion argument with
     respect to this sub-claim in a footnote.  (See Alt. Mot. for Summ. J.
     at 88 n.43.)  Because respondent has not fully briefed this argument,
26   the court will not address it.

**E.   Jury Instruction Re Mitigation Evidence**

In this claim petitioner alleges that the trial court erroneously rejected his request that two specific jury instructions be given with respect to the consideration of evidence mitigating against a death sentence.  (Am Pet. at 65.)  Specifically, petitioner alleges that the following two requested instructions should have been given:

> An individual juror may consider something as a mitigating factor if any reasonable evidence supports the existence of this mitigating factor and regardless of whether all twelve jurors find the existence of reasonable evidence of this mitigating factor.

> * * *

> Each mitigating factor is important because any single mitigating factor may, standing alone, support a decision that death is not the appropriate penalty.

(Id. (citing CT at 1498, 1501.)  Petitioner claims that in rejecting the proposed instructions the trial court acted in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

Respondent moves for summary judgment in his favor on this jury instruction claim.  Respondent argues that because the jury instructions given in petitioner's case did nothing to limit the consideration of mitigating evidence, petitioner has failed to allege a cognizable claim of federal constitutional error.  According to respondent, the instructions given were adequate to perform the constitutional function of guiding the jury's direction in sentencing and were in compliance with United States Supreme Court precedent.

/////

1  (Alt. Mot. for Summ. J. at 90-94 (citing <u>Buchanan v. Angelone</u>, 522

2  U.S. 269 (1998); <u>Boyde v. California</u>, 494 U.S. 370 (1990)).)

3        Petitioner opposes respondent's motion and moves for

4  summary judgment in his own favor on this claim.  In so moving,

5  petitioner argues that there is a reasonable likelihood that the

6  jurors understood the instructions as given to preclude consideration

7  of relevant mitigating evidence.  In this regard, petitioner argues

8  that because the first requested instruction set out above was

9  rejected and the instructions as given repeatedly referred to

10  "mitigating factors" in the plural, it is reasonably likely that the

11  jury understood the instructions as precluding the use of a single

12  mitigating factor to support a sentence of life without the

13  possibility of parole.  In addition, petitioner argues that because

14  the second requested instruction was rejected and the instructions as

15  given referred to the jury with the collective "you," it is

16  reasonably likely that the jury understood the instructions as

17  precluding an individual juror from considering an item as mitigating

18  unless the jurors were unanimous on the point.  Finally, petitioner

19  contends that the Supreme Court's decisions in <u>Buchanan</u> and <u>Boyde</u> did

20  not involve proposed instructions similar to those presented by the

21  defense in his case and that, in any event, the legal principles

22  announced in those decisions support the granting of habeas relief

23  here.

24        In general, a challenge to jury instructions does not state

25  a federal constitutional claim.  See <u>Middleton v. Cupp</u>, 768 F.2d

26  1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119

1   (1982)); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983).

2   In order to warrant federal habeas relief, a challenged jury

3   instruction "cannot be merely 'undesirable, erroneous, or even

4   "universally condemned,"' but must violate some due process right

5   guaranteed by the fourteenth amendment." <u>Prantil v. California</u>, 843

6   F.2d 314, 317 (9th Cir. 1988) (quoting <u>Cupp v. Naughten</u>, 414 U.S.

7   141, 146 (1973)).  To prevail on such a claim petitioner must

8   demonstrate "that an erroneous instruction 'so infected the entire

9   trial that the resulting conviction violates due process.'" <u>Prantil</u>,

10  843 F.2d at 317 (quoting <u>Darnell v. Swinney</u>, 823 F.2d 299, 301 (9th

11  Cir. 1987)).  In making its determination, this court must evaluate

12  the challenged jury instructions "'in the context of the overall

13  charge to the jury as a component of the entire trial process.'" <u>Id.</u>

14  (quoting <u>Bashor v. Risley</u>, 730 F.2d 1228, 1239 (9th Cir. 1984)).

15  Where the challenge is to a refusal or failure to give an

16  instruction, the petitioner's burden is "especially heavy," because

17  "[a]n omission, or an incomplete instruction, is less likely to be

18  prejudicial than a misstatement of the law." <u>Henderson v. Kibbe</u>, 431

19  U.S. 145, 155 (1977).  <u>See</u> <u>also</u> <u>Villafuerte v. Stewart</u>, 111 F.3d 616,

20  624 (9th Cir. 1997).

21        The Eighth Amendment requires adherence to two basic steps

22  in the capital decisionmaking process: an "eligibility" decision and

23  a "selection" decision.  Petitioner's claim involves the latter.  In

24  this regard, the Constitution requires that the jury in a capital

25  case "be able to 'consider and give effect to [a defendant's

26  mitigating] evidence in imposing sentence.'" <u>Penry v. Johnson (Penry</u>

58

1  (II), 532 U.S. 782, 797 (2001) (quoting Penry v. Lynaugh (Penry I),

2  492 U.S. 302, 319 (1989)).  Thus, the jury is to consider "as a

3  mitigating factor, any aspect of [the] defendant's character or

4  record and any of the circumstances of the offense that the defendant

5  proffers as a basis for a sentence less than death."  Lockett v.

6  Ohio, 438 U.S. 586, 604 (1978) (emphasis in original).  See also

7  Penry II, 532 U.S. at 797; Belmontes, 350 F.3d at 898.  The Supreme

8  Court has explained the constitutional underpinnings of this

9  requirement as follows:

10          For it is only when the jury is given a "vehicle
            for expressing its 'reasoned moral response' to
11          that evidence in rendering its sentencing
            decision," Penry I, 492 U.S. at 328, that we can
12          be sure that the jury "has treated the defendant
            as a 'uniquely individual human bein[g]' and has
13          made a reliable determination that death is the
            appropriate sentence," id., at 319 (quoting
14          Woodson v. North Carolina, 428 U.S. 280, 304, 305
            (1976)).
15

16  Penry II, 532 U.S. at 797 (parallel citations omitted).  See also

17  Blystone v. Pennsylvania, 494, U.S. 299, 307-08 (1990).

18          Accordingly, a trial judge's instructions are to

19  communicate to the jury "that the sentencer may not be precluded from

20  considering, and may not refuse to consider, any constitutionally

21  relevant mitigating evidence."  Buchanan v. Angelone, 522 U.S. 269,

22  276 (1998) (citing Penry I, 492 U.S. at 317-18; Eddings v. Oklahoma,

23  455 U.S. 104, 113-14 (1982); Lockett, 438 U.S. at 604); Belmontes,

24  350 F.3d at 898.  In this same vein, the Supreme Court has struck

25  down state procedures that limited any given juror's consideration of

26  mitigating circumstances in capital sentencing to such evidence that

the entire jury had found relevant.  <u>McKoy v. North Carolina</u>, 494

U.S. 433, 463 (1990) ("Such a scheme, under which . . . a single

juror's finding regarding the existence of mitigation must control,

is asserted to be demanded by 'the principle established in

[<u>Lockett</u>], that a sentencer may not be precluded from giving effect

to all mitigating evidence.'"); <u>Mills v. Maryland</u>, 486 U.S. 367

(1988).

Finally, the standard to be applied in reviewing a claim

that penalty phase jury instructions ran afoul of these

constitutional requirements is "'whether there is a reasonable

likelihood that the jury has applied the challenged instruction in a

way that prevents the consideration of constitutionally relevant

evidence.'"  <u>Buchanan</u>, 522 U.S. at 276 (quoting <u>Boyde</u>, 494 U.S. at

380).  <u>See also</u> <u>Belmontes</u>, 350 F.3d at 900.  In the face of such a

challenge, the jury's penalty decision "must stand 'if there is *only*

*a possibility* of such an inhibition'" <u>Belmontes</u>, 350 F.3d at 905

(quoting <u>Boyde</u>, 494 U.S. at 380).[22]

At the conclusion of the penalty phase of petitioner's

trial the jury was given a number of instructions to guide them in

their deliberations with respect to the consideration of mitigating

factors and the appropriate penalty. In this regard, the jury was

instructed that:

_____

[22]   The Constitution does not require that a specific
instruction on mitigating evidence be given as long as the
instructions given do not preclude the capital jury from considering
mitigating evidence.  <u>Buchanan</u>, 522 U.S. at 276-77; <u>see also</u> <u>Weeks v.
Angelone</u>, 528 U.S. 225, 232 (2000).

(1) "the law does not dictate which of the two choices you must choose [death or life without the possibility of parole]; that choice is solely up to you" (CT at 1525; RT at 7391);

(2) they shall consider as "a mitigating factor" any mental or emotional impairments suffered by the defendant as a result of alcohol and drug abuse or from psychological and sexual abuse or from his family background (CT at 1527; RT at 7392);

(3) "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial may be considered as a mitigating factor" (CT at 1527; RT at 7392-93);

(4) "You may consider pity, sympathy or mercy for David Anthony Breaux" (CT at 1528; RT at 7393);

(5) "Even if you conclude that the aggravating factors outweigh the mitigating factors, you are not required to impose death but may in your discretion return a verdict of life without possibility of parole" (CT at 1528; RT at 7393);

(6) they could consider any lingering doubt of Mr. Breaux's guilt or the truth of the special circumstance as a mitigating factor (CT 1529; RT 7393-94);

(7) if they concluded the aggravating factors outweighed the mitigating factors they "may" impose a sentence of death but if they determined the mitigating factors outweighed the aggravating factors they "shall" impose the sentence of life without possibility of parole (CT at 1530; RT at 7395);

(8) if they were not convinced beyond a reasonable doubt that aggravating factors outweighed the mitigating factors they must choose life imprisonment without the possibility of parole and if they had a reasonable doubt as to the appropriate punishment they likewise were required to choose life without the possibility of parole (CT at 1531; RT at 7395);

61

(9) their consideration of aggravating factors
was limited to those listed by the court but a
"mitigating factor" was any "consideration which
does not necessarily constitute a justification
or excuse of the offense in question, but which
you may view as extenuating or reducing the
degree of Mr. Breaux's culpability" (CT at 1533-
34; RT at 7396-97);

(10) the weighing of mitigating and aggravating
factors is not a mechanical counting of factors
but rather the jurors were "free to assign
whatever moral or sympathetic value you deem
appropriate to each and all of the various
factors you are permitted to consider" (CT at
1537; RT at 7398);

(11) the parties were "entitled to the individual
opinion of each juror," "[e]ach of you must
decide the case for yourself" and "should not be
influenced to decide any question in a particular
way because a majority of the jurors, or any one
of them, favor such a decision" (CT at 1540; RT
at 7400) and

(12) their verdict must be unanimous (CT at 1544-
45; RT at 7403).

The jury was provided with three verdict forms from which

to choose.  The first reflected a finding that aggravating factors

did not outweigh mitigating factors, resulting in a punishment of

life imprisonment without the possibility of parole.  The second

reflected a finding that aggravating factors outweighed mitigating

factors but nonetheless choosing a punishment of life imprisonment

without the possibility of parole.  The third reflected a finding

that aggravating factors outweighed mitigating factors and choosing

the punishment of death.  (CT at 1545; RT at 7404.)

The two proposed penalty phase jury instructions upon which

petitioner bases this claim were objected to by the prosecution and

rejected by the trial court because they were found to be confusing

1  and to address matters adequately covered in the instructions as

2  given.  (RT at 7204-05, 7214-15.)  The court concludes that no

3  constitutional error was committed in the rejection of the two

4  proposed defense instructions.

5         Considering the penalty phase instructions as a whole,

6  there is not a reasonable likelihood that petitioner's jury applied

7  those instructions in a manner that prevented consideration of any

8  mitigating factor.  See Buchanan, 522 U.S. at 276; Boyde, 494 U.S. at

9  380); Belmontes, 350 F.3d at 904-05.  In this regard, the court finds

10  unpersuasive petitioner's argument that his first requested

11  instruction was necessary because the instructions as given

12  repeatedly referred to "mitigating factors" in the plural making it

13  reasonably likely that the jury understood they were precluded from

14  using a single mitigating factor to support a sentence of life

15  without the possibility of parole.  First, the argument is factually

16  inaccurate in that the instructions given in many instances referred

17  to "mitigating factor" in the singular.  (See CT at 1527, 1529, 1533-

18  34; RT at 7392-94, 7396-97.)  Moreover, when the instructions are

19  considered as a whole[23] it is clear that the jury was adequately

20  _____

21     [23]  In particular, as set forth above, petitioner's jury was
   instructed that if they had a reasonable doubt as to the appropriate
22  punishment, they were required to choose life without the possibility
   of parole.  (CT at 1531; RT at 7395.)  They were also instructed that
23  they could consider as a mitigating factor any sympathetic or other
   aspect of the defendant's character or record whether or not related
24  to the offense.  (CT at 1527; RT at 7392-93.)  Finally, they were
   instructed that a mitigating factor was any consideration which,
25  while not constituting a justification of the offense, the jury
   viewed as reducing the degree of petitioner's culpability (CT at
26  1533-34; RT at 7396-97).

1  informed that they were free to consider any relevant mitigating

2  factor.  See Jeffries v. Blodgett, 771 F. Supp. 1520, 1548 (W.D.

3  Wash. 1991) (rejecting the same argument advanced by petitioner

4  here), vacated and remanded on other grounds, 5 F.3d 1180 (9th Cir.

5  1993).

6         No more compelling is petitioner's argument that his second

7  requested instruction was required because the instructions as given

8  referred to the jury with the collective "you," making it reasonably

9  likely that the jury understood the instructions as precluding an

10 individual juror from considering an item as mitigation unless the

11 jurors were unanimous on the point.  Nothing in the instructions or

12 the verdict forms required the jurors to reach agreement as to the

13 existence of any particular mitigating factor.  The only unanimous

14 agreement required was for the return of a penalty verdict.  (CT at

15 1544-46.)  Any suggestion that reference to the jury as "you" in the

16 instructions suggested to the jurors that they could not consider a

17 mitigating factor unless all agreed as to its existence is clearly

18 overcome by the instruction given advising each juror of the duty to

19 provide the parties with his or her individual opinion, uninfluenced

20 "to decide any question in a particular way because the majority of

21 the jurors, or any one of them, favor such a decision."  (CT at 1540;

22 RT at 7400.)  No more specific instruction was required.  See

23 Buchanan, 522 U.S. at 276-77; see also Weeks v. Angelone, 528 U.S.

24 225, 232 (2000).  Thus, there is not a reasonable likelihood that

25 petitioner's jury applied the instructions in a manner that prevented

26 consideration of any mitigating factor.

1    Accordingly, respondent's motion for summary judgment

2  should be granted with respect to this claim and petitioner's cross-

3  motion for summary judgment should be denied.

4    **F.   Trial Court's Denial of Pitchess Discovery**

5    In this claim petitioner alleges that the trial court erred

6  in denying him discovery with respect to mitigating evidence in

7  violation of his constitutional rights under the Fifth, Sixth, Eighth

8  and Fourteenth Amendments.  (Am. Pet. at 66-68.)  Specifically,

9  petitioner alleges that the prosecution relied on his 1975 felony

10 conviction for battery on a police officer as an aggravating factor

11 in support of a death sentence.  Petitioner alleges that he sought

12 discovery of citizen complaints against the two officers who were the

13 victims of the 1975 assault.  Following an in camera review of the

14 citizen complaints produced for inspection, the trial court denied

15 petitioner's discovery motion.  Petitioner alleges that the trial

16 court's actions prevented him from countering the prosecution's

17 penalty phase case and denied him his right to a fair penalty phase

18 trial.

19    Respondent moves for summary judgment on this claim,

20 arguing that: (1) petitioner has failed to state a cognizable claim;

21 (2) the trial court's denial of discovery was not an abuse of

22 discretion since the court reviewed pre-1975 complaints against the

23 officers and considered file cards listing post-1975 complaints

24 before denying discovery and petitioner's showing of materiality with

25 respect to the discovery sought was weak; (3) the defense made a

26 tactical decision to avoid relitigating the 1975 prior offense,

1  making discovery unnecessary; and (4) the 1975 prior conviction was

2  of little importance to the penalty phase presentation in any event.

3  Petitioner opposes respondent's motion for summary judgment

4  and moves for partial summary judgment in his own favor on the issue

5  of whether the trial court erred in denying his discovery motion.

6  Petitioner asserts that the issue of prejudice is not ripe for

7  determination because it is unknown what information would have been

8  discovered had the discovery motion properly been granted.

9  On April 23, 1985, counsel on behalf of petitioner filed a

10 motion seeking disclosure of police personnel records reflecting

11 complaints and investigations of the police officers involved in the

12 incident that resulted in petitioner's 1975 felony conviction for

13 battery on a police officer. (CT at 712-27.)[24] Petitioner's trial

14 counsel took the position that the defense was not required to allege

15 the existence of prior complaints against the officers in order to be

16 entitled to such discovery under state law. (CT at 720.) The City

17 Attorney opposed the motion on behalf of the Sacramento Police

18 Department. (CT at 797-99.) The motion came on for hearing on July

19 31, 1985. (RT Pretrial (PT) at 50-80.) At that time the court

20 granted the motion only with respect to personnel records reflecting

21 complaints within five years prior to petitioner's 1975 conviction.

22 /////

23 /////

24 /////

25 ────────────────────

26 [24] The so-called Pitchess (Pitchess v. Superior Court, 11 Cal.
   3d 531 (1974)) motion was re-filed on July 2, 1985. (CT at 785-94.)

1  (RT PT at 75-79.)[25]  The court set a date for the custodian of

2  records to appear with the ordered discovery.  (Id. at 82; CT at

3  825.)  On October 23, 1985, a hearing was held at which time the

4  designated representative of the Sacramento Police Department

5  appeared and testified regarding his records search.  (RT PT at 122-

6  67.)  The court clarified that the discovery order required review of

7  any personnel records reflecting complaints against the officers for

8  the five year period prior to the incident as well as for the time

9  period between the incident and petitioner's conviction for

10  assaulting a police officer.  (Id. at 162-66.)  The court reiterated

11  its ruling that no search for complaints made against the officers

12  after petitioner's 1975 conviction was required.  (Id. at 166.)  On

13  November 14, 1985, the court announced that it had reviewed index

14  cards reflecting any formal and informal complaints for the officers

15  in question as well as all files still in existence containing

16  complaints against the officers for the relevant time period.  (Id.

17  at 212.)  The court found that none of the information reviewed was

18  /////

19  /////

20  /////

21  /////

22  /////

23

---

24      [25]  California Evidence Code § 1045(b)(1) directs a court to
exclude from disclosure information "consisting of complaints
25  concerning conduct occurring more than five years before the event or
transaction which is the subject of the litigation in aid of which
26  discovery or disclosure is sought."

1  relevant to petitioner's capital murder trial and disclosure was

2  therefore denied.  (Id. at 215-16.)[26]

3        As noted above, before the trial court petitioner's counsel

4  took the position that they were not required to allege the existence

5  of prior complaints against the officers in order to be entitled to

6  the sought-after discovery under state law.  Accordingly, counsel

7  never attempted to make a showing that the officers' files in fact

8  contained complaints, either relating to the period before or after

9  1975, material to petitioner's defense.  That failure is fatal to

10  this claim of constitutional error.

11        In Harrison v. Lockyer, 316 F.3d 1063 (9th Cir.), cert.

12  denied, ___ U.S. ___, 123 S. Ct. 1805 (2003), the court was

13  confronted with a somewhat similar claim.  In that case the

14  petitioner had moved the state trial court for discovery of all

15  police records from the arresting officer's personnel file, including

16  records of complaints more than five years before the incident at

17  issue.  316 F.3d at 1065.  The motion was denied, the order was

18  affirmed and review was denied.  Id.  In a federal habeas action

19  petitioner alleged that California's five year cut-off for the

20  discovery of impeachment material violated his due process rights.

21  /////

22  _____

23        [26]  The index cards were reviewed because by 1985, police
    personnel files involving the time period pre-1975 had been destroyed
    in the regular course of business.  The parties spend much time
24  arguing over whether the trial court reviewed all the entries on the
    index cards or only those for the 1970-75 time period.  The record is
25  not clear in this regard.  Nonetheless, given the court's analysis of
    this issue, whether the trial court reviewed all the index card
26  entries or only some of them, is of no consequence.

1  Id.  The Ninth Circuit found that this constitutional claim was

2  properly rejected, stating as follows:

3         We postponed decision of this case until the
           Supreme Court of California had decided an
4          analogous challenge to the five-year cut-off
           pertaining to evidence from the police files.
5          That court has held that despite the statutory
           cut-off, citizen complaints against officers are
6          subject to disclosure if they are "exculpatory"
           and that a California trial court should order
7          such disclosure after the court has reviewed the
           file in chambers.  City of Los Angeles v.
8          Superior Court, 29 Cal.4th 1, 124 Cal.Rptr.2d
           202, 52 P.3d 129, 137 (Cal. 2002).  This judicial
9          review, however, is contingent on the defendant
           making a preliminary showing that the file
10         contains information material to his defense.  Id.
           at 138.  The California Supreme Court observed
11         that this procedure complied with Brady v.
           Maryland, 373 U.S. 83, 87-88, 83 S.Ct. 1194, 10
12         L.Ed.2d 215 (1963), as modified by Pennsylvania
           v. Ritchie, 480 U.S. 39, 58, n. 15, 107 S.Ct.
13         989, 94 L.Ed.2d 40 (1987) (defendant must
           establish "a basis for his claim that the file
14         contains material evidence").  City of Los
           Angeles v. Superior Court, 124 Cal.Rptr.2d 202,
15         52 P.3d at 138-39.

16         We are not instructed on how a defendant in a
           criminal case will know, or be able to make, a
17         preliminary showing that a police personnel file
           contains evidence material to his defense.  But
18         we are clear that the California Supreme Court
           has faithfully followed the United States Supreme
19         Court.  In our case Harrison made no showing that
           [the officer's] file contained complaints
20         material to his defense.  Therefore, Harrison was
           not denied due process when he was denied access
21         to material more than five years old.

22  Id. at 1065-66.

23         Thus, despite any statutory cut-off imposed by California

24  law, citizen complaints against officers are to be disclosed if they

25  are exculpatory.  However, the defendant must first make a

26  preliminary showing that the personnel file in fact contains

information material to the defense.  This conclusion is consistent

with the standards applicable to any claim of the withholding of

evidence favorable to the accused with respect to guilt or

punishment.  See Brady v. Maryland, 373 U.S. 83 (1963).  In order to

establish a Brady violation, a petitioner must prove three things:

"[t]he evidence at issue must be favorable to the accused, either

because it is exculpatory, or because it is impeaching; that evidence

must have been suppressed by the State, either willfully or

inadvertently; and prejudice must have ensued." Strickler v. Greene,

527 U.S. 263, 281-82 (1999).

Here, as in Harrison, the petitioner failed to make any

showing that evidence within the police personnel files was

exculpatory.  Accordingly, petitioner's constitutional rights were

not violated when he was denied access to those materials.

Therefore, petitioner's motion for partial summary judgment on this

claim should be denied and respondent's motion for summary judgment

granted.

### G.   Trial Court's Failure To Recuse the District Attorney's Office and the Assigned Deputy District Attorney

In this claim petitioner asserts that his constitutional

rights were violated when the state trial court denied his motion to

recuse the Sacramento County District Attorney's Office and the

deputy district attorney who tried his case.  (Am. Pet. at 68-72.)

Specifically, petitioner alleges the following.  The murder victim,

Connie Decker, was the most active volunteer in a local social and

charitable club.  The members of that club took extraordinary

interest in the prosecution of the case and in urging the imposition
of the death penalty.  The deputy district attorney assigned to try
petitioner's case suggested that the club designate a member as its
representative to the District Attorney's Office.  That
representative, an attorney, subsequently had between 23 and 35
contacts with prosecutors about the case.  The contacts were
extensive enough that the trial attorney testified that had he been
about to resolve the case short of trial he would have called the
club representative.

In addition, petitioner alleges that the murder victim had
been romantically involved with a Sacramento County Municipal Court
Commissioner who was a former deputy district attorney.  The
Commissioner characterized the prosecutors involved in petitioner's
case as being good friends of his.  When the Commissioner learned
that petitioner had offered to plead guilty in exchange for a
sentence of life without parole, he passed the information on to his
brother, who was a member of the social club noted above.  Finally,
petitioner alleges that the wife of the trial prosecutor was also a
member of that social club.  The prosecutor himself knew several
members of the club, attended some of their events, at his wife's
request spoke at a club function to discuss the criminal justice
system, volunteered to take over the case when the previously-
assigned prosecutor developed a calendaring conflict and then had ten
contacts with the attorney designated as the club's representative,
who was also an acquaintance of the prosecutor.

/////

1          Petitioner alleges that although the Sacramento County

2   District Attorney's Office had no written standards for determining

3   whether to seek or continue pursuing the death penalty and despite

4   the fact that in other cases where the death penalty was initially

5   sought that office allowed defendants to plead guilty in exchange for

6   a sentence of life without parole, in petitioner's case the

7   prosecutor refused to entertain such a resolution.   Petitioner

8   contends that a full investigation and evidentiary hearing with

9   respect to this claim is necessary.   In the end, he alleges that the

10  denial of his recusal motion violated his constitutional rights as

11  guaranteed by the Fifth, Eighth and Fourteenth Amendments.

12          Respondent moves for summary judgment on this claim.

13  Respondent argues that the state trial court conducted a full

14  evidentiary hearing on the recusal motion and that the state court's

15  determination of factual issues is entitled to a presumption of

16  correctness on habeas review.   In this regard, respondent notes the

17  state court findings, affirmed on appeal, that petitioner had failed

18  to show bias, conflict of interest, an appearance of a conflict or a

19  likelihood that a fair trial could not be provided.   Because

20  petitioner was not denied a fair trial by the involvement of the

21  Sacramento County District Attorney's Office in trying the case,

22  respondent contends he is entitled to summary judgment in his favor

23  on this claim.

24          Petitioner opposes respondent's motion and seeks judgment

25  in his favor as a matter of law on this claim.   Petitioner argues

26  that the interest in the case expressed by the Municipal Court

72

Commissioner, the involvement and concern expressed by members of the social club in which the victim had been an active member and the prosecutor's connection with that social club through his wife, including his appearance at a club luncheon to discuss the capital case process before he took over the prosecution of the case, combined to form a web of personal and professional conflicts resulting in unfairness in the prosecution of this case.   Petitioner agrees that the fairness of the trial is the issue presented but contends that such fairness includes a fair-minded exercise of prosecutorial discretion with respect to charging decisions and plea bargaining.   (Opp'n & Cross-Mot. for Summ. J. at 166 (citing Ganger v. Peyton, 379 F.2d 709, 712 (4th Cir. 1967).)   Petitioner again argues that although this District Attorney's Office had resolved other capital cases with sentences of life without parole, it refused to dispose of petitioner's case in that manner.[27]

Before petitioner's trial commenced, an evidentiary hearing was held with respect to petitioner's recusal motion.   (RT at 5-133.) In addition to the facts summarized above, the court heard testimony that Mr. John O'Mara, Supervisor of the Major Crimes Section, made the initial recommendation in the charging and disposition of capital cases and that the ultimate decision regarding whether to seek the death penalty is made by the District Attorney of Sacramento County.

---

[27]   In support of this point, petitioner cites three cases and submits the declarations of counsel in two of those cases which merely state that they were capital cases resolved by plea agreements calling for the imposition of the sentence of life without parole. (Opp'n & Cross-Mot. for Summ. J. at 168 n.121 & Ex. NN.)

(RT at 60, 70-72.)  Deputy District Attorney O'Mara testified that
prior to re-assigning the case he told the social club representative
that in his judgment the case should proceed to trial and that a jury
should determine the appropriate penalty.  (RT at 79.)  Deputy
District Attorney Druliner, the trial prosecutor, testified that he
did not feel that the contacts from the social club representative
were attempts to influence his handling of the case.  (RT at 61.)  He
also had the impression that the social club was interested in seeing
the case handled in a professional manner as opposed to being
committed to the prosecution of the case to a death verdict, while
recognizing that there were some members who no doubt wanted the
latter course followed.  (RT at 64-68.)  Mr. O'Mara also testified
that he had told Mr. Druliner that he didn't think it was a good idea
for him to address the social club but that he could not prevent him
from doing so.  (RT at 86-87.)  The trial court denied the motion to
recuse, finding that no conflict of interest had been established and
that there was no evidence that any pressure had been put on the
District Attorney's Office or that the prosecutor had been improperly
influenced in his handling of the case.  (RT at 131-33.)

Prosecutors are "traditionally accorded wide discretion
. . . in the enforcement process."  Marshall v. Jerrico, Inc., 446
U.S. 238, 248 (1980).  Nonetheless,

/////

/////

/////

/////

> [a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions.

Id. at 249-50.  Similarly, it has long been recognized that

> [a criminal prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . .  He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935).  Accord Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 807 (1987),  These same principles apply with equal force to state prosecutors.  Sheppard v. Rees, 909 F.2d 1234, 1238 (9th Cir. 1989).

Nonetheless, the standards of neutrality for prosecutors are not as demanding as those applied to judicial or quasi-judicial officers.  Young, 481 U.S. at 810; Marshall, 446 U.S. at 249-50; Dick v. Scroggy, 882 F.2d 192, 197 (6th Cir. 1989).  This is because, unlike judges who must always remain impartial, prosecutors are partisan advocates who are permitted to be zealous in their enforcement of the law.  Marshall, 446 U.S. at 248-50; Dick, 882 F.2d at 197.  Accordingly, a petitioner claiming that a prosecutor bore a personal bias against him must demonstrate that the fairness of his

1  trial was affected and that he was thus prejudiced by the

2  prosecutor's involvement.  Dick, 882 F.2d at 196-97 ("[W]e are not

3  persuaded that Mr. Dick's prosecution by a Commonwealth Attorney who

4  may have been less than disinterested constituted an irregularity

5  'sufficiently fundamental' to justify our setting aside the

6  conviction in this case."); Newman v. Frey, 873 F.2d 1092, 1093-94

7  (8th Cir. 1989) (habeas relief denied where one of the prosecutors in

8  petitioner's murder case was a friend of the murder victim and had

9  represented the victim's family and business in civil legal matters);

10  Gallo v. Kernan, 933 F. Supp. 878, 885 (N.D. Cal. 1996)(habeas relief

11  denied where it was claimed that the prosecutor demonstrated an

12  improper personal and emotional bias against petitioner by taking

13  unprecedented actions, including visiting the victim in the hospital,

14  attending the victim's divorce proceedings and taking positions

15  adverse to petitioner, that the prosecutor had not taken in similar

16  cases), aff'd, 141 F.3d 1175 (9th Cir. 1998); see also United States

17  v. Terry, 17 F.3d 575, 579 (2d Cir. 1994).

18          Instructive in this regard is the decision in Wright v.

19  United States, 732 F.2d 1048 (2d Cir. 1984).  In that case the

20  petitioner challenged his federal Hobbs Act conviction on the grounds

21  that he had been deprived of his constitutional right to a

22  disinterested prosecutor.  It was established that the wife of the

23  trial prosecutor had brought two prior complaints regarding

24  petitioner to federal authorities, had actively petitioned federal,

25  state and local authorities to investigate petitioner, and had

26  allegedly been assaulted by petitioner's supporters.  732 F.2d at

1055.   Nonetheless, the court affirmed the dismissal of the petition for post-conviction relief concluding:

> In short, this case, with the facts taken at their worst against the Government, does not present the spectacle of a prosecutor's using the "awful instruments of the criminal law" [citation omitted] for purpose of private gain and, although we consider the choice of Puccio as prosecutor to have been ill advised, we do not regard it as having deprived Wright of due process of law. At the very most . . . it deprived him of the chance that, with another prosecutor, he might have undeservedly escaped indictment and consequent conviction for crimes of which he was properly found to be guilty.

732 F.2d at 1058.

This case is no different.  In support of his claim petitioner focuses in large part on the prosecutor's refusal to resolve his case by way of guilty plea in exchange for an agreed upon sentence of life imprisonment without parole.  He cites three capital cases that the Sacramento County District Attorney's Office agreed to resolve in this manner.  However, whether to offer a plea bargain clearly is an area in which prosecutors are accorded relatively unfettered discretion.  Weatherford v. Bursey, 429 U.S. 545, 561 (1977) ("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial."); King v. Brown, 8 F.3d 1403, 1408 (9th Cir. 1993).[28]

Petitioner's reliance on the decision in Ganger v. Peyton is likewise unavailing.  In that case the petitioner had been

---

[28] "The Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty."  Mabry v. Johnson, 467 U.S. 504, 511 (1984).

1  convicted of assaulting his wife.  The prosecutor, who was employed

2  in that capacity part-time, represented the wife in the pending

3  divorce action based on the same assault.  The court found that the

4  prosecutor had offered to dismiss the assault charge in exchange for

5  a property settlement favorable to his client in the divorce action.

6  379 F.2d at 711-12.  Under those extreme circumstances the court

7  found that the obvious conflict of interest required the setting

8  aside of the state court conviction.  Id. at 714-15.  In petitioner's

9  case, then-Deputy District Attorney Druliner did not initiate the

10 prosecution, as the prosecutor in Ganger did.  Rather, he took over

11 the prosecution from John O'Mara, the supervisor of the Major Crimes

12 Section of the office, who had developed a scheduling conflict.  The

13 decision to seek the death penalty had already been made before

14 Druliner came into the case.  Moreover, unlike the prosecutor in

15 Ganger, there is no claim here that the prosecutor who tried

16 petitioner's case was utilizing the criminal process to advance his

17 own pecuniary interest.  See Dick, 882 F.2d at 193-97 (habeas relief

18 denied in an assault case arising out of an auto accident where the

19 prosecutor subsequently represented the accident victim in a civil

20 case against the petitioner even though that representation may have

21 commenced prior to the challenged conviction); Newman, 873 F.2d at

22 1093-94; Wright, 732 F.2d at 1057-58 (distinguishing Ganger); Gallo,

23 933 F. Supp. at 885.

24         For these reasons the court concludes that petitioner has

25 failed to make a showing that the Sacramento District Attorney's

26 Office, and the deputy district attorney who tried his case in

particular, harbored such extreme personal bias or prejudice against him that his due process rights were violated.  Accordingly, petitioner's motion for summary judgment on this claim should be denied and respondent's motion for judgment in his favor should be granted.

### H.   Systematic Underrepresentation of Hispanics in the Jury Panel

Petitioner claims that the systematic and substantial underrepresentation of persons of Hispanic origin from the panel from which his jury was selected violated his constitutional right to a jury drawn from a fair cross-section of the community.  (Am. Pet. at 73-78.)  Specifically, petitioner claims that the trial erred in denying his motion to quash the jury venire in that he had made the prima facie showing required under <u>Duren v. Missouri</u>, 439 U.S. 357 (1979).  Accordingly, petitioner claims, the prosecution should have been required to demonstrate a significant state interest advanced by the jury selection process that resulted in the disproportionate exclusion of Hispanics.

Respondent moves for summary judgment on this claim, noting that the state trial court held an evidentiary hearing on the defense motion to quash the jury venire and, after taking evidence, concluded that the defense had failed to make even a prima facie showing of unconstitutional underrepresentation.  (RT at 1611-13.)  That determination was affirmed on appeal by the California Supreme Court.  <u>See</u> <u>Breaux</u>, 1 Cal. 4th at 297-99.  Respondent argues that even viewed in the light most favorable to petitioner, the evidence presented by

1   the defense established an absolute disparity between eligible
2   Hispanic jurors in the population and those appearing in the jury
3   pool of 2.8%, a disparity repeatedly found insubstantial and
4   constitutionally permissible.

5          Petitioner opposes the respondent's motion and moves for
6   summary judgment in his favor on this claim.  He argues that it is
7   undisputed that the group alleged to be excluded (Hispanics) is a
8   "distinctive" group in the community.  See Duren, 439 U.S. at 364.
9   He asserts the only questions are whether the representation of
10  Hispanics in the jury venire was fair and reasonable in relation to
11  the number of Hispanics in the community and, if not, whether that
12  underrepresentation was due to the systematic exclusion of Hispanics
13  in the jury-selection process.  Id.  Most importantly for resolution
14  of the pending motion, petitioner concedes that in light of binding
15  Ninth Circuit precedent he failed to make out a prima facie case of
16  substantial underrepresentation of Hispanics as required.

17         In Taylor v. Louisiana, 419 U.S. 522 (1975), the United
18  States Supreme Court held that systematic exclusion of women during
19  the jury-selection process, resulting in jury pools not "reasonably
20  representative" of the community, denies a criminal defendant his
21  Sixth and Fourteenth Amendment right to a jury selected from a fair
22  cross-section of the community.  419 U.S. at 531-33.  See also United
23  States v. Esquivel, 88 F.3d 722, 724-25 (9th Cir. 1996).  In order to
24  establish a prima facie violation of the fair-cross-section
25  requirement, a defendant must show:
26  /////

           (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren, 439 U.S. at 364.  See also Thomas v. Borg, 159 F.3d 1147, 1149-50 (9th Cir. 1998); Esquivel, 88 F.3d at 725.

It is conceded that petitioner satisfied the first prong of the prima facie showing requirement in that Hispanics are members of a distinctive and identifiable group in the community.  See United States v. Nelson, 137 F.3d 1094, 1101 (9th Cir. 1998); United States v. Sanchez-Lopez, 879 F.2d 541, 547 (9th Cir. 1989).[29]  As to the second prong, however, "'the Duren test requires proof, typically statistical data, that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community.'"  Thomas, 159 F.3d at 1150 (quoting Esquivel, 88 F.3d at 726).  See also Belmontes, 350 F.3d at 890.

Here, petitioner argues that in determining the extent of underrepresentation of Hispanics in the jury venires the comparative disparity test should be employed.  As petitioner recognizes, however, that position has been rejected by the Ninth Circuit, which instead has long applied the absolute disparity analysis. Thomas, 159 F.3d at 1150; Esquivel, 88 F.3d at 726; United States v.

---

[29]  "[T]he Supreme Court has held that 'there is no rule that [Sixth Amendment claims] may be made only by those defendants who are members of the group excluded from jury service.'" United States v. Nelson, 137 F.3d at 1101 n.1 (quoting Taylor, 419 U.S. at 526).

1  Cannady, 54 F.3d 544, 548 (9th Cir. 1995); Sanchez-Lopez, 879 F.2d at

2  547; United States v. Kleifgen, 557 F.2d 1293, 1297 (9th Cir. 1977).

3  The absolute disparity is determined by "'taking the percentage of

4  the group at issue in the total population and subtracting from it

5  the percentage of that group that is represented on the master jury

6  wheel.'"   Thomas, 159 F.3d at 1150 (quoting Sanchez-Lopez, 879 F.2d

7  at 547).

8        In this case petitioner presented testimony from his

9  expert, Dr. Edgar Butler, establishing that at the most Hispanic

10  jurors were underrepresented by 2.8% as a matter of absolute

11  disparity.  (RT at 291-372, 530-680.)  Such an absolute disparity

12  figure has been found by the Ninth Circuit to be constitutionally

13  permissible.  Nelson, 137 F.3d at 1101 (3.9% absolute disparity with

14  respect to Hispanic jurors insufficient to state a Sixth Amendment

15  claim); Esquivel, 88 F.3d at 726-27 (underrepresentation of 4.9% not

16  substantial); Cannady, 54 F.3d at 548 (2.2% to 3.1% disparity for

17  Hispanics failed to state a claim); United States v. Suttiswad, 696

18  F.2d 645, 649 (9th Cir. 1982) (7.7% absolute disparity

19  constitutionally permissible); Kleifgen, 557 F.2d at 1297 (2.9% and

20  4.4% absolute disparities insufficient to state a cognizable claim);

21  see also United States v. Rodriguez, 776 F.2d 1509, 1511 (11th Cir.

22  1985) ("Although precise mathematical standards are not possible,

23  this circuit has consistently found that a prima facie case of

24  underrepresentation has not been made where the absolute disparity

25  . . . does not exceed ten percent.").  Thus, petitioner has failed to

26  /////

satisfy the second prong of the test under <u>Duren</u> and respondent is entitled to judgment in his favor as to this claim.[30]

Accordingly, petitioner's motion for summary judgment on this claim should be denied and respondent's motion for judgment in his favor should be granted.

## I.   Admission of Petitioner's Post-Arrest Statements

In Claim I, petitioner alleges that the introduction of his post-arrest statement taken at the hospital while he was under the influence of morphine violated his rights under the Fifth, Sixth, and Fourteenth Amendments.  (Am. Pet. at 78.)

In support of this claim, petitioner alleges that, after having been shot twice during his arrest, he was taken to a hospital for emergency surgery.  His injuries were painful.  He feared that the police might harm him and asked to have them removed from the emergency room.  At 5:31 a.m. he received a 10-milligram injection of morphine.  (<u>Id.</u> (citing RT at 407, 695, 709, 724-25 & 889).)

Petitioner alleges that morphine operates on a person's central nervous system, creating a euphoria that takes away the person's perception of pain and of danger, thereby lessening the self-protective instincts.  An average person under treatment with morphine would have difficulty understanding a <u>Miranda</u> advisement and perceiving the effect of information given to the police, even though

---

[30]   In light of petitioner's failure to make the required showing as to the second prong, the court need not reach the issue of whether the third prong of the test (whether underrepresentation is due to systematic exclusion of the group in the jury-selection process) was properly applied.  Although the parties have nonetheless addressed the third prong of the test, the court declines to do so.

the person may exhibit no outward signs of intoxication and may appear to understand questions and give appropriate responses. Intravenous injection of morphine has a greater effect on a patient than any other mode of administration. An injection has its peak effect on the patient about one hour after its administering. (Id. at 78-79 (citing RT at 698, 700 & 721-25; People v. Fordyce, 612 P.2d 1131, 1133 (Colo. 1980)).

Petitioner alleges that Detective Bell read him his Miranda rights at 6:32 a.m., when the morphine injection would have been having its maximum effect. Petitioner stated that he would waive his rights. Bell then interrogated petitioner for approximately an hour and ten minutes and, after a break of 15 to 20 minutes, for an additional 20 to 30 minutes. The interrogation occurred prior to petitioner's surgery. Bell testified that petitioner had some difficulty focusing his attention, that Bell had to repeat questions, that petitioner's train of thought would wander, and that the interview was terminated when petitioner no longer appeared to be responsive to questions. (Id. at 79 (citing RT at 436-38, 452-54, 503-04, 514-15, 517-18 & 892).)

Petitioner claims the prosecution failed to meet its burden of showing that his waiver of his Miranda rights was knowing, intelligent, and voluntary and that his statement to Bell was voluntary. Petitioner claims the use of his statement at trial violated his rights to due process and equal protection of the law, to freedom from compulsory self-incrimination, to a reliable determination of his guilt or innocence of capital murder, and to a

1  fair, reliable individualized, nonarbitrary, and adequately guided

2  determination of the appropriateness of death as the penalty.  (Id.

3  at 79-80.)

4       In his motion for summary judgment on this claim,

5  respondent argues that petitioner's Miranda rights were not violated.

6  Respondent asserts that the material facts concerning petitioner's

7  contact with the authorities and the statements he made before and

8  after his arrest were thoroughly explored by the trial court at the

9  hearing on the Miranda motion.  Respondent argues that the facts set

10  forth by the California Supreme Court in People v. Breaux, 1 Cal. 4th

11  at 300-01, are entitled to a presumption of correctness and that

12  petitioner is not entitled to an evidentiary hearing on his Miranda

13  claim because he had a full opportunity to litigate the issue in the

14  trial court, the trial court held a hearing, and the California

15  Supreme Court reviewed and affirmed the trial court's decision.

16  (Alt. Mot. for Summ. J. at 119-21.)

17       Respondent states that courts determine whether a

18  confession was voluntary and whether a Miranda waiver was knowing and

19  intelligent by looking at the totality of the circumstances.  (Alt.

20  Mot. for Summ. J. at 122 (citing Arizona v. Fulminante, 499 U.S. 279,

21  285-86 (1991); United States v. Bautista-Avila, 6 F.3d 1360, 1365

22  (9th Cir. 1993).)  Respondent argues that the record demonstrates

23  that there was no improper influence on petitioner, his will was not

24  overborne, and he knowingly and intelligently waived his Miranda

25  rights and voluntarily gave a statement to police.

26  /////

1    Respondent contends that petitioner was injected with

2 morphine "a full hour before he was informed of his <u>Miranda</u> rights

3 and an hour and a half before he was interviewed by Detective Bell."

4 (Alt. Mot. for Summ. J. at 124 (citing RT at 438-39, 503, 695-97 &

5 889; <u>Breaux</u>, 1 Cal. 4th at 300).)   The effects of the morphine were

6 estimated to last one to two hours, although Dr. Gylling testified

7 that petitioner told him he had injected heroin earlier that day,

8 which would have caused the morphine to leave petitioner's system

9 faster.   (<u>Id.</u> (citing RT at 700 & 722).)   Medical professionals

10 testified that when petitioner spoke with Detective Bell he was

11 coherent and understood what was said to him, gave medical staff a

12 detailed history, and was wide awake and responsive.   There was

13 testimony that petitioner answered "fairly in-depth questions

14 appropriately and with apparent understanding," his speech was not

15 slurred, and he was competent to give informed consent to surgery.

16 Defense psychiatrist Dr. Mehtani conceded that petitioner was "well

17 versed in the <u>Miranda</u> rights, having exercised them in the prior week

18 when arrested for being under the influence of heroin and while under

19 the influence of heroin."   Respondent argues that petitioner's

20 attempt to shift blame for the murder to a non-existent Mexican

21 hitchhiker also demonstrates that petitioner was aware of the nature

22 of Detective Bell's questions.   (<u>Id.</u> (citing RT at 405, 407, 414-15,

23 418-19, 463-64, 690-91, 693 & 888-89; <u>Breaux</u>, 1 Cal. 4th at 301).)

24    On the basis of petitioner's responses to the situation,

25 the nature of morphine, petitioner's prior experience waiving his

26 rights, and the content of petitioner's statement to Detective Bell,

1   respondent contends that petitioner's statements were voluntary and
2   his waiver of <u>Miranda</u> rights was knowing and intelligent.

3        Petitioner opposes respondent's motion and argues that his
4   conviction and sentence must be set aside because his statement made
5   at the hospital under the influence of morphine was admitted at the
6   guilt-phase of his trial even though the prosecution failed to show
7   that his waiver of <u>Miranda</u> rights was knowing, intelligent, and
8   voluntary or that the statement itself was voluntary.   Petitioner
9   contends that he is entitled to summary judgment on the undisputed
10  facts or is at least entitled to an evidentiary hearing on this
11  claim.   (Opp'n & Cross-Mot. for Summ. J. at 173.)   Petitioner relies
12  on the facts alleged in his amended petition and on Detective Bell's
13  testimony before the trial court that petitioner spoke in a soft
14  voice and slowly while being interrogated, that there were some long
15  pauses between petitioner's answers, that those answers were often
16  simply "yes" or "no," and that the interrogation ended because
17  petitioner had nodded off.   (<u>Id.</u> at 173-74 (citing RT at 481 & 513-
18  18).)

19       Petitioner also argues that his waiver of the privilege
20  against self-incrimination was not knowing, intelligent, and
21  voluntary due to his ingestion of drugs.   Petitioner does not claim
22  that Detective Bell coerced his statements.   Rather, petitioner urges
23  the court to consider the decision in <u>People v. Fordyce</u> for its
24  discussion of the effects of morphine on the ability of a patient to
25  make a knowing and intelligent decision to make a statement to police
26  /////

1 officers or, in the alternative, to hold an evidentiary hearing on

2 this issue. (Id. at 175-76.)

3         Petitioner contends that the circumstances in Fordyce and

4 this case were very similar: morphine was given in a dosage

5 effective to take the edge off the patient's pain (612 P.2d at 1133;

6 RT at 408 & 699), doctors testified that at the time of the patient's

7 statements to police the patient appeared to be oriented as to

8 person, place, and time (612 P.2d at 1133; RT at 401-02), and other

9 witnesses testified that the patient appeared to be reasonable and

10 able to follow directions (612 P.2d at 1133) or was coherent,

11 rational, and responsive during interactions (RT at 894-95). In

12 Fordyce, an expert toxicologist testified that an effective dose of

13 morphine creates a euphoria which takes away the perceptions of pain

14 and danger, thereby lessening the self-protective instincts, although

15 the patient may exhibit no outward signs of intoxication. An

16 effective dose of morphine also interferes with short-term memory, so

17 that "[a]n average person under treatment with morphine would have

18 difficulty understanding a Miranda advisement and perceiving the

19 important effect of information given to the police" (612 P.2d at

20 1133). The Colorado Supreme Court found that apparently rational

21 behavior can be consistent with an effective dose of morphine and

22 that the specific and predictable effects of morphine on the central

23 nervous system may cause the patient to be sufficiently impaired to

24 render any statement involuntary. The court ruled that the

25 defendant's statements to police were inadmissible because her waiver

26 of the Fifth Amendment privilege against self-incrimination was not

knowing, intelligent, and voluntary.  There was no testimony by an expert toxicologist in petitioner's case, and the testimony of defense expert Dr. Mehtani and prosecution witnesses did not focus on the specific effects of morphine on petitioner's will.  (Id. at 176-77.)

Petitioner suggests that this court "can benefit" from the expert toxicologist's testimony in Fordyce or, in the alternative, should order an evidentiary hearing at which "an expert toxicologist or pharmacologist could testify so that this court may assess whether the morphine administered to [petitioner] was sufficient to render his Miranda waiver invalid and subsequent statements inadmissible." (Id. at 177.)

Petitioner claims the state court record demonstrates that the morphine administered to him rendered him incapable of understanding either the Miranda advisement or the consequences of waiving his Miranda rights.  In this regard, petitioner views the testimony of Dr. Gylling, Dr. Gage, Nurse Lords, and Detective Bell as evidence that the intravenous administration of morphine transformed him within an hour from a belligerent, aggressive, rude and uncooperative individual who was afraid of the police into a soft-spoken cooperative individual who was willing to respond to a detective's interrogation without counsel present.  Petitioner contends that it is reasonably probable that his waiver of his Fifth Amendment rights resulted from morphine's having taken away his perception of danger and reduced his self-protective instincts, making it difficult for him to perceive the effect of the information

89

he gave to the police.  Petitioner asserts that there is no
persuasive evidence to the contrary.  (Id. at 178-79.)

Petitioner cites Pierce v. Cardwell, 572 F.2d 1339, 1341
(9th Cir. 1978), for the proposition that a claim of intoxication, if
proved, entitles the petitioner to relief.  The petitioner in Pierce
alleged that he was suffering from intoxication caused by the
combined effect of alcohol and Valium.  The court held that the
alleged intoxication, if established as fact, may have made the
petitioner incapable of a voluntary, knowing, and intelligent waiver.
Petitioner also relies upon the decision in Gladden v. Unsworth, 396
F.2d 373, 379-81 (9th Cir. 1968), in which the court discussed the
constitutional dangers that arise when a defendant's statement is
made while intoxicated and recognized that intoxication prevents an
individual from exercising his rational intellect or his free will.
(Id. at 179-80.)

Finally, petitioner argues that the erroneous admission of
his statement was prejudicial in both phases of his trial.  In his
statement to Detective Bell, petitioner said he had used heroin on
the day he was shot but did not mention cocaine.  Petitioner gave a
detailed description of a third-party perpetrator, a "Mexican
hitchhiker."  The defense theory at trial, supported primarily by the
testimony of Dr. Rosenthal, was that petitioner was so intoxicated on
cocaine that he was unable to premeditate or deliberate the killing
or form the specific intent to kill.  The prosecutor attacked Dr.
Rosenthal's testimony by establishing during cross-examination that
the testimony depended entirely on Dr. Rosenthal's accepting as true

90

the statements made to him by petitioner.   In closing argument, the

prosecutor emphasized that Dr. Rosenthal's opinion was based on

petitioner's story and pointed to petitioner's statement to Detective

Bell, in which he made no mention of cocaine, did not claim that he

shot Connie Decker in a state of cocaine-induced rage, and instead

claimed a Mexican hitchhiker killed her.   Thus, petitioner argues,

admission of petitioner's hospital statement allowed the prosecutor

to undermine petitioner's credibility and therefore the validity of

Dr. Rosenthal's opinion, leaving petitioner effectively without a

defense.   Petitioner asserts that the effect was compounded in the

penalty phase by the possibility that the jury viewed petitioner's

story of a Mexican hitchhiker as a calculated and callous attempt to

avoid responsibility for the killing.   Petitioner concludes that the

admission of his hospital statement at trial was both erroneous and

harmful, entitling him to either summary disposition in his favor or

an evidentiary hearing.   (Id. at 180-82.)

     In reply and in opposition to petitioner's cross-motion,

respondent asserts that petitioner appears to have abandoned his

argument that his hospital statement was involuntary and is now

relying instead on Miranda grounds.   Respondent reiterates that the

voluntariness of petitioner's hospital statements was determined by

the state courts.   Respondent characterizes petitioner's assertion of

the effect of morphine to reduce anxiety as a new approach to the

facts but one that fails to undermine the validity of petitioner's

waiver, particularly in light of the state courts' determination,

based on an evidentiary hearing, that the effects of morphine had

worn off by the time of the questioning and that petitioner was not

significantly under the influence of morphine.   Respondent cites the

trial court's rejection of the testimony of defense witness Dr.

Mehtani and the express finding that there was "no indication of

undue pressure.   No indication of – that drugs or fear or loss of

sleep were influencing his decision."   Respondent contends that

petitioner is implicitly requesting judicial notice of evidentiary

matter regarding morphine as set forth in the Colorado Supreme Court

opinion and that such evidence would be improper new evidence under

Keeney v. Tamayo-Reyes.   Respondent argues that petitioner has

offered nothing that overcomes the presumption of correctness under

former 28 U.S.C. § 2254(d) and that Claim I should be rejected.

(Resp't's Reply at 26-27 (citing RT at 1604).)

        In reply, petitioner denies that either his evidence or his

approach is new.   Petitioner asserts that the very evidence alluded

to, along with a virtually identical argument, was presented to the

California Supreme Court in 1991 on direct appeal.   Petitioner

contends that he claimed then, as he does now, that his waiver was

invalid because the effects of morphine, as well as shock from his

gunshot wounds and the lingering effects of illicit drugs ingested

prior to his arrest, made him incapable of acting knowingly,

intelligently, and voluntarily.   Petitioner contends that respondent

misstates the degree to which this court owes deference to the trial

court's factual findings made after a hearing and argues that the

material facts were not adequately developed at that hearing because

there was no expert testimony regarding the effects of morphine on

voluntariness.  Petitioner further argues that the record as a whole

supports a finding that he was under the influence of morphine when

he waived his rights and that respondent has disputed neither the

facts relied upon in petitioner's cross-motion or the expert

testimony in <u>Fordyce</u>.  (Pet'r's Reply at 43-45.)

At oral argument, the court inquired of petitioner's

counsel whether petitioner has abandoned the argument that his

statement was involuntary and now relies completely on <u>Miranda</u>, as

respondent argued.  (Tr. of Oral Argument July 10, 2001, at 32.)

Petitioner's counsel observed that the distinction between

"involuntary and <u>Miranda</u>" and between "14th Amendment v. 5th

Amendment" is difficult to sort out due to the fact that much of the

jurisprudence on voluntariness predated <u>Miranda</u>.  Counsel stated that

petitioner continues to rely on the Fourteenth Amendment as well as

the Fifth Amendment and has not abandoned the claim that his

statement was involuntary.  Counsel also asserted that petitioner

"was under the influence of a lot more than morphine and we may need

additional evidence on that influence."  (<u>Id.</u> at 32-33.)

In his post-arrest statement to Detective Bell in the

hospital, petitioner stated that he kidnapped Connie Decker for a joy

ride.  (Alt. Mot. for Summ. J. at 23 (citing RT at 4428).)

Petitioner said he got into Ms. Decker's car, held a gun on her, and

demanded that she drive away; directed her to stop in a parking lot,

traded seats with her, and drove away with her in the passenger seat;

picked up a Mexican hitchhiker; left Ms. Decker with the hitchhiker

while he went for a drive; found only the Mexican when he returned

93

1   and was told by the Mexican that he had shot Ms. Decker and put her

2   in a dumpster; drove away with the Mexican; later contacted the

3   Mexican and, with the Mexican's help, moved Ms. Decker's body to

4   another location; took Ms. Decker's purse and sold it, and took a

5   credit card from the purse and tried to use it.  (Alt. Mot. for Summ.

6   J. at 21-23 (citing RT at 4402-10, 4416-19, 4422-24, 4426-28, 4560).)

7           Although petitioner did not confess to the killing, the

8   same analysis applies to direct confessions, statements that amount

9   to admissions of part or all of an offense, and statements that

10  purport to be exculpatory but are used by the prosecution to impeach

11  the defendant's testimony at trial or to prove his guilt by

12  implication.  See Miranda v. Arizona, 384 U.S. 436, 476-77 (1966);

13  Gladden v. Unsworth, 396 F.2d 373, 375-76 (9th Cir. 1969).

14          Petitioner's challenge to the introduction of his post-

15  arrest statement has been presented under the Fifth and Fourteenth

16  Amendments.[31]  In Dickerson v. United States, the Supreme Court traced

17  the history of the law governing the admission of confessions,

18  observing that

19              [p]rior to Miranda, we evaluated the
                admissibility of a suspect's confession under a
20              voluntariness test.  The roots of this test
                developed in the common law, as the courts of
21              England and then the United States recognized
                that coerced confessions are inherently
22              untrustworthy.  Over time, our cases recognized

23  _____

24      [31]  Petitioner asserts in his amended petition that the
    introduction of his post-arrest statement at trial violated his
25  rights under the Fifth, Sixth, and Fourteenth Amendments.  The
    parties have not argued and the undersigned does not discern a Sixth
26  Amendment basis for petitioner's claim that his statements should not
    have been admitted at trial.  (See Am. Pet. at 78.)

two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence:  the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.

. . . [F]or the middle third of the 20th century our cases based the rule against admitting coerced confessions primarily, if not exclusively, on notions of due process.  We applied the due process voluntariness test in "some 30 different cases decided during the era that intervened between Brown [decided in 1936] and Escobedo v. Illinois"[decided in 1964].  Those cases refined the test into an inquiry that examines "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession.  The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation."  The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing."

We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.  But our decisions in Malloy v. Hogan [in 1964] and Miranda [in 1966] changed the focus of much of the inquiry in determining the admissibility of suspects' incriminating statements.  In Malloy, we held that the Fifth Amendment's Self-Incrimination Clause is incorporated in the Due Process Clause of the Fourteenth Amendment and thus applies to the States.  We decided Miranda on the heels of Malloy.

In Miranda, we noted that the advent of modern custodial police interrogation brought with it an increased concern about confessions obtained by coercion.  Because custodial police interrogation, by its very nature, isolates and pressures the individual, we stated that "[e]ven without employing brutality, the 'third degree' or [other] specific stratagems, . . . custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals."  We concluded that the coercion inherent in custodial interrogation blurs the

95

line between voluntary and involuntary
statements, and thus heightens the risk that an
individual will not be "accorded his privilege
under the Fifth Amendment . . . not to be
compelled to incriminate himself." Accordingly,
we laid down "concrete constitutional guidelines
for law enforcement agencies and courts to
follow." Those guidelines established that the
admissibility in evidence of any statement given
during custodial interrogation of a suspect would
depend on whether the police provided the suspect
with four warnings. These warnings . . . have
come to be known colloquially as "_Miranda_ rights"
. . . .

_Dickerson v. United States_, 530 U.S. 428, 432-35 (2000) (citations

and footnote omitted).

       The _Miranda_ guidelines arose from the Court's concern "that

reliance on the traditional totality-of-the-circumstances test raised

a risk of overlooking an involuntary custodial confession, a risk

that the Court found unacceptably great when the confession is

offered in the case in chief to prove guilt." _Id._ at 442 (citing

_Miranda_, 384 U.S. at 457). "[S]omething more than the totality test

was necessary" to prevent the use of unwarned statements as evidence

in the prosecution's case in chief. _Id._ at 442 & 443-44.

       In _Colorado v. Connelly_, 479 U.S. 157 (1986), the Court

considered the case of a man who approached police to confess to a

murder and did confess after receiving _Miranda_ advisements. It was

later determined that the defendant was suffering from a psychosis

that interfered with his ability to make free and rational choices

and, while not preventing him from understanding his rights,

motivated him to confess. Although no police misconduct or coercion

occurred, the trial court suppressed the defendant's statements as

involuntary, finding that his mental state vitiated his attempted

waivers of the right to counsel and the privilege against self-

incrimination.   The Colorado Supreme Court affirmed on the grounds

that the defendant's mental state interfered with his rational

intellect and his free will, that admission of his confession would

violate the Due Process Clause of the Fourteenth Amendment, and that

the defendant's mental condition precluded him from making a valid

waiver of his _Miranda_ rights.   479 U.S. at 160-63.

The Supreme Court reversed, holding that "coercive police

activity is a necessary predicate to the finding that a confession is

not "voluntary" within the meaning of the Due Process Clause of the

Fourteenth Amendment."   _Id._ at 167.

> Absent police conduct causally related to the
> confession, there is simply no basis for
> concluding that any state actor has deprived a
> criminal defendant of due process of law. . . .
> [A]s interrogators have turned to more subtle
> forms of psychological persuasion, courts have
> found the mental condition of the defendant a
> more significant factor in the "voluntariness"
> calculus.   But this fact does not justify a
> conclusion that a defendant's mental condition,
> by itself and apart from its relation to official
> coercion, should ever dispose of the inquiry into
> constitutional "voluntariness."

_Id._ at 164 (footnote and citation omitted).   Accordingly, while a

defendant's mental condition is relevant to his susceptibility to

police coercion, "mere examination of the confessant's state of mind

can never conclude the due process inquiry."   _Id._ at 165.   With

regard to the Fifth Amendment privilege against self-incrimination,

the Court likewise held that "[t]he sole concern of the Fifth

Amendment, on which _Miranda_ was based, is governmental coercion."

97

1   Id. at 170.  The voluntariness of a waiver of the Fifth Amendment

2   privilege or of any Miranda right depends on "the absence of police

3   overreaching, not on 'free choice' in any broader sense of the word."

4   Id. at 169-70.  See United States v. Kelley, 953 F.2d 562, 565-66

5   (9th Cir. 1992) (holding that a statement given to police while the

6   defendant was obviously suffering from heroin withdrawal was

7   voluntary and that the circumstances of the interrogation did not

8   reach the requisite level of coercive activity by police necessary to

9   support a finding to the contrary).  See also Henry v. Keenan, 197

10  F.3d 1021, 1026 (9th Cir. 1999); Clabourne v. Lewis, 64 F.3d 1373,

11  1379 (9th Cir. 1995); United States v. Miller, 984 F.2d 1028, 1030-31

12  (9th Cir. 1993).[32]

13        In the present case, petitioner has not alleged and "does

14  not assert that his statements to Detective Bell were coerced."

15  (Opp'n & Cross-Mot. for Summ. J. at 175.)  The undisputed facts do

16  not demonstrate that any police overreaching or other governmental

17  coercion occurred in the taking of petitioner's post-arrest

18  statement.  Respondent is therefore entitled to summary judgment on

19  Claim I, and petitioner's cross-motion should be denied.

20  /////

21  /////

22

23        [32]  In People v. DeBaca, 736 P.2d 25 (Colo. 1987) (en banc), the
    Colorado Supreme Court distinguished People v. Fordyce on the facts
    but also noted that Fordyce was decided before Colorado v. Connelly
24  and that the court had not addressed "the question whether the police
    conduct was of the coercive nature required by Colorado v. Connelly
25  as a necessary predicate to a finding of involuntariness under the
    due process clause of the fourteenth amendment."  736 P.2d at 27-28 &
26  n.3.

1    **J.   Prosecutorial Misconduct/Comment on Defense Tactics**

2          In this claim petitioner contends that the prosecutor

3    committed misconduct throughout his guilt-phase closing argument.

4    (Am. Pet. at 80-82.)   Specifically, petitioner takes issue with the

5    following portion of that argument:

6                One of the things that has occurred in this case,
             it's been really interesting from my standpoint.
7             I think it's probably been interesting maybe from
             your standpoint. Fascinating actually.

8
             It's been like a law school trial tactics class
9             because one of the things you learn in law
             school, that you're taught in law school is that
10            if you don't have the law on your side, argue the
             facts.  If you don't have the facts on your side,
11            argue the law.  If you don't have either one of
             those things on your side, try to create some
12            sort of a confusion with regard to the case
             because any confusion at all is to the benefit of
13            the defense because confusion - -

14   (Am. Pet. at 80.)   Petitioner asserts that this argument to the jury

15   that defense counsel were trained to create confusion with regard to

16   the case, and the trial court's failure to cure the prejudice

17   stemming therefrom, violated his Fifth, Sixth, Eighth and Fourteenth

18   Amendment rights.   (<u>Id</u>. at 80-82.)

19         Respondent contends that this claim is ripe for resolution

20   on summary judgment.   Respondent argues that the challenged comment

21   made during the prosecutor's guilt phase closing argument immediately

22   followed, and was in response to, the defense argument in which the

23   prosecutor was accused by defense counsel of "sandbagging," rewarding

24   witnesses for favorable testimony, and making an effort to create a

25   misunderstanding as to the evidence regarding the effects of cocaine.

26   (Alt. Mot. for Summ. J. at 125-26.)   Respondent points out that the

1  trial court overruled defense counsel's objection to the prosecutor's

2  comment, finding that neither side had gone too far.  (Id. at 126.)

3  Respondent also notes that this argument was rejected by the

4  California Supreme Court on direct appeal because the prosecutor's

5  single comment was properly understood as cautioning the jury to rely

6  on the evidence introduced at trial.  (Id. at 126-27.)  Respondent

7  argues that both rulings were correct since the challenged comment

8  was merely a response to defense counsel's argument impugning the

9  prosecutor's integrity, a cautionary instruction was given by the

10  trial court directing the jury to focus on the evidence and not on

11  any personal disagreement between counsel, and the comment did not

12  have a substantial and injurious effect or influence in determining

13  the verdict to the extent of denying petitioner a fair trial.  (Id. at

14  126-27.)

15       Petitioner also moves for summary judgment in his favor on

16  this claim arguing that: (1) the prosecutor's comment clearly and

17  improperly impugned defense counsel's integrity; (2) the trial

18  court's statement to the jury in overruling the defense objection

19  affirmed the prosecutor's claim that defense attorneys were trained

20  to create confusion; and (3) the error was harmful both as to the

21  guilt and penalty phase verdicts as evidenced by the length and

22  closeness of the jury's deliberations.  (Opp'n & Cross Mot. for Summ.

23  J. at 182-84.)

24       The legal standards generally applicable to claims of

25  prosecutorial misconduct have been addressed in Section B, supra.  In

26  short, in considering claims of prosecutorial misconduct involving

1  allegations of improper argument, the court is to examine the likely

2  effect of the statements in the context in which they were made and

3  determine whether the comments so infected the trial with unfairness

4  as to make the resulting conviction a denial of due process.  <u>Turner</u>,

5  281 F.3d at 868; <u>Sandoval</u>, 241 F.3d at 778; <u>see also Darden</u>, 477 U.S.

6  at 181; <u>Donnelly</u>, 416 U.S. at 643.  "[I]t 'is not enough that the

7  prosecutors' remarks were undesirable or even universally

8  condemned.'"  <u>Darden</u>, 477 U.S. at 181 (citation omitted).  The issue

9  is whether the "remarks, in the context of the entire trial, were

10  sufficiently prejudicial to violate [petitioner's] due process

11  rights."  <u>Donnelly</u>, 416 U.S. at 639.

12      It is generally unprofessional and improper for a

13  prosecutor to malign or impugn the integrity of defense counsel in

14  closing argument.  <u>See United States v. Rodrigues</u>, 159 F.3d 439, 449-

15  51 (9th Cir. 1998), <u>amended by</u> 170 F.3d 881 (9th Cir. 1999); <u>Williams</u>

16  <u>v. Borg</u>, 139 F.3d 737, 745 (9th Cir. 1998); <u>United States v.</u>

17  <u>Frederick</u>, 78 F.3d 1370, 1379-80 (9th Cir. 1996).  However, a

18  prosecutor's comments must be examined in the context of the entire

19  trial and not in isolation.  <u>United States v. Robinson</u>, 485 U.S. 25,

20  33 (1988); <u>Greer</u>, 483 U.S. at 765-66; <u>United States v. Young</u>, 470

21  U.S. 1, 11-12 (1985).

22          In order to make an appropriate assessment, the
           reviewing court must not only weigh the impact of
23          the prosecutor's remarks, but must also take into
           account defense counsel's opening salvo.  Thus
24          the import of the evaluation has been that if the
           prosecutor's remarks were "invited," and did no
25          more than respond substantially in order to
           "right the scale," such comments would not
26          warrant reversing a conviction.

1  Young, 470 U.S. at 12-13.  This "idea of 'invited response' is used

2  not to excuse improper comments, but to determine their effect on the

3  trial as a whole."  Darden, 477 U.S. at 182 (citing Young, 470 U.S.

4  at 13).  While a prosecutor may fairly rebut defense counsel's

5  contentions, United States v. Bagley, 772 F.2d 482, 494 (9th Cir.

6  1985), the prosecution is not entitled to use improper tactics in

7  response to tactics of defense counsel, Young, 470 U.S. at 7-9.

8      Here, the prosecutor's comment does not justify the

9  granting of habeas relief.  As noted above, the law requires that in

10  assessing whether error of constitutional dimension occurred the

11  prosecutor's comments must be viewed in context.  The prosecution's

12  guilt phase closing argument in this case contained no mention of

13  defense counsel or their conduct.  (RT at 6454-6520.)  In the defense

14  guilt phase closing argument petitioner's counsel chided the

15  prosecutor for "sandbagging" by not talking about "the real facts of

16  this case" and not mentioning the testimony of defense expert Dr.

17  Fred Rosenthal.[33]  (RT at 6533.)  Defense counsel also suggested that

18  the prosecutor was willing to reward a witness who gave testimony

19  favorable to the prosecution and had elicited misleading testimony

20  calling into question the testimony of a defense witness.  (RT at

21  6547, 6552.)  In his rebuttal guilt phase argument the prosecutor

22  addressed involuntary manslaughter, voluntary manslaughter, second

23

---

24      [33]  Dr. Rosenthal was called as a psychiatric expert by the
    defense.  He testified that in his opinion due to petitioner's
25  cocaine use and lack of sleep petitioner did not intend to or
    premeditate the shooting of the victim but was reacting impulsively
26  and irrationally rather than with deliberation.  (See RT at 5307-11.)

1  degree murder and first degree murder with respect to petitioner's

2  killing of the victim. (RT at 6674.) It was in this context that

3  the prosecutor made the challenged comment. (Id.) Defense counsel

4  objected on the grounds that the argument was in "violation of the

5  Sixth Amendment" and "went beyond the facts on the record." (RT at

6  6675.) The trial court overruled the objection stating, apparently

7  in response to the second stated basis of the objection, as follows:

> I will instruct the jury, however, that any
> argument that relates to facts that are not on
> the record should be disregarded by the jury. At
> times counsel may make an error, forget what's
> there and what is not; but they may argue those
> facts that are on the record, are those facts
> which are commonly known by all the people. With
> that explanation, the objection is overruled.

13  (Id.)

14         At the next recess, petitioner's counsel reiterated his

15  objection to the prosecutor's rebuttal argument as suggesting defense

16  counsel was engaging in improper conduct, thereby denying petitioner

17  his Sixth Amendment right to effective assistance of counsel. (RT at

18  6679.) Counsel requested that the prosecutor be instructed not to

19  again attack the character of defense counsel. (Id.) The trial

20  court denied the request, stating:

> Very common in trials. There is fairly wide
> latitude given to counsel in their argument.
> They do not have to be complete gentlemen. And I
> believe that I heard defense counsel impugn the
> motivation of the prosecution for testimony – or
> argument that they made. And again, this is –
> this is the observation and opinion of counsel in
> an adversary type position. I don't think it has
> gone too far. Of course there are bounds upon

26  /////

103

1           that.  But I don't think that it has gone to the
2           point where it would deprive Mr. Breaux of his
          Sixth Amendment rights.

3    (RT at 6682.)  Defense counsel's motion for a mistrial on this basis

4    was also denied.  (Id.)  The court's jury instructions included the

5    pattern instruction that statements made by the attorneys are not

6    evidence.  (RT at 6733.)

7          The undersigned does not agree with the trial court's

8    characterization of the prosecutor's comment as "very common."  Nor

9    was the prosecutor's comment clearly intended to merely caution the

10   jury to rely on the evidence introduced at trial.  The comment,

11   though brief and isolated, also suggested to the jury that defense

12   counsel had been trained to confuse the jury because confusion was

13   always to the benefit of the defense.  The argument was therefore

14   improper.  See Rodrigues, 159 F.3d at 449-51 (prosecutor's comment

15   that defense counsel had "tried to deceive [the jury] . . . about

16   what this case is really about" found to be a false accusation and "a

17   gratuitous attack on the veracity of defense counsel" that distorted

18   the trial process); Frederick, 78 F.3d at 1379-80 (prosecutor's

19   argument "complimenting" defense counsel for confusing a prosecution

20   witness on cross-examination found to be improper).  However, despite

21   the impropriety in this case, there is no constitutional error

22   justifying the granting of habeas relief unless the comment was

23   prejudicial to the point of denying petitioner a fair trial.  Darden,

24   477 U.S. at 181; Turner, 281 F.3d at 868; Rodrigues, 159 F.3d at 449-

25   51; Williams, 139 F.3d at 745.  In this case the comment at issue was

26   brief and isolated and certainly was not the predominant theme of the

prosecutor's rebuttal argument.  Defense counsel objected to the

argument and, although the objection was overruled, the trial court

advised the jury that any argument relating to facts not established

by the evidence should be disregarded.  The jury was later instructed

that the arguments of counsel were not evidence.  While these

instructions were not particularly focused on the nature of defense

counsel's objection, they nonetheless suggested that counsel's

argument should be viewed as merely that.  Moreover, to some extent

the comment did suggest a focus on the evidence even though the

prevailing implication was that defense counsel was seeking to create

confusion.  Finally, defense counsel in his closing argument told the

jury that the prosecutor was "sandbagging," not addressing the "real

facts of this case" and suggested that the prosecutor had elicited

misleading testimony in attacking the defense case.  Such comments by

the defense invited some response, thus supporting the conclusion

that the prosecutor's improper comment did not have the effect of

denying petitioner a fair trial.  See Darden, 477 U.S. at 181-82.

Accordingly, as to this claim petitioner's motion for

summary judgment should be denied and respondent's motion granted.[34]

---

[34]  This case is distinguishable from Bruno v Rushen, 721 F.2d
1193 (9th Cir. 1983), upon which petitioner relies.  In that case the
prosecutor argued to the jury that defense counsel had engaged in
witness tampering and had agreed to aid in the fabricating of a
defense for the sake of profit.  Id. at 1194 & nn.1-3.  In addition,
the prosecutor openly hinted to the jury that the fact that the
defendant had hired counsel was in some way probative of his guilt.
Id. at 1194.  The court found that error of constitutional dimension
had occurred and that the error was not harmless in light of the
extensive nature of the improper argument and the fact that the
comments were calculated to wrongly impute guilt to the defendant and
struck at the heart of the defendant's story.  Id. at 1194-95.  None

1    **K.    Consciousness of Guilt Jury Instruction**

2            Petitioner alleges that the trial court erred in

3    instructing the jury it could consider a defendant's post-arrest

4    false statements (CALJIC 2.03) and efforts to conceal evidence

5    (CALJIC 2.06) as tending to prove a consciousness of guilt.  (Am.

6    Pet. at 82-95.)  Petitioner notes that the instructions were given

7    over his objection and asserts that the instructions were irrelevant

8    in the context of this case where petitioner had conceded his guilt

9    on counts two through eight and conceded that he had killed the

10   victim but contested only the allegation that the killing was murder

11   in the first degree.   In light of these concessions, petitioner

12   claims that the instructions were unconstitutional in that they

13   encouraged the jury to draw the impermissible inference that such

14   evidence was inculpatory of petitioner on the special circumstances

15   allegations and on the first degree murder charge.

16           Respondent moves for summary judgment on this claim,

17   arguing that the challenged instructions were properly given since

18   petitioner's acts showed consciousness of guilt with respect to all

19   offenses and special circumstances charged.   Respondent also argues

20   that a defendant's post-arrest conduct can be relevant to the state

21   of mind with which an offense is committed.   Respondent notes that

22   the California Supreme Court rejected petitioner's arguments on

23   direct appeal on the grounds that: (1) the instructions in question

24

25   of those factors are present here.  See Dortch v. O'Leary, 863 F.2d
     1337, 1345-46 (7th Cir. 1988) (prosecutor's argument that defense
     counsel had presented "the biggest snow job in the courtroom" did not
26   deny defendant a fair trial).

caution that such evidence is not sufficient to establish guilt; (2)
the instructions do not address the defendant's mental state at the
time of the offense and do not compel the drawing of an impermissible
inference in regard thereto; and (3) the issue of petitioner's guilt
on each of the charges remained before the jury in that petitioner
had not pled guilty to any of the charges. See Breaux, 1 Cal. 4th at
304. In addition, respondent contends that the Ninth Circuit has
rejected petitioner's argument with respect to CALJIC 2.03 and that
CALJIC 2.06 is indistinguishable. See Turner v. Marshall, 63 F.3d
807, 819-20 (9th Cir. 1995), overruled on other grounds by Tolbert v.
Page, 182 F.3d 677 (9th Cir. 1999).

Petitioner opposes respondent's motion and moves for
summary judgment in his favor on this claim. In doing so petitioner
argues that the instructions provided the jury with an improper
permissive inference in that they suggested a conclusion could be
drawn from evidence that was not justified by reason and common
sense. See Ulster County Court v. Allen, 442 U.S. 140, 157-63
(1979). In this regard, petitioner argues that evidence of his post-
arrest false statements and his efforts to conceal evidence was not
relevant to the only contested issue at trial, whether he was guilty
of first degree murder or of some other crime based upon his mental
state at the time of the commission of the crime. Petitioner argues
that because the facts proved (acts reflecting consciousness of
guilt) had no rational connection to whether he acted with
deliberation and premeditation, the instructions were given in
violation of his right to due process. Finally, petitioner asserts

1  that the error was prejudicial in that the only issue at trial was

2  his mental state at the time and which was hotly contested, with the

3  length and closeness of the jury deliberations reflecting that the

4  question was a close one.

5        On direct appeal the California Supreme Court rejected

6  petitioner's challenge to the consciousness of guilt instructions

7  because: (1) the instructions did not address the defendant's mental

8  state at the time of the offense and did not direct or compel the

9  drawing of any inference with respect thereto; and (2) petitioner had

10 not pled guilty to any pending charge and the issue of guilt was

11 before the jury on all of those charges.   Breaux, 1 Cal. 4th at 304.

12 The undersigned agrees with that conclusion.

13        As noted above in Section E, supra, a challenge to jury

14 instructions generally does not state a federal constitutional claim.

15 Middleton, 768 F.2d at 1085; Gutierrez, 695 F.2d at 1197.   In order

16 to warrant federal habeas relief, a challenged jury instruction

17 cannot be merely "'undesirable, erroneous, or even "universally

18 condemned,"' but must violate some due process right guaranteed by

19 the fourteenth amendment."   Prantil, 843 F.2d at 317 (quoting Cupp,

20 414 U.S. at 146).   To prevail, petitioner must demonstrate that an

21 erroneous instruction "'so infected the entire trial that the

22 resulting conviction violates due process.'"   Prantil, 843 F.2d at

23 317 (quoting Darnell, 823 F.2d at 301).   The court must evaluate the

24 challenged jury instructions "'in the context of the overall charge

25 to the jury as a component of the entire trial process.'"   Id.

26 (quoting Bashor, 730 F.2d at 1239).

1    In this case, the court's instructions were as follows:

2    If you find that before this trial the defendant
     made a willfully false or deliberately misleading
3    statement concerning the charge upon which he is
     now being tried, you may consider such statements
4    as a circumstance tending to prove a
     consciousness of guilt but it is not sufficient
5    by itself to prove guilt.  The weight to be given
     such a circumstance and its significance, if any,
6    are matters for your determination.

7                        *  *  *

8    If you find that a defendant attempted to
     suppress evidence against himself in any manner,
9    such as by concealing evidence, such attempts may
     be considered by you as a circumstance tending to
10   show a consciousness of guilt.   However, such
     evidence is not sufficient in itself to prove
11   guilt, and its weight and significance, if any,
     are matters for your consideration.

12

13   (CT at 1342-43.)

14       The Ninth Circuit has upheld instructions such as those at

15   issue here so long as they do not state that the conduct or statement

16   constitutes "evidence of guilt, but merely states that the jury may

17   consider them as indicating a consciousness of guilt."   Turner, 63

18   F.3d at 819-20.   The challenged instructions pass muster under that

19   standard.   Moreover, despite petitioner's trial strategy not to

20   contest his guilt with respect to the non-homicide charges and the

21   killing (RT at 6521-29), the question of petitioner's guilt as to

22   those charges was still submitted to the jury for decision.   Indeed,

23   the trial judge confirmed with defense counsel after jury selection

24   that the defense had "not entered into any stipulations, you have not

25   pleaded guilty, you have not made any admissions in front of the

26   jury."  (RT at 4216.)  Evidence was admitted at trial from which the

                                    109

jury could find that petitioner had made false post-arrest statements to police and had attempted to conceal incriminating evidence. (See RT at 4403-28, 4439-40, 4544-47, 4621-24, 4648, 4701-04, 4846-51.) Thus, the instructions were appropriate in light of the pending charges and the evidence admitted at trial.

Most importantly, petitioner has failed to meet his burden of showing that the giving of these instructions "had [a] substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Even assuming that consciousness of guilt had no relevance in this case given petitioner's concessions at trial, the challenged jury instructions did not require the jury to draw any conclusions. The instructions merely informed the jury that misleading acts or statements "may" be considered as a circumstance tending to show or prove a consciousness of guilt. See Turner, 63 F.3d at 820. Finally, nowhere in closing arguments was it suggested to the jury that finding consciousness of guilt was relevant to determining the degree of petitioner's guilt with respect to the killing. While it may have been preferable for the trial court to have specifically admonished the jury in this regard, petitioner has failed to establish any reason to believe that the jury applied the challenged instructions in a way that violated his due process rights.

Accordingly, with respect to this claim petitioner's motion for summary judgment should be denied and respondent's motion granted.

/////

**L.   Petitioner's Competence to Stand Trial**

In Claim L, petitioner alleges that he was unable to assist counsel in a rational manner and that his conviction and death sentence therefore violated the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Am. Pet. at 84-92.)  The claim is a substantive, as opposed to procedural, incompetence claim.

Respondent contends that nothing proffered by petitioner shows that he was unable to understand the nature and purpose of the proceedings or that he was unable to assist his attorneys.[35] Respondent asserts that petitioner offers no documents in support of this claim and relies on the uncontested facts shown at trial that he used drugs around the time of the charged crimes, that he was in a traffic collision on June 16, 1984, in which he hit his head, that he was shot in the course of his arrest, and that he was given pain medication during treatment for his gunshot wounds, along with the new allegation that he was abused as a child.  Respondent argues that the uncontested facts from trial coupled with petitioner's allegations of child abuse are insufficient as a matter of law to

---

[35]   In Claim L petitioner alleges that he "was incompetent to stand trial, was not capable of understanding the nature and purpose of the proceedings against him, did not comprehend his own status and condition in reference to such proceedings, and also was not able to assist his attorneys in conducting his defense in a rational manner." (Am. Pet. at 85.)  In opposition to respondent's motion regarding Claim L, petitioner observes in a footnote that "[m]uch of respondent's briefing on this claim addresses the 'unable to understand the nature and object of the proceedings' prong of the competency test" and declares that "[p]etitioner's claim does not go to this prong of the test."  (Opp'n & Cross-Mot. for Summ. J. at 192 n.134.)  It appears that petitioner has abandoned his allegation that he was not capable of understanding the nature and purpose of the proceedings against him.

111

1   demonstrate a federal constitutional error for which petitioner is

2   entitled to relief.   (Alt. Mot. for Summ. J. at 135-37.)

3          Respondent states that the standard for incompetence to

4   stand trial is whether the defendant's mental condition is such that

5   he lacks the capacity to understand the nature and object of the

6   proceedings against him, to consult with counsel, and to assist in

7   preparing his defense.   Respondent acknowledges that a state deprives

8   a defendant of due process if it fails to provide an adequate

9   mechanism for determining whether a defendant is incompetent to stand

10  trial and that a trial court is required to investigate the

11  defendant's competence if a sufficient basis for doubt is shown.

12  Respondent contends, however, that petitioner neither challenges the

13  adequacy of California's mechanism for determining incompetence nor

14  claims that the trial court was required to declare a doubt regarding

15  petitioner's competence based on the information before that court.[36]

16          Petitioner agrees that there are a number of undisputed

17  facts relevant to this claim, including the facts that petitioner had

18  a history of polysubstance abuse that began when he was nine years

19  old; suffered a head injury in a traffic accident not long before his

20  arrest that went untreated; and was wounded during his arrest and

21  ─────────────────

22  [36]   Respondent argues at length that the United States Supreme
    Court has not held that incompetence to stand trial "in itself"
    warrants federal habeas relief.   Respondent concedes that Ninth

23  Circuit opinions have so stated but characterizes those statements as
    being wrong as a matter of law, arguing that relief may not be

24  granted on this claim under Teague v. Lane.   (Alt. Mot. for Summ. J.
    at 137-42.)   See pp. 13-15, supra.   Respondent also asserted an

25  abuse-of-the-writ argument in support of his motion for summary
    judgment on Claim L, but the argument was withdrawn in respondent's

26  reply.   (Alt. Mot. for Summ. J. at 136; Resp't's Reply at 7.)

given morphine for the pain.  Petitioner contends that all of these facts affected his competency to stand trial but that the primary focus of Claim L is that he was unable to assist in his defense because of the abuse he suffered as a child and because of other factors arising from his family history.  Petitioner asserts that it is also undisputed that he did not discuss these matters with his trial counsel, despite repeated questioning, and that his inability to do so can be addressed in the context of an evidentiary hearing on petitioner's claims of ineffective assistance of counsel, if a hearing is held.  Petitioner cites the arguments he has offered in support of Claims C and W[37] concerning counsel's awareness of his inability to assist in his defense and counsel's failure: to develop evidence to prove abuse indirectly; to institute competency proceedings; and to secure the services of an expert in child sexual abuse.[38]  Petitioner concludes that he is entitled to summary judgment on Claim L or to an evidentiary hearing to resolve any remaining factual issues concerning his competence to stand trial.  (Opp'n & Cross-Mot. for Summ. J. at 191-93 & n.135; Ex. UU.)

"The conviction of an accused person while legally incompetent to stand trial is a clear violation of the constitutional

---

[37] Petitioner indicates that his amended petition mistakenly incorporates the allegations of Claims C and X into Claim L. Petitioner intended to and did incorporate the allegations of Claims C and W into Claim L.  (Opp'n & Cross-Mot. for Summ. J. at 191 n.133.)

[38] Petitioner also argues that respondent's procedural bar arguments, including those relating to <u>Keeney v. Tamayo-Reyes</u>, <u>Teague v. Lane</u>, and the AEDPA standard of review, should all be summarily rejected.

guarantee of due process." <u>Hernandez v. Ylst</u>, 930 F.2d 714, 716 (9th

Cir. 1991)(citing <u>Pate v. Robinson</u>, 383 U.S. 375, 378 (1966)).  <u>See</u>

<u>also</u> <u>Cooper v. Oklahoma</u>, 517 U.S. 348, 354 (1996); <u>Davis v. Woodford</u>,

333 F.3d 982, 999 (9th Cir. 2003); <u>Cacoperdo v. Demosthenes</u>, 37 F.3d

504, 510 (9th Cir. 1994).  A defendant is incompetent to stand trial

if he lacks sufficient present ability to consult with his lawyer

with a reasonable degree of rational understanding or lacks a

rational as well as factual understanding of the proceedings against

him.  <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960).  <u>See</u> <u>also</u>

<u>Godinez v. Moran</u>, 509 U.S. 389, 396 (1993); <u>Williams v. Woodford</u>, 306

F.3d 665, 705 (9th Cir. 2002); <u>Hernandez</u>, 930 F.2d at 716 n.2.

The burden of establishing mental incompetence rests with

the petitioner.  <u>Boag v. Raines</u>, 769 F.2d 1341, 1343 (9th Cir. 1985);

<u>Lee v. United States</u>, 468 F.2d 906, 906-07 (9th Cir. 1972); <u>see</u> <u>also</u>

<u>Williams</u>, 306 F.3d at 705.  In a habeas corpus proceeding, a

petitioner is entitled to an evidentiary hearing on the issue of

competency to stand trial if he or she presents sufficient facts to

create a real and substantial doubt as to competency, even if those

facts were not presented to the trial court.  <u>Deere v. Woodford</u>, 339

F.3d 1084, 1086 (9th Cir. 2003); <u>Steinsvik v. Vinzant</u>, 640 F.2d 949,

954 (9th Cir. 1981).  "A . . . 'substantial doubt' exists 'when there

is substantial evidence of incompetence'" <u>Deere</u>, 339 F.3d at 1086

(quoting <u>Cuffle v. Goldsmith</u>, 906 F.2d 385, 392 (9th Cir. 1990)).

It is undisputed that petitioner had a history of substance

abuse that began at a young age; that he suffered a head injury in a

traffic accident not long before his arrest and the injury went

1  untreated; that injuries suffered by petitioner during his arrest

2  required hospitalization; and that drugs were administered to him in

3  the hospital and throughout his pretrial incarceration.  These

4  factors may have affected petitioner's ability to assist in his

5  defense and when joined with his allegations of child abuse and other

6  adverse factors in his family history create a real and substantial

7  doubt as to whether petitioner was able to assist counsel in his

8  defense.

9       The court finds that the allegations set forth in Claim L

10 are sufficient to demonstrate a federal constitutional error for

11 which petitioner may be entitled to relief if the allegations are

12 proved.  The undersigned, of course, is not suggesting that the

13 allegations and the current record requires the ultimate conclusion

14 that petitioner was not competent to assist in his defense.  Rather,

15 taken as a whole, the facts in the record raise sufficient doubt to

16 preclude the granting of summary judgment on the claim.  Therefore,

17 Claim L should not be dismissed for failure to allege a

18 constitutional error.[39]

19      Petitioner, as the moving party on his cross-motion for

20 summary judgment, has not demonstrated that he is entitled to

21 judgment in his favor at the present time.  An evidentiary hearing is

22 likely necessary to resolve the truth of petitioner's allegations

23 concerning his inability to assist counsel in his defense.  See

24

25      [39] Respondent's arguments concerning Keeney v. Tamayo-Reyes,
Teague v. Lane, and the AEDPA standard of review also lack merit.

26

1   Deere, 339 F.3d at 1086; Williams, 306 F.3d at 705 (district court

2   conducting evidentiary hearing on petitioner's mental state in

3   conjunction with his ineffective-assistance-of-counsel claims).

4   Accordingly, neither party is entitled to summary judgment in their

5   favor as to this claim.

6     **M.**  **Death Qualification of Jury**

7       In this claim petitioner asserts that prospective jurors

8   were questioned during voir dire regarding their views on the death

9   penalty and, as a result, several prospective jurors who could have

10  otherwise been fair and impartial were excluded because of their

11  views regarding the death penalty.  (Am. Pet. at 92-93.)  Petitioner

12  alleges that this "death-qualifying" voir dire denied him his rights

13  to a representative jury, an impartial jury, a reliable determination

14  of his guilt or innocence and a fair, reliable, individualized, non-

15  arbitrary and adequately-guided determination with respect to the

16  proper penalty as required under the Fifth, Sixth, Eighth and

17  Fourteenth Amendments.

18      Respondent moves for summary judgment in his favor on this

19  claim, arguing that the California Supreme Court properly rejected

20  petitioner's argument on direct appeal because the United States

21  Supreme Court has held that the "death qualification process" does

22  not violate a defendant's federal constitutional rights.  See

23  Lockhart v. McCree, 476 U.S. 162 (1986).  In response, petitioner

24  agrees that United States Supreme Court precedent is adverse to his

25  position with respect to both the fair-cross-section and impartial

26  jury aspects of his claim.  See Lockhart, 476 U.S. at 173-84;

1    Buchanan v. Kentucky, 483 U.S. 402, 414-20 (1987); see also Furman v.

2    Wood, 190 F.3d 1002, 1004-05 (9th Cir. 1999).   Thus, petitioner

3    concedes that the relief he seeks on this claim can come only from

4    the United States Supreme Court.

5            In light of petitioner's concession, respondent's motion

6    for summary judgment should be granted on this claim.

7        **N.    Defense Counsel's Concession of Non-Homicide Counts Without
             Petitioner's Waiver of His Right to a Jury Trial**

8

9            In this claim petitioner alleges that in closing argument

10   trial counsel improperly conceded petitioner's guilt as to all

11   charges except the murder count.   In this regard, petitioner alleges

12   that his trial counsel urged the jury to return guilty verdicts as to

13   those charges, telling the jury that the only question for them to

14   resolve was whether he was guilty of first degree murder, second

15   degree murder or manslaughter.   Petitioner alleges that he was

16   unaware his counsel would be conceding his guilt, did not understand

17   his constitutional rights and did not waive, and would not have

18   waived, his constitutional right to trial with respect to those other

19   charges.   Thus, petitioner alleges that his counsel's concession of

20   guilt was carried out in violation of petitioner's constitutional

21   rights.   (Am. Pet. at 93-95.)   Both sides have moved for summary

22   judgment in their favor with respect to this claim.

23           Respondent argues defense counsel's tactical concession

24   that petitioner was the perpetrator of the charged offenses was

25   reasonable in light of the overwhelming evidence to that effect and

26   did not require that petitioner waive his trial rights.   Respondent

1    notes that a similar contention by petitioner was rejected by the

2    California Supreme Court on direct appeal.  Breaux, 1 Cal. 4th at

3    306-07.

4            Petitioner opposes respondent's motion and seeks summary

5    judgment in his favor on this claim, arguing that his trial counsel

6    entered a waiver-less, de facto guilty plea on his behalf.

7    Petitioner clarifies that this is not an ineffective assistance claim

8    challenging the tactical decisions of counsel.  Rather, it is his

9    claim that: (1) regardless of the evidence and the soundness of the

10   tactical decision, there was an absence of personal, constitutional

11   waivers attendant to the de facto guilty plea as required; and (2)

12   counsel was ineffective in conceding guilt in the absence of such

13   waivers.  He contends that the writ must issue as to the seven non-

14   homicide counts to which counsel improperly conceded guilt and that

15   he also suffered prejudice with respect to his first-degree murder

16   conviction since it was based upon the robbery conviction that was

17   infected by the error.

18           In reply respondent states that petitioner suggests a rule

19   that defense counsel may not make a tactical decision to concede

20   guilt in closing argument as to some charges in urging the jury to

21   return a defense verdict with respect to the remaining charges absent

22   a personal plea waiver from the defendant.  Respondent asserts that

23   no such rule exists.  Petitioner counters that courts have recognized

24   that guilty plea principles apply to actions by trial counsel that

25   are the functional equivalent to a guilty plea.  See Brookhart v.

26   /////

                                  118

1  <u>Janis</u>, 384 U.S. 1 (1966); <u>Wiley v. Sowders</u>, 647 F.2d 642 (6th Cir.

2  1981).

3          Beginning with the voir dire of perspective jurors

4  petitioner's trial counsel was straightforward and direct in

5  embracing a guilt phase strategy that would concede guilt on all

6  charges except those posing the threat of a potential death sentence.

7  Thus, counsel stated to the second prospective juror he questioned:

8              And you'd learn, when I make my opening
             statement, Mr. Breaux is charged with eight
9            separate charges.
             Mr. Breaux maintains he is not guilty of the
10           charge of first degree murder, but as to the
             other seven charges, the defendant is going to
11           concede those in this trial.
             There's not going to be any contest as to
12           the other seven charges.
             Would you tell me what your reaction to
13           knowing those facts is?
                            *  *  *
14           As for seven of those eight charges, he's
             admitting those.
15                          *  *  *
             The defense position would be that it's
16           relevant for you to hear about the seven other
             crimes so you're going to hear about that.  But
17           we're not going to contest the issue of his
             guilt.  In other words, we're going to concede
18           he's guilty.
             We feel there's value in the jury hearing
19           that in that that information will be of some
             assistance in deciding the issues we are
20           contesting.
             And so, knowing that, that's our attitude
21           and that, therefore, the prosecution will have to
             present evidence on those other seven counts,
22           what's your response to knowing that that's our
             position, that we want you to hear it and,
23           therefore, you'll be required to hear that
             evidence even though we're not contesting it?
24

25  (RT at 2811-13.)  Throughout the course of voir dire defense counsel

26  made similar statements regarding the focus of the defense solely on

119

1  the first degree murder charge.  (See, e.g., RT at 2878, 2991-92,

2  3028, 3053, 3160, 3222, 3484, 3510, 3600, 3633, 3651, 3710.)

3      Counsel unequivocally announced the defense trial strategy

4  again at the outset of his opening statement by telling the jury:

5          The D.A. has described here this morning
           some of the evidence that you will hear in this
6          case.
               Let me briefly outline for you the remainder
7          of the evidence that will be presented so you
           might have a total picture in your mind at the
8          outset.
               The evidence in this case will show that Mr.
9          David Breaux is not guilty of first degree
           murder, and the evidence will show the special
10         circumstances are not true.
               Mr. Breaux is guilty of all the other
11         charges, the other seven charges.  For that
           reason, many of the witnesses will not be asked
12         any questions or very few questions by myself.
               But we feel it is important that you hear
13         about the facts.  Because those facts will be
           relevant to your determination that Mr. Breaux is
14         not guilty of first degree murder.

15  (RT at 4287.)

16      In his opening statement in the guilt phase counsel went on

17  to tell the jury that the evidence would show that petitioner robbed

18  a store where Greg Hardy worked as a clerk, kidnapped Mr. Hardy to

19  delay the report of the robbery to police, robbed Connie Decker,

20  kidnapped her and, in a cocaine-induced frenzy and rage, shot and

21  killed her.  (RT at 4293-95.)  Petitioner's counsel also stated that

22  the evidence would show that when confronted by police two days

23  later, Mr. Breaux refused to surrender and was in possession of a

24  firearm.  (RT at 4297.)  Counsel concluded his opening statement by

25  telling the jury that:

26  /////

1
2
3

> When all the evidence is in, it will be
> clear that Mr. Breaux is not guilty of first
> degree murder and it will also be clear that Mr.
> Breaux is guilty of second degree murder or
> manslaughter and all of the other charges.

4  (RT at 4298.)

5      Throughout the guilt phase trial petitioner's counsel

6  remained consistent with this announced strategy.  Thus, at the

7  conclusion of the guilt phase, counsel returned to the strategy

8  announced in voir dire and in opening statements:

9
10
11
12
13
14
15
16
17
18
19

> As I told you at the outset, it's our
> position that the District Attorney has not
> proven first degree murder in this case.
>     And it's our position that the District
> Attorney has not proven beyond a reasonable doubt
> and to a moral certainty that the special
> circumstances are true.
>     As I told most of you in jury selection, as
> to all the other charges and allegations against
> Mr. Breaux, we concede those.  And as jurors,
> when you go back into the jury room, as far as
> the defense is concerned, you can take the other
> jury forms and check guilty and not give them any
> further thought.
>     What this trial has been about from the very
> day you entered the courtroom is whether or not
> Mr. Breaux, at the time he killed this woman,
> carefully thought about the killing and whether
> or not it occurred during the course of a robbery
> as defined within the law.

20  (RT at 6521.)

21      Throughout his closing guilt phase argument counsel

22  conceded petitioner's guilt with respect to all charges save for the

23  first degree murder charge.[40]  Counsel concluded his argument by

24

25
26

_____

[40]   In this regard, counsel argued that: petitioner was guilty
of all of the charges except the murder charge (RT at 6522); the jury
instructions were long and complicated but need not concern the jury
because Mr. Breaux was guilty of every count and every charge except

focusing, as the defense had throughout, solely on the first degree

murder charge which posed the risk of imposition of the death

penalty:

> And I'm confident that if you will apply the
> law in this case that you will find Mr. Breaux is
> not guilty of first-degree, felony murder and
> that he is not guilty of deliberate and
> premeditated murder and that the special
> circumstances are not true.

(RT at 6658.)

As noted above, petitioner takes the position that in this

claim he does not challenge the tactical decisions of counsel as

constituting ineffective assistance.  The concession is well taken.

It has frequently been recognized that conceding guilt as to some

counts of a multi-count case to bolster the case for innocence on the

remaining counts is, although somewhat unusual, a valid trial

strategy which does not necessarily constitute deficient performance

by counsel.  See Anderson v. Calderon, 232 F.3d 1053, 1087-90 (9th

Cir. 2000), cert. denied, 534 U.S. 1036 (2001), abrogation on other

grounds recognized by Osband v. Woodford, 290 F.3d 1036, 1043 (9th

Cir. 2002); United States v. Swanson, 943 F.2d 1070, 1075-76 (9th

Cir. 1991) ("We recognize that in some cases a trial attorney may

find it advantageous to his client's interests to concede certain

elements of an offense or his guilt of one of several charges."); see

also United States v. Holman, 314 F.3d 837, 840 (7th Cir. 2002),

---

the murder charge (RT at 6523); after the jurors dealt with the other
charges by checking "guilty," the first question they should address
is whether Mr. Breaux was guilty of first degree felony-murder (RT at
6534).

cert. denied, ___ U.S. ___, 123 S. Ct. 2238 (2003) (and cases cited therein); Haynes v. Cain, 298 F.3d 375, 382 (5th Cir.) (en banc), cert. denied, 537 U.S. 1072 (2002) (court finding that in conceding guilt as to second degree murder defense counsel adopted a strategy that proved effective in avoiding the death penalty for their client). "Conceding an indefensible charge is thought to build credibility with a jury by acknowledging the overwhelming evidence of guilt for that particular charge, creating goodwill and trust that can be applied towards arguments attacking the remaining charges." Holman, 314 F.3d at 840. See also Anderson, 232 F.3d at 1088-89 (counsel's closing argument crafted to attempt to avoid the possibility of the death penalty found to be a strategic choice that survives review under the Strickland standard). This was an appropriate case for utilization of such a strategy since the evidence on counts two through eight was overwhelming.

Petitioner, however, claims that, regardless of the evidence and the soundness of the tactical decision, this was a de facto guilty plea without the required personal, constitutional waivers and that counsel's concession of guilt in the absence of such waivers constituted ineffective assistance of counsel. This is a more difficult question.

The ultimate decision as to whether to plead guilty or not guilty is left to the defendant. See Brookhart v. Janis, 384 U.S. 1,

/////

/////

/////

7 (1966); <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983).[41]  An attorney is required "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." <u>Strickland</u>, 466 U.S. at 688.

Although the strategy in question has been approved of by many courts in circumstances similar to those confronted by counsel in this case, it has also been held that "an attorney's concession of a client's guilt without any indication of the client's consent to the strategy is deficient conduct for <u>Strickland</u> purposes." <u>Holman</u>, 314 F.3d at 843.  <u>See also</u> <u>Francis v. Spraggins</u>, 720 F.2d 1190, 1194 (11th Cir. 1983) ("Where a capital defendant, by his . . . plea, seeks a verdict of not guilty, counsel, though faced with strong evidence against his client, may not concede the issue of guilt merely to avoid a somewhat hypocritical presentation during the sentencing phase and thereby maintain his credibility before the jury."); <u>Elmer Wiley v. Sowders</u>, 669 F.2d 386, 389 (6th Cir. 1982); <u>Earl Wiley v. Sowders</u>, 647 F.2d 642, 650 (6th Cir. 1981) ("[P]etitioner was deprived of effective assistance of counsel when his own lawyer admitted his client's guilt, without first obtaining his client's consent to this strategy."); <u>Haynes</u>, 298 F.3d at 382 ("[I]t is plausible that the failure of Haynes' attorneys to obtain his consent [in conceding guilt as to second degree murder] might constitute deficient performance under <u>Strickland</u>.").

---

[41]  Of course, pleading guilty before trial implicates the criminal defendant's right against self-incrimination, the right to a trial by jury, and the right to be able to confront one's accusers. <u>Boykin v. Alabama</u>, 395 U.S. 238, 243 (1969).

The preferred method of pursuing this defense strategy is for counsel to obtain the defendant's consent on the record in open court, thereby forestalling any issues with respect to consent that may be raised later.  See Holman, 314 F.3d at 843; Elmer Wiley, 669 at 389; Earl Wiley, 647 F.2d at 650.  An affidavit from the defendant reflecting a knowing and voluntary consent to the strategy would also likely suffice.  See Holman, 314 F.3d at 843.  Here, there is no indication in the record whether petitioner's counsel had petitioner's consent to pursue this strategy based upon concession of guilt.[42]  Petitioner's trial counsel have not addressed this subject in their declarations filed in connection with these habeas proceedings.  Whether counsel's performance was constitutionally deficient turns on whether petitioner did in fact consent to this strategy.  Under these circumstances additional evidence is required before it can be determined whether counsels' performance was constitutionally deficient. Holman, 314 F.3d at 843 n.4; Elmer Wiley, 669 at 389 ("[W]e remand this case to the District Court for the purpose of conducting an evidentiary hearing to determine whether the petitioner freely and knowingly consented to the trial strategy.")

Finally, respondent argues that petitioner is not entitled to relief with respect to his murder conviction on this claim even if habeas relief was granted on the other charges and the special circumstances.  (Opp'n to Cross-Mot. for Summ. J. at 29-30.)

---

[42]   The most that can be said from the present record is that petitioner was present during voir dire, opening statements and closing argument and did not voice his own objection to his counsel's statements of concession.

1 │ Petitioner argues in conclusory fashion that prejudice exists because
2 │ the constitutional error undermined the robbery verdict which served
3 │ as the only known basis for the first degree murder conviction.
4 │ (Opp'n & Cross-Mot. for Summ. J. at 200.)

5 │ Assuming the error alleged in this claim is established, in
6 │ order to be entitled to relief petitioner will be required to
7 │ establish that he suffered prejudice as a result. Strickland, 466
8 │ U.S. at 694; see also Bell v. Cone, 535 U.S. 685, 696-98 (2002)
9 │ (prejudice presumed only in those extreme cases where counsel fails
10 │ to oppose the prosecution entirely, not where tactical decisions are
11 │ made to concede elements of a case to focus on others); Haynes, 298
12 │ F.3d at 382. Establishing prejudice may be a difficult task with
13 │ respect to this claim. However, neither party has addressed the
14 │ issue sufficiently and the court therefore concludes that neither
15 │ party has met the burden imposed under Rule 56(c) of showing an
16 │ entitlement to judgment as a matter of law on this claim. See
17 │ Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (moving
18 │ party who bears the burden of proof must make a showing in support of
19 │ summary judgment "sufficient for the court to hold that no reasonable
20 │ trier of fact could find other than for the moving party").[43]

21 │ For these reasons the court will recommend that the cross-
22 │ motions for summary judgment on claim N be denied.
23 │ /////

24 │
25 │ [43] As noted above, resolution of ineffective assistance of
counsel claims often necessitates a hearing on the issue of
26 │ prejudice. Babbitt, 151 F.3d at 1177; Siripongs I, 35 F.3d at 1314;
see also Hoffman, 236 F.3d at 536.

**O.    Petitioner's Absence From Certain Court Proceedings**

In Claim O, petitioner claims his absence from various court proceedings violated his rights under the Fifth, Eighth, and Fourteenth Amendments.  Petitioner cites pages 1273, 1277, 1305, 1306, 1307, 1308, 1309, 1424-25, 1451-56, 1547, 1549, 1550, and 1552 of the Clerk's Transcript in support of this claim.  Petitioner asserts that absence by waiver in a capital case is a violation of multiple constitutional rights.  Citing Claim L, petitioner also claims his oral waiver of personal presence at the specified proceedings was not knowing, voluntary, and intelligent.  (Am. Pet. at 95.)

Respondent contends that petitioner's absence from inconsequential trial appearances upon his waiver of presence did not violate his rights.  Respondent argues that each proceeding at which petitioner waived his presence occurred outside the presence of the jury and concerned solely procedural matters not requiring petitioner's presence and at which counsel fully represented his interests.  Respondent cites the same pages of the Clerk's Transcript relied upon by petitioner.  Respondent argues that federal law does not support petitioner's assertion that a defendant in a capital case cannot waive his presence and that therefore petitioner's waiver precludes a finding that his rights were violated.  With regard to the allegation that petitioner was incompetent to waive his presence at the specified proceedings, respondent relies on the arguments offered in favor of summary judgment on Claim L.  Respondent contends that any relief on Claim O would depend on a new rule that may not be

1    applied to petitioner under <u>Teague v. Lane</u>.   Respondent also contends

2    that petitioner is not entitled to an evidentiary hearing on this

3    claim unless the court intends to consider facts outside the record.

4    (Alt. Mot. for Summ. J. at 146-49.)

5         In opposition, petitioner concedes that the Ninth Circuit

6    has rejected the contention that waivers of personal appearance are

7    not permitted in capital cases.   (Opp'n & Cross-Mot. for Summ. J. at

8    200 (citing <u>Campbell v. Wood</u>, 18 F.3d 662, 671-72 (9th Cir. 1994) (en

9    banc)).   Petitioner contends, however, that he was mentally

10   incompetent to waive his right to be present.   Petitioner relies in

11   this regard on the arguments made in opposition to respondent's

12   motion and in support of his own cross-motion on Claim L.

13        Every person charged with a felony has a fundamental right

14   to be present at every stage of the trial.   <u>Illinois v. Allen</u>, 397

15   U.S. 337, 338 (1970); <u>Campbell</u>, 18 F.3d at 671.   This right is

16   guaranteed by the Confrontation Clause of the Sixth Amendment and the

17   Due Process Clauses of the Fifth and Fourteenth Amendments.   <u>United</u>

18   <u>States v. Gagnon</u>, 470 U.S. 522, 526 (1985).   The right to be present,

19   like many other constitutional rights, may be waived.   <u>See</u> <u>Gagnon</u>,

20   470 U.S. at 529; <u>Taylor v. United States</u>, 414 U.S. 17, 19-20 (1973);

21   <u>Hayes v. Woodford</u>, 301 F.3d 1054, 1078 (9th Cir. 2002); <u>Brewer v.</u>

22   <u>Raines</u>, 670 F.2d 117, 119 (9th Cir. 1982).[44]   The Ninth Circuit has

23   determined that there is "no principled basis for limiting to

24   noncapital offenses a defendant's ability knowingly, voluntarily, and

25   _____

26   [44]   A defendant may also lose the right to be present at trial
     by misconduct.   <u>Allen</u>, 397 U.S. at 342-43; <u>Campbell</u>, 18 F.3d at 671.

1  intelligently to waive the right of presence." Campbell, 18 F.3d at

2  672. See also Hayes, 301 F.3d at 1078-80 (affirming district court's

3  conclusion following evidentiary hearing that capital case

4  defendant's waiver of personal appearance at the first day of the

5  penalty phase trial was voluntary); Amaya-Ruiz v. Stewart, 121 F.3d

6  486, 496 (9th Cir. 1997) (finding that the defendant in a capital

7  case voluntarily waived his right to be present at the hearing on

8  aggravating and mitigating factors).

9       "A waiver is an 'intentional relinquishment or abandonment

10 of a known right or privilege.'" Campbell, 18 F.3d at 672 (quoting

11 Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). The determination of

12 whether a waiver was knowing and voluntary is a mixed question of law

13 and fact. Id. (citing Terrovona v. Kincheloe, 852 F.2d 424, 427 (9th

14 Cir. 1988)). "The ultimate issue of voluntariness is a legal

15 question requiring independent federal determination." Id. (citing

16 Arizona v. Fulminante, 499 U.S. 279, 286 (1991)). In resolving the

17 issue of voluntariness, a court must "indulge every reasonable

18 presumption against the loss of the constitutional right to be

19 present at a critical stage of the trial." Id. (citing Allen, 397

20 U.S. at 343). See also Amaya-Ruiz, 121 F.3d at 496.

21       Respondent's motion for summary judgment on Claim O is

22 perfunctory. Respondent contends that all appearances waived by

23 petitioner were inconsequential, occurred outside the presence of the

24 jury, and concerned only procedural matters not requiring

25 petitioner's presence. Respondent offers no discussion or analysis

26 of the specific proceedings at issue, merely citing the same pages of

129

1   the state court record listed in the amended petition.   With regard

2   to respondent's reliance on the arguments advanced as to Claim L, the

3   court has determined that an evidentiary hearing is necessary to

4   resolve the truth of petitioner's allegations concerning his

5   inability to assist counsel in his defense.   Due to the deficiencies

6   of respondent's motion, the need for an evidentiary hearing with

7   regard to some of the allegations in Claim L, and the presumption

8   against the loss of the constitutional right to be present at any

9   critical stage of the trial, the court finds that respondent has not

10   demonstrated that he is entitled to judgment as a matter of law on

11   Claim O.

12          Petitioner's cross-motion for summary judgment likewise

13   fails to demonstrate that there exists no genuine issue as to any

14   material fact and that petitioner is entitled to judgment as a matter

15   of law on Claim O.   Petitioner claims that his absence from various

16   proceedings was not knowing, voluntary, and intelligent.   (Am. Pet.

17   at 95.)   He explains the basis for this claim by citing to Claim L,

18   in which he broadly alleges his incompetence to stand trial:

19              [Petitioner] was incompetent to stand trial, was
             not capable of understanding the nature and
20              purpose of the proceedings against him, did not
             comprehend his own status and condition in
21              reference to such proceedings, and also was not
             able to assist his attorneys in conducting his
22              defense in a rational manner.

23   (Am. Pet. at 85.)   In the course of briefing the pending motions,

24   petitioner has narrowed this claim.   In opposition to respondent's

25   motion for summary judgment, petitioner states that "[m]uch of

26   respondent's briefing on [Claim L] addresses the 'unable to

130

1  understand the nature and object of the proceedings' prong of the

2  competency test" and asserts that "[p]etitioner's claim does not go

3  to this prong of the test."  (Opp'n & Cross-Mot. for Summ. J. at 192

4  n.134.)   In reply to respondent's opposition, petitioner states

5  further that

6         [t]he competency issue here is a relatively
   narrow and discrete one: petitioner was unable to
7  meaningfully participate in his defense at the
   penalty phase because he was unable to discuss
8  the abuse he had suffered at the hands of his
   father, and because trial counsel, knowing to a
9  reasonable certainty that petitioner had, in
   fact, been abused, failed to obtain the services
10  of an expert who would be able to elicit that
   information from petitioner.

11

12  (Pet'r's Reply at 47.)

13       Petitioner has disavowed his allegation that he was unable

14  to understand the nature and object of the proceedings and has

15  narrowed his claim of incompetence to the specific issue of his

16  ability to "meaningfully participate in his defense at the penalty

17  phase" because of abuse by his father in conjunction with the other

18  factors noted above in Section L.  Assuming for the sake of argument

19  that each court proceeding at issue in Claim O occurred during the

20  penalty phase of petitioner's trial, the court finds that petitioner

21  has made no showing that his waiver of presence from any of the

22  proceedings was not knowing, voluntary, or intelligent due to his

23  history of abuse or that any of the proceedings deprived petitioner

24  of his right to meaningfully participate in his defense.  Moreover,

25  there are disputed material facts concerning petitioner' ability to

26  assist counsel in his defense.  As the moving party on his cross-

1  motion for summary judgment, petitioner has not made the required

2  showing and is not entitled to summary judgment in his favor on Claim

3  O.

4          Accordingly, the motions of both parties for summary

5  judgment as to this claim should be denied.

6  **P.   Exclusion of Jurors For Cause Based Upon Death Penalty Views**

7

8          In Claim P petitioner asserts that the trial court erred

9  when, upon motion of the prosecution, it excused prospective jurors

10 Cara Gehrke, Timothy Grieve, and Isabell Miller because of their

11 views on the death penalty.  (Am. Pet. at 95-96.)  Petitioner alleges

12 that the record does not show that these jurors' views would have

13 prevented or substantially impaired the performance of their duties

14 as jurors.  Petitioner asserts that the trial court's error violated

15 his Sixth, Eighth, and Fourteenth Amendment rights to due process of

16 law and to a fair, reliable, individualized, nonarbitrary, and

17 adequately guided determination of the appropriateness of death as

18 the penalty.

19         Respondent contends that petitioner's claim is groundless

20 and seeks summary judgment based on the transcript of voir dire.

21 Respondent asserts that petitioner is not entitled to an evidentiary

22 hearing on this claim because it was the subject of a hearing before

23 the trial court and a decision on appeal.  (Alt. Mot. for Summ. J. at

24 150-54.)

25         Respondent cites <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980),

26 for "the general proposition that a juror may not be challenged for

132

1   cause based on his views about capital punishment unless those views

2   would prevent or substantially impair the performance of his duties

3   as a juror in accordance with his instructions and his oath." 

4   Respondent relies on Wainwright v. Witt, 469 U.S. 412 (1985), in

5   which the Supreme Court reaffirmed the Adams standard and held that

6   the standard does not require that a juror's bias be proved with

7   unmistakable clarity:

> [D]eterminations of juror bias cannot be reduced
> to question-and-answer sessions which obtain
> results in the manner of a catechism.  What
> common sense should have realized experience has
> proved: many veniremen simply cannot be asked
> enough questions to reach the point where their
> bias has been made "unmistakably clear"; these
> veniremen may not know how they will react when
> faced with imposing the death sentence, or may be
> unable to articulate, or may wish to hide their
> true feelings.  Despite this lack of clarity in
> the printed record, however, there will be
> situations where the trial judge is left with the
> definite impression that a prospective juror
> would be unable to faithfully and impartially
> apply the law. . . .  [T]his is why deference
> must be paid to the trial judge who sees and
> hears the juror.

18   469 U.S. at 424-26 (footnote omitted).  Respondent states that the

19   Court determined in Witt that the trial court's decision on the juror

20   at issue was fairly supported by the record even though the trial

21   court did not expressly state the standard on which it relied and the

22   prospective juror's statements were ambiguous.

23          Respondent argues that in this case prospective jurors

24   Gehrke, Grieve, and Miller all made statements that fairly support

25   the trial court's findings of substantial impairment.  Cara Gehrke

26   stated at the outset of voir dire that she was against the death

1  penalty and did not think murder would justify taking a life.  (RT at

2  2358.)  When the prosecutor asked her if she really thought she would

3  be able to vote for the death penalty, she answered, "No, I don't

4  think I could."  (RT at 2369.)  The prosecutor then challenged her

5  for cause under Witt.  (RT at 2369-70.)  The trial court addressed

6  the challenge as follows:

7           The test that we are now operating under is
             whether or not her views about capital punishment
8           would prevent or substantially impair her
             performance of her duties as a juror in
9           accordance with the instructions and the oath
             that she took. . . .
10           This is one of those instances . . . that a
             juror, after being talked to by counsel, will
11          take perhaps differing and conflicting types of
             positions, and the last answer, whether she
12          didn't believe that she could, she didn't say
             that she believed that she would.
13           Nevertheless, under the standard of Witt, I
             can come to the conclusion then, that her – her
14          ability to perform has been substantially
             impaired.
15           The Court will so find and the challenge is
             sustained.
16

17  (RT at 2371-72.)

18         Timothy Grieve stated that he felt strongly about the death

19  penalty and said, "I think it is morally wrong for society to execute

20  someone regardless of the situation."  (RT at 3084.)  When defense

21  counsel asked Grieve whether there was a possibility that, if all

22  doubt had been removed and the case was egregious enough, he could

23  envision himself voting for the death penalty, Grieve responded "I

24  don't think so. . . .  I don't think there is any way I could."  (RT

25  at 3088-89.)  The trial court sustained the prosecutor's challenge

26  under Witt, finding that "the attitude of this juror makes him

134

1  substantially impaired in following instructions of the Court and his

2  oath as a juror."  (RT at 3089.)

3          Isabell Miller stated that she did not know if she could

4  sit on the case and explained, "I wouldn't want to commit anybody to

5  the death chamber.  I couldn't have that on my conscience."  (RT at

6  3796, 3802.)  When the prosecutor asked her whether she could vote

7  for the death penalty in any case, she responded, "I don't think I

8  could.  No."  (RT at 3803.)  The court, noting an apparent conflict

9  between statements made to the prosecutor and statements made to

10  defense counsel, asked her whether she could consider the evidence

11  and, if proper, vote for the death penalty.  (RT at 3804.)  She

12  answered, "I don't think I could."  (Id.)  Defense counsel then asked

13  her whether she could consider voting for the death penalty in an

14  extreme case, if the facts were terrible enough and she felt there

15  had been an inexcusable killing for no good reason, i.e., "just a

16  horrible death for absolutely no acceptable reason."  (RT at 3805.)

17  Miller responded, "I don't think so."  (Id.)  The court then

18  sustained the prosecutor's challenge.  (Id.)

19          Respondent argues that this record shows that all three

20  prospective jurors expressed conscientious objections to the death

21  penalty which demonstrated a substantial reluctance to impose the

22  death penalty.  Respondent contends that, although the prospective

23  jurors said they did not "think" they could vote for the death

24  penalty, their statements were absolute expressions that they could

25  never vote for the death penalty.  Respondent asserts that such

26  /////

1   statements provided ample support for the trial court's rulings and

2   therefore summary judgment should be granted.

3          Petitioner also seeks summary judgment on Claim P,

4   asserting that the same record cited by respondent demonstrates that

5   all three prospective jurors were unconstitutionally excluded for

6   cause because of their views concerning the death penalty.   (Opp'n &

7   Cross-Mot. for Summ. J. at 201-04.)

8          Petitioner advances two arguments in support of his cross-

9   motion.   First, he argues that jurors cannot be excluded if they are

10  merely indecisive about whether the death penalty will affect them.

11  For this argument, petitioner relies on the decisions in Gray v.

12  Mississippi, 481 U.S. 648 (1987), and Adams, 448 U.S. at 49-50.

13  Petitioner's second argument is that jurors who firmly believe that

14  the death penalty is unjust may nevertheless serve as jurors in

15  capital cases so long as they state clearly that they are willing to

16  temporarily set aside their own beliefs in deference to the rule of

17  law.   In support of this argument, petitioner relies on Lockhart v.

18  McCree, 476 U.S. 162, 176 (1986), and Gray, 481 U.S. at 658, 662-63.

19  Petitioner argues that prospective jurors cannot be excluded despite

20  initial responses indicating that they are excludable if further

21  questioning makes it clear that they could set aside their scruples

22  and serve as jurors.

23         Petitioner contends that both arguments are applicable to

24  prospective juror Cara Gehrke.   On initial examination by defense

25  counsel, Mrs. Gehrke stated that she was against the death penalty

26  and did not believe in it.   (RT at 2358.)   She also said she could

"listen openly, fairly" to the evidence, including penalty phase

evidence, and could be "fair minded" in "openly consider[ing]"

whether or not the penalty evidence persuaded her one way or another.

(RT at 2360-61.)   She stated: "I can't say there is no case that I

wouldn't, you know, vote for the death penalty," and "I just don't

happen to believe in it . . . .  But I can't say that I would never."

(RT at 2362-63.)   She further stated that she could "put aside [her]

personal feelings, listen to the evidence, consider the evidence, and

be open to the possibility of voting" for either penalty.   (RT at

2363.)   On examination by the prosecutor, she stated that it "would

be hard for me to vote for the death penalty.   But, if I was picked

as a juror, and I had to do so, then I would put my personal feelings

– if that's what you're going to ask me – I would put them aside and

I would think nothing about how I felt personally."   (RT at 2364-65.)

When the prosecutor asked her if she really thought she would

honestly consider voting for death, when the penalty decision would

be solely up to her, she responded, "That's – that's a hard question.

Unless it really, you know, comes up, I can't . . . answer that."

(RT at 2366-67.)   The prosecutor asked whether she would be able to

vote for the death penalty when she didn't believe in it and had been

against it for a long time, and she replied, "No, I don't think so."

(RT at 2369.)

          Petitioner cites the trial court's observation that Mrs.

Gehrke had expressed "perhaps differing and conflicting types of

positions" as well as the California Supreme Court's finding on

direct appeal that Mrs. Gehrke's answers, like those of prospective

1  jurors Grieve and Miller, were "arguably equivocal."   (RT at 2372;

2  Breaux, 1 Cal. 4th at 308-10.)   Petitioner contends that the record

3  on voir dire and the findings of both state courts show that Mrs.

4  Gehrke was merely indecisive, like Mrs. Bounds, the prospective juror

5  excluded by the trial court in Gray.   The trial court in Gray had

6  excluded Mrs. Bounds after finding that her responses to questions

7  about her views on the death penalty revealed that she was "totally

8  indecisive.  She says one thing one time and one thing another."   481

9  U.S. at 655 n.7.   The Supreme Court ruled that such a juror was

10  clearly qualified to be seated as a juror under the Adams and Witt

11  criteria.   481 U.S. at 659.   Petitioner argues that the state trial

12  court's finding in this case concerning Mrs. Gehrke's "differing and

13  conflicting types of positions" is essentially the same as the trial

14  court's finding in Gray that Mrs. Bounds "sa[id] one thing one time

15  and one thing another."   Thus, petitioner argues, the exclusion of

16  Mrs. Gehrke was no more justified than was the exclusion of Mrs.

17  Bounds in Gray.   Petitioner argues further that the exclusion of Mrs.

18  Gehrke was improper because she expressly stated that she could and

19  would put her personal feelings aside for purposes of this case.   (RT

20  at 2363-65.)   Petitioner contends that Mrs. Gehrke should not have

21  been excluded from the jury because she was willing to set aside her

22  own beliefs in deference to the rule of law and made it clear she

23  could set aside her scruples and serve as a juror.   See McCree, 476

24  U.S. at 176; Gray, 481 U.S. at 658, 662-63.

25        Next, petitioner offers the following summary of Timothy

26  Grieve's voir dire responses: he felt strongly about the death

138

penalty, believed it was "morally wrong for society to execute
someone regardless of the situation," doubted that he could vote for
death even if convinced the defendant was guilty of a reprehensible
crime, and said that, despite the possibility that he could change
his mind, he did not think there was any way he could vote for death.
(RT at 3084-89.)  Petitioner offers the following summary of Isabell
Miller's voir dire responses: she initially said she "wouldn't want
to commit anybody to the death chamber" and "couldn't have that on
[her] conscience," but then indicated she could be fair and impartial
to both sides in deliberations, said she thought she would be open to
the possibility of voting for death depending on the evidence and
arguments, said she would do her best to decide for either punishment
depending on what she heard in the courtroom and thought that she
could do that, responded to the prosecutor's questions by saying she
didn't think she could vote for the death penalty in any case and
wouldn't want that on her conscience, and told the trial judge she
didn't think she could vote for the death penalty even if the facts
were terrible.  (RT at 3796-3805.)  Petitioner contends that this
record does not show that either Timothy Grieve or Isabell Miller was
substantially impaired in the performance of his or her duties in
accordance with the court's instructions and the juror's oath, or
that either of them could not temporarily set aside his or her
scruples and serve as a juror.

        In opposition to petitioner's cross-motion, respondent
argues that the words used by the three prospective jurors in their
responses during voir dire do not comprise the sole determining

139

factor.   Respondent emphasizes the importance of the trial judge's

assessment of each prospective juror's feelings based on his or her

statements and all relevant considerations, including demeanor, tone

of voice, body language, and other forms of non-verbal communication

and indicia of feelings.   Respondent asserts that the trial judge

must evaluate the credibility of each prospective juror's statements

under oath based in large part on observations made during voir dire.

Respondent argues that, under Witt, 469 U.S. at 431-35, the trial

judge's decisions must be given due deference and should be followed

if fairly supported by the record.   Respondent contends that where,

as here, the trial court's decisions depended on interpretation of a

juror's statements, those decisions should be conclusive if rational

under the circumstances.

        In reply, petitioner asserts that respondent has completely

ignored the Supreme Court's holding in Gray, despite petitioner's

argument that the exclusion of Mrs. Gehrke is indistinguishable from

the exclusion of Mrs. Bounds in Gray, and has also implied that the

trial judge's decision to exclude these three prospective jurors is

immune to reversal.   In addition, petitioner asserts that

respondent's characterization of the deference to be accorded to a

trial judge's decisions is significantly overstated.   Petitioner

contends that Gray could not have been decided as it was if the trial

judge's decision had been deemed conclusive merely because of the

trial judge's opportunity to assess the prospective jurors'

statements.

/////

It is well established that "[t]he State infringes a capital defendant's right under the Sixth and Fourteenth Amendments to trial by an impartial jury when it excuses for cause all those members of the venire who express conscientious objections to capital punishment." Wainwright, 469 U.S. at 416.  The Supreme Court so held in 1968 in the context of a challenge to an Illinois statute that permitted trial courts to excuse for cause "any juror who shall, on being examined, state that he has conscientious scruples against capital punishment." Witherspoon v. Illinois, 391 U.S. 510, 512 (1968).  In Witherspoon, "nearly half the veniremen . . . were excused for cause because they 'expressed qualms about capital punishment.'" Witt, 469 U.S. at 418 (quoting Witherspoon, 391 U.S. at 513).  The Supreme Court in Witherspoon held that a jury obtained under the Illinois statute "would not be the impartial jury required by the Sixth Amendment, but rather a jury 'uncommonly willing to condemn a man to die.'" Id. (quoting Witherspoon, 391 U.S. at 521). The Witherspoon Court concluded that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon, 391 U.S. at 522.  "[T]he Witherspoon Court also recognized the State's legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate administration of a State's death penalty scheme." Witt, 469 U.S. at 416.

1    In _Witt_ the Court clarified the standard to be used for

2 determining when prospective jurors may properly be excused for cause

3 on the basis of their death penalty views.  The Court rejected the

4 standard suggested by dicta in _Witherspoon_ and held that the proper

5 standard is that articulated in _Adams v. Texas_.  469 U.S. at 418-24.

6 The Court rejected "adherence to a requirement that a prospective

7 juror make it 'unmistakably clear . . . that [he or she] would

8 _automatically_ vote against the imposition of capital punishment.'"

9 _Id._ at 419 (quoting _Witherspoon_, 391 U.S. at 522 n.21).  Instead, "'a

10 juror may not be challenged for cause based on his views about

11 capital punishment unless those views would prevent or substantially

12 impair the performance of his duties as a juror in accordance with

13 his instructions and his oath.'"  _Id._ at 420 & 424 (quoting _Adams_,

14 448 U.S. at 45).

15    The _Adams_ test for determining juror exclusion eliminates

16 both "the requirement that a juror may be excluded only if he would

17 never vote for the death penalty" and "the extremely high burden of

18 proof" required to show that a prospective juror would be unable to

19 apply the death penalty under any circumstances.  _Id._ at 421.  The

20 standard "does not require that a juror's bias be proved with

21 'unmistakable clarity,'" for "determinations of juror bias cannot be

22 reduced to question-and-answer sessions which obtain results in the

23 manner of a catechism."  _Id._ at 424.

24    This standard "leaves trial courts with the difficult task

25 of distinguishing between prospective jurors whose opposition to

26 capital punishment will not allow them to apply the law or view the

1  facts impartially and jurors who, though opposed to capital

2  punishment, will nevertheless conscientiously apply the law to the

3  facts adduced at trial."  Id. at 421.  Some prospective jurors

4  "cannot be asked enough questions to reach the point where their bias

5  has been made 'unmistakably clear,'" and some jurors "may not know

6  how they will react when faced with imposing the death sentence, or

7  may be unable to articulate, or may wish to hide their true

8  feelings."  Id. at 424-25.  Accordingly, "where the trial judge is

9  left with the definite impression that a prospective juror would be

10 unable to faithfully and impartially apply the law" and therefore

11 excuses the juror for cause, "deference must be paid to the trial

12 judge who sees and hears the juror," despite a lack of clarity in the

13 printed record.  Id. at 425-26.

14      The Court in Witt addressed at length the question of the

15 degree of deference that a federal habeas court must pay to a state

16 trial judge's determination of juror bias arising from the juror's

17 death penalty views.  Id. at 426-30.  The Court noted its observation

18 in Patton v. Yount, 467 U.S. 1025 (1984), that

19           the question whether a venireman is biased has
            traditionally been determined through voir dire
20           culminating in a finding by the trial judge
            concerning the venireman's state of mind. . . .
21           [S]uch a finding is based upon determinations of
            demeanor and credibility that are peculiarly
22           within a trial judge's province.  Such
            determinations were entitled to deference even on
23           direct review; "[t]he respect paid such findings
            in a habeas proceeding certainly should be no
24           less."

25 469 U.S. at 428 (quoting Patton, 467 U.S. at 1038) (footnotes

26 omitted).  The Court decided that its holding in Patton "applies

143

1  equally well to a trial court's determination that a prospective

2  capital sentencing juror was properly excluded for cause," for the

3  trial judge's "predominant function in determining juror bias

4  involves credibility findings whose basis cannot be easily discerned

5  from an appellate record." Id. at 429.  A state trial court's

6  findings concerning a prospective juror's bias are therefore factual

7  findings entitled to a presumption of correctness on federal habeas

8  review.  Id. at 429, 431.  "[T]he question is not whether a reviewing

9  court might disagree with the trial court's findings, but whether

10  those findings are fairly supported by the record." Id. at 434.  In

11  order to determine whether the trial court's findings are fairly

12  supported by the record, the reviewing court must consider the entire

13  context surrounding the trial court's exclusion of a prospective

14  juror.  Id. at 424-26; see also Darden v. Wainwright, 477 U.S. 168,

15  176-78 (1986) (noting that the court's "inquiry does not end with a

16  mechanical recitation of a single question and answer" and taking

17  into account the trial court's statements to the entire venire and to

18  other prospective jurors where the entire venire was present

19  throughout the voir dire).

20          The record in this case shows that prospective juror

21  Timothy Grieve was initially questioned on the morning of November

22  17, 1986, in a group of four prospective jurors.  (RT at 2971-84.)

23  After providing general information about criminal proceedings, the

24  trial judge requested the assurance of each of the four prospective

25  jurors that he or she "will follow the law as I state it to you

26  whether you do agree with it or not."  (RT at 2977.)  Grieve was the

1   only one of the four prospective jurors who did not give the court

2   such an assurance, stating instead, "Well, in the sense if it is a

3   capital case I would not be able -- I would have some difficulty with

4   the death penalty."  (RT at 2978.)  The judge responded, "We'll get

5   to that a little later on and, yes, it is a capital case."  (RT at

6   2978.)  The judge then advised the four prospective jurors that they

7   might be questioned individually by the court and the attorneys as to

8   their attitude concerning the death penalty and the alternative

9   penalty of life in state prison without possibility of parole.  (RT

10  at 2979.)  The judge subsequently asked the four prospective jurors

11  if they could think of any reason why, if chosen to be a juror, they

12  could not be fair and impartial to both sides.  Immediately after

13  asking the question, the judge remarked that Grieve had raised an

14  issue in that regard and that they would talk to him about it later.

15  (RT at 2983.)

16       In the afternoon of November 17, 1986, Grieve was

17  questioned individually.  (RT at 3082-89.)  After Grieve indicated

18  that he understood defense counsel's prefatory remarks, counsel asked

19  Grieve whether he could listen to each side present its respective

20  positions during the penalty phase of the trial, if the case reached

21  that phase.  (RT at 3083-84.)  Grieve responded, "Well, listen to

22  them, yes.  But --"  (RT at 3084.)  Defense counsel then said,

23  "Obviously, you feel strongly about the death penalty" and asked

24  Grieve to state what his feelings were.  (Id.)  Grieve responded, "I

25  think it is morally wrong for society to execute someone regardless

26  of the situation."  (Id.)  He explained that his feelings were based

1  on both moral grounds and on practical grounds arising from the

2  fallibility of judges and juries and the resulting possibility of

3  error.  Grieve stated that it bothered him that someone who is

4  innocent could be executed.  (RT at 3085.)  When asked whether his

5  moral scruples were such that he could not consider the possibility

6  of voting for death, even if personally persuaded that a defendant

7  had committed the killing and had done so in an absolutely

8  reprehensible fashion, he answered, "I really wouldn't know, of

9  course, until I was in that situation.  But I doubt it."  (RT at

10  3085-86.)  Defense counsel rephrased the question, asking again

11  whether it was possible that Grieve could vote for the death penalty

12  in a theoretical case.  (RT at 3086.)  Grieve responded:

13           Uh, again, I'm not sure.
         I could say, by way of example, as a police

14  reporter, I am aware of some pretty heinous
crimes.

15           And none of the ones I'm aware of really
could compel me to vote for the death penalty,

16  even if I believed in the case.
         The man -- decapitation murder in Sacramento

17  a couple of weeks ago, for instance, that has
been as heinous as they get.

18           And I don't think I would be in support of
the death penalty for whoever is found guilty of

19  that.

20  (RT at 3086-87.)  In response to defense counsel's final question

21  concerning the possibility of voting for the death penalty in an

22  egregious case from which all doubt had been removed, Grieve

23  responded,

24  /////

25  /////

26  /////

1                 I don't think so.  Again, I don't think -- I
2        mean, there is always that possibility that
        somewhere out there there is going to be
3        something that changes my mind.
                 But, with everything I know now, I don't
4        think there is any way I could.

5 (RT at 3087-89.)  The trial judge sustained the prosecutor's

6 challenge for cause under <u>Witt</u>, finding that Grieve would be

7 substantially impaired in following instructions of the court and his

8 oath as a juror.  (RT at 3089.)

9        This record reflects that Grieve consistently affirmed and

10 explained his belief that he would be unable to vote for the death

11 penalty.  Grieve gave no indication that he could put aside his

12 personal feelings and vote for the death penalty in this case or in

13 any hypothetical case.  Significantly, Grieve did not provide

14 assurance that he could follow the law as stated by the court

15 regardless of whether he agreed with it or not.  There is ample

16 support for the trial court's finding that Grieve would be

17 substantially impaired in following the instructions of the court and

18 his oath as a juror.  The record supports the trial court's decision

19 to excuse prospective juror Grieve for cause.

20        Prospective juror Isabell Miller was initially questioned

21 on the morning of November 21, 1986, in a group of three prospective

22 jurors.  (RT at 3780-94.)  Immediately after the group voir dire was

23 completed, Miller was questioned individually.  (RT at 3794-3805.)

24 In response to defense counsel's question about her reaction to the

25 possibility of sitting as a juror in the kind of case described by

26 the judge, Miller responded, "I don't know if I could or not" and

1   explained, "I don't know about being guilty or not."  (RT at 3796.)

2   When asked whether it caused her concern that the case involved a

3   charge of first degree murder as well as other charges, she answered

4   in the affirmative and stated, "Well, I wouldn't want to commit

5   anybody to the death chamber.  I couldn't have that on my conscience.

6   That's all."  (Id.)  She responded, "I do" when asked if she had

7   "feelings about the death penalty."  (Id.)  Defense counsel asked

8   whether she could listen to the evidence fairly during the guilt

9   phase of the trial, to which Miller answered with certainty, "Oh,

10  yes, I could do --."  (RT at 3797.)  With regard to the penalty phase

11  of the trial, however, Miller answered only "I think so" upon being

12  asked if she thought she could be fair and impartial to both sides.

13  (RT at 3798.)  She also answered "I think so" when asked if she

14  thought she could "at least in theory, be open to the possibility of

15  voting for either death or life without possibility of parole

16  depending upon what's been said to you and how you feel after you've

17  heard all that has occurred in the courtroom."  (RT at 3799.)  In

18  response to defense counsel's inquiry as to whether she could sit as

19  a juror in the penalty phase and decide for either punishment

20  depending upon the evidence, Miller said only that she would do her

21  best.  (RT at 3800.)

22       The prosecutor asked Miller whether she had said she would

23  not commit anybody to the death chamber.

24          A.    Yes, that's what I said.  I wouldn't want it
                  on my conscience.
25          Q.    Okay.  And you also said that you could not
                  have that on your conscience; is that accurate?
26          A.    That's right.

148

1  (RT at 3802.)  The prosecutor explained that the court's penalty

2  phase instructions would not tell the jurors how to vote and that it

3  would be up to each juror individually to make the decision, to which

4  Miller responded, "I see."  (RT at 3802-03.)  Voir dire continued as

5  follows:

6          Q.   Do you think that you honestly, if the
            decision was yours to make -- in a jury
7          deliberation, could you, in considering the
            evidence and considering the instructions, could
8          you really vote for the death penalty in any
            case?
9          A.   I don't think I could.
                No.
10         Q.   And why is that?
                And I'm not challenging you, I'm just asking
11         you why do you think that you don't think that
           you could?
12         A.   Well, I wouldn't want that on my conscience.
           That's why.
13              I just -- anything else but the death
           penalty.

14

15  (RT at 3803-04.)

16          The court attempted to clarify Miller's seemingly

17  contradictory views:

18         Q.   A minute ago you said, first of all, that
           you -- that the death penalty would be on your
19         conscience and you didn't think you could put
           somebody in the death chamber or something like
20         that.
           A.   Uh-huh.  (In the affirmative.)
21         Q.   Then Mr. Fathey asked some questions and you
           said, yes, you could consider and you could vote
22         for the death penalty, and now Mr. Druliner is
           asking you if you could vote for it and you said
23         you can't vote for the death penalty.
                What is your true feelings?
24              Could you consider the evidence, and if it's
           proper, vote for the death penalty and if it's
25         not, not vote for the death penalty?
           A.   I don't think I could.  I just don't think I
26         could.

149

1   (RT at 3804.)  Defense counsel then received the same answer:

2           Q.   Ma'am, if the case were extreme enough, if
        the facts were terrible enough and you felt that
3       there had been an inexcusable killing for no good
        reason, could you consider voting for the death
4       penalty in such a case?
        A.   I don't think so.
5

6   (RT at 3805.)  The court sustained the prosecutor's challenge for

7   cause, finding that Miller was substantially impaired as defined in

8   <u>Witt</u>.  (<u>Id.</u>)

9           Close scrutiny of the record reveals no inconsistency in

10  Miller's opposition to the death penalty.  She stated repeatedly that

11  she did not want to commit anybody to the death chamber and could not

12  have such a decision on her conscience.  While she was certain she

13  could listen to the evidence fairly during the guilt phase of the

14  trial, all of her answers to defense counsel regarding the penalty

15  phase were equivocal: "I think so" as to her ability to be fair and

16  impartial to both sides when considering the evidence; "I think so"

17  as to her ability to be open, "at least in theory," to the

18  possibility of voting for either death or life without possibility of

19  parole; and "I'd do my best" as to her ability to sit as a juror in

20  the penalty phase and decide for either punishment depending on what

21  she heard in the courtroom.  Miller did not state at any time that

22  she could vote for the death penalty.  Nor did Miller state that she

23  would put aside her personal feelings and consider the death penalty.

24  When the court asked her to clarify her true feelings and state

25  whether she could vote for the death penalty, she responded that she

26  did not think she could.  She gave the same answer to defense

150

counsel.  The trial judge, having satisfied himself that Miller had

expressed her true feelings about the death penalty, was justified in

finding that Miller's views would have substantially impaired her

performance of her duties as a juror.  The record supports the trial

court's decision to excuse prospective juror Miller for cause.

Prospective juror Cara Gehrke was initially questioned on

the afternoon of November 10, 1986, in a group of three prospective

jurors.  (RT at 2328-41.)  Immediately after the group voir dire was

completed, Gehrke was questioned individually.  (RT at 2341-69.)

Defense counsel described the proceedings that would occur during the

penalty phase if the defendant were found guilty and asked Gehrke

what she thought of the death penalty:

> A.   I don't believe in it.
> Q.   What do you mean by that?
> A.   Well, taking --  I mean, I don't believe in
> the taking of a life.
>      But once they do, I don't think taking
> another life is going to justify the first one.
>      It is not going to bring the victim back.
>      And all it is going to do is cause
> heartache, and that, for the -- you know, for
> both sides of the families.
>      So I'm against the death penalty.
> Q.   Have you thought about that for some period
> of time?
>      Your views on it?
>      Or have you just thought about it since we
> have been in court here this afternoon?
> A.   No.  I felt that way -- I felt that way ever
> since I can remember.
>      I don't -- I don't believe in --

(RT at 2357-58.)

Defense counsel probed further, asking Gehrke first whether

she thought she could take an oath saying she would listen openly and

fairly; she responded, "Yeah."  (RT at 2360-61.)  Counsel asked next

151

whether she could be "a fair-minded person" and listen to evidence

meant to persuade her that death is the appropriate penalty; she

responded, "Yeah."  (RT at 2361.)  When counsel asked whether she

could not only listen to the evidence in support of both possible

penalties but also be a fair-minded person and consider whether or

not the evidence persuaded her in one direction or the other, Gehrke

answered somewhat equivocally, "Yeah.  I think -- yeah."  (RT at

2361.)  Voir dire continued as follows:

> Q.   And then, finally, at some point, the Court
> would expect of you, and it would be [a]
> requirement as a juror, if you are sworn to hear
> this case, to, at least, be open in theory to the
> possibility of voting either for death or for
> life in prison without the possibility of parole.
>       It would not expect you to, in fact, vote
> one way or the other.  Of course, that's up to
> you to decide that.
>       But you must, in fact, entertain openly the
> possibility that you -- forget the possibility --
> that you would vote either way notwithstanding
> your feelings, whether they are strong or
> otherwise.
>       Do you think you could do that?
> A.   Yes.  I guess, I could.
> Q.   Now, let me ask you again, because it is
> important to all of us.
>       In saying that yes, you think you could,
> would you be able to assure his Honor and both of
> the counsel -- both for the State and for the
> defense -- that, after having heard the evidence,
> after having considered it, that, at least, you
> would consider voting for the death penalty or
> for life without possibility of parole?
> A.   Yes.
> Q.   You are not telling the Court that there is
> no case -- or are you -- are you telling the
> Court there is no case that you could envision
> voting for death?
>       Or would you have to wait to hear the
> evidence?
> A.   No.  I can't say there is no case that I
> wouldn't, you know, vote for the death penalty.
>       I just don't happen to believe in it.

152

1          But I can't say that I would never.
           . . . .
2      Q.   It comes down to this, ma'am.
           You need to assure the Court that you could
3      put aside your personal feelings, listen to the
       evidence, consider the evidence, and be open to
4      the possibility of voting in either direct -- it
       doesn't -- pardon me?
5      A.   I was going to say yes.  I could do that.

6  (RT at 2362-63.)

7          In response to probing by the prosecutor, Gehrke reiterated

8  that she had been against the death penalty for a long time.  (RT at

9  2363-64.)  She also stated, however, that she could put her personal

10 feelings aside:

11     Q.   . . .  [B]ased on your initial responses to
       the question about the death penalty, it appeared
12     that what you were talking about is you don't
       believe in the death penalty, and you felt that
13     way for a long time?
       A.   That's right.
14     Q.   And --
       A.   It would be hard for me to vote for the
15     death penalty.
           But, if I was picked as a juror, and I had
16     to do so, then I would put my personal feelings -
       - if that's what you are going to ask me -- I
17     would put them aside and I would think nothing
       about how I felt personally.
18         It would be what, you know, I was doing here
       in court.
19

20 (RT at 2364-65.)

21         The prosecutor explained to Gehrke that the court would

22 give penalty phase instructions concerning the law, that the

23 instructions would only describe the factors to consider, that "what

24 it comes down to is that decision would be your individual decision

25 and the individual decisions of the eleven other jurors," and that

26 her vote would be solely up to her.  (RT at 2365-66.)

                                153

1     Q.   Now, given that the decision would be yours,
don't -- do you think that you would really,
2     honestly consider voting for the death penalty
when you know that you could vote for life
3     without possibility of parole and then avoid
voting for something that you don't believe in?
4     A.   I -- I -- I don't think I follow you.
I don't know what you mean.
5          You mean, if the decision was mine and I
don't have those other eleven people?
6     Q.   No.   What I mean is that your vote in the
penalty phase, your vote at any time as a juror,
7     is your vote.   Okay?
It is not the person's next to you vote.
8     Not the judge's vote.
It is yours.
9     A.   Uh-huh.
Q.   Okay.   Now, assuming you are in the penalty
10    phase of the case, and you have heard all of the
evidence, and the judge has explained to you the
11    law of what the various factors are that you can
consider -- okay?
12    A.   Yeah.
. . . .
13    Q.   Okay.   And when you describe the death
penalty as something you don't believe in,
14    obviously, that causes concern.   Causes me some
concern.
15         Now, when -- assume that we are in the
penalty phase of the case.
16         In other words, the defendant has been found
guilty of murder in the first degree and one or
17    more of the special circumstances have been found
to be true.
18    A.   Okay.   Yeah.
Q.   That's how we get into the penalty phase.
19    A.   (Nodded head.)
Q.   That's how we get into the penalty phase.
20         Now, really, what it comes down to is will
you be able to vote for something, that is the
21    death penalty, considering the fact that it's
something that you didn't believe in and haven't
22    believed in and you've been against it for just
about as long as you can remember?
23         Do you really think that you would be able
to vote for the death penalty?
24    A.   No, I don't think I could.

25    (RT at 2366-69.)

26    /////

154

1    Defense counsel objected to the prosecutor's final question

2   and to Gehrke's response to it, on the ground that both were

3   ambiguous.  The objection was overruled.  Argument was then heard

4   outside Gehrke's presence.  The prosecutor challenged the juror

5   pursuant to <u>Witt</u> on the ground that her responses showed that her

6   feelings about the death penalty would prevent or substantially

7   impair her performance of her duties as a juror in accordance with

8   the instructions and the oath.  Defense counsel argued that the juror

9   had stated without ambiguity that she could vote for the death

10   penalty if persuaded it was appropriate and that the prosecutor

11   obtained a contrary response by means of a leading question that was

12   awkward and ambiguous.  (RT at 2369-71.)

13    The trial court stated the <u>Witt</u> test, emphasizing the words

14   "prevent or substantially impair," and ruled as follows:

15        This is again one of the instances where I
     mentioned that a juror, after being talked to by
16        counsel, will take perhaps differing and
     conflicting types of positions, and the last
17        answer, whether she didn't believe that she
     could, she didn't say that she believed that she
18        would.
        Nonetheless, under the standard of Witt, I
19        can come to the conclusion, then, that her -- her
     ability to perform has been substantially
20        impaired.
        The Court will so find and the challenge is
21        sustained.

22   (RT at 2372.)

23    The record reflects that Gehrke was consistent in stating

24   that she was against the death penalty, that she didn't believe in

25   the taking of life, and that she had held these feelings for as long

26   as she could remember.  The record also reflects that Gehrke was

155

confident she could take an oath to listen openly and fairly and was equally confident she could listen to evidence meant to persuade her that death was the appropriate penalty.  She was less confident, however, that she could consider whether that evidence persuaded her in one direction or the other.  In response to defense counsel's increasingly lengthy and confusing questions, she "guessed" she could be open "in theory" to the possibility of voting for the death penalty.  In an even less meaningful response, she responded in the affirmative when defense counsel asked her whether she would be able to assure the court and counsel for both sides that, after hearing the evidence and having considered it, she would at least "consider voting for the death penalty or for life without possibility of parole."  Gehrke was unwilling to say she would never vote for the death penalty and initially thought she could put her personal feelings aside, listen to the evidence, consider the evidence, and be "open to the possibility of voting."  In response to the prosecutor's initial questions, Gehrke repeated that she could put her personal feelings aside and consider the death penalty.  However, after the prosecutor described the nature of the decision to be made by jurors in the penalty phase of the trial, Gehrke appeared to be confused. Once she grasped the prosecutor's final question, i.e., whether she really thought she would be able to vote for the death penalty when it would be easy to avoid that course by voting for life in prison without possibility of parole, she answered that she did not think she could vote for the death penalty.

/////

1       Gehrke's responses were not "differing and conflicting"

2  when those responses are considered in light of the questions asked.

3  In addition, the trial judge, aided by his ability to assess Gehrke's

4  demeanor, was entitled to resolve any ambiguity arising from her

5  responses in favor of a determination that she would be substantially

6  impaired in following instructions of the court and her oath as a

7  juror.   The record therefore supports the trial court's finding of

8  impairment and decision to excuse prospective juror Gehrke for cause.

9       Petitioner's reliance on <u>Gray</u> in support of this claim is

10  unavailing.   The trial judge in that case did indeed state that Mrs.

11  Bounds "is totally indecisive," saying "one thing one time and one

12  thing another."   <u>Gray</u>, 481 U.S. at 655 n.7.   However, the judge had

13  previously concluded that Bounds was capable of voting to impose the

14  death penalty.   <u>Id.</u> at 653.   After the prosecutor asked the court for

15  an additional peremptory to use against Bounds, the judge admitted

16  that he had made the State use "about five" peremptory challenges

17  against prospective jurors who were unequivocally opposed to the

18  death penalty.   As a means of correcting his errors, the judge caused

19  Bounds to be subjected to further voir dire in the hope that she

20  would "equivocate" so that he could "let her off as a person who

21  can't make up her mind."   <u>Id.</u> at 653-54.   In response to further

22  questioning, however, "Bounds stated that she could reach either a

23  guilty or not guilty verdict and that she could vote to impose the

24  death penalty if the verdict were guilty."   <u>Id.</u> at 654.   Despite the

25  absence of any answer that rendered Bounds excludable for cause, the

26  trial judge stated that he had "cheated the State" out of at least

five peremptories and would therefore excuse Bounds for cause.  _Id._ at 654-55 & n.7.  The issue before the Supreme Court in Gray was whether the trial court's clearly erroneous exclusion of Bounds for cause should be subject to harmless-error review.  _Id._ at 651.  The wholly unsupported exclusion of Bounds for cause bears no resemblance to the exclusion of Cara Gehrke for cause in the present case.

The undersigned finds that respondent has carried his burden as moving party in demonstrating that the trial court's findings of bias were made under the proper standard, that those findings are entitled to deference, and that the decisions to excuse the three prospective jurors are fairly supported by the record.  Petitioner has failed to adduce evidence that the trial court's factual determinations were erroneous.  Petitioner's cross-motion for summary judgment should therefore be denied, and respondent's motion for summary judgment should be granted on Claim P.

### Q.   Discriminatory Imposition of the Death Penalty

Petitioner alleges that the trial court violated his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments in summarily rejecting his claim "that the death penalty was discriminatorily imposed on the basis of the victim's race" and in denying petitioner's request for an evidentiary hearing, a continuance, and fees for an expert witness.  (Am. Pet. at 96-97.)

Petitioner makes the following allegations in support of this claim: In a motion filed on March 4, 1987, petitioner asserted that the death penalty is discriminatorily imposed on the basis of the victim's race.  He requested an evidentiary hearing, along with a

continuance and expert consultant fees.  Petitioner offered evidence
that, of thirteen cases in which the death penalty was imposed in
Sacramento County under California's 1978 death penalty law, eleven
of the victims were white, one was Hispanic, and one was Asian.  The
prosecutor opposed the motion.  The trial court denied the motion on
the ground that petitioner had made an insufficient showing for
relief or for a continuance.

Petitioner claims that the death penalty is
discriminatorily imposed in Sacramento County on the basis of the
race of the victim and that the trial court's summary denial of his
motion and requests for evidentiary hearing, funding, and a
continuance denied him his rights to due process and equal protection
of the law, to freedom from discrimination on the basis of race, to
meaningful access to the courts, to mount a defense, and to a fair,
reliable, individualized, nonarbitrary, and adequately guided
determination of the appropriateness of death as a penalty.  (Am.
Pet. at 96-97 (citing CT at 1577; RT at 7471, 7473-75, 7476).)
Petitioner contends that his claim is supported by the facts alleged
and by other facts to be presented at an evidentiary hearing after
full investigation and factual development.

Respondent seeks summary judgment on the ground that
statistical evidence is insufficient to establish discriminatory
imposition of the death penalty and that petitioner's claim must fail
under McCleskey v. Kemp, 481 U.S. 279 (1987), and Harris v. Pulley,
885 F.2d 1354 (9th Cir. 1988).  (Alt. Mot. for Summ. J. at 154-60.)
Respondent asserts that the material undisputed facts are those

1   contained in the trial court record.  (Id. (citing CT at 1565-77; RT

2   at 7470-76).)   According to respondent, the record shows that

3   petitioner presented the trial court with a list of death judgments

4   imposed in Sacramento County between 1978 and 1987, indicating that

5   in eleven cases the victims were white, in one case the victim was

6   Hispanic, and in one case the victim was Asian.  At oral argument,

7   petitioner cited an additional case in which the death penalty was

8   imposed and the victims were white.

9           Respondent argues that petitioner had a full opportunity to

10  litigate this claim in the state courts, a hearing was held, the

11  trial judge determined the pertinent facts and rendered a decision,

12  and the decision was reviewed and affirmed by the California Supreme

13  Court.  Respondent asserts that the evidence in the trial court

14  record is the only proper evidence before this court.

15          Respondent notes that petitioner sought a continuance and

16  expert funding in order to permit Edward J. Bronson to present

17  statistical evidence of discrimination in the imposition of the death

18  penalty.  The trial judge was aware that certiorari had been granted

19  in McCleskey v. Kemp and cited several other cases in concluding that

20  "there is not a sufficient showing here that it is proper to grant

21  the motion or for a continuance, and the motion is thus denied."

22  (Alt. Mot. for Summ. J. at 155.)  Respondent argues that the trial

23  court's decision to deny both funding and a continuance was correct

24  and that petitioner is not entitled to an evidentiary hearing on

25  habeas review because statistical evidence is insufficient to state a

26  federal claim.

Citing McCleskey, 481 U.S. at 292-93, and Carriger v. Lewis, 971 F.2d 329, 334 (9th Cir. 1992)(en banc), respondent argues that petitioner cannot prevail on a claim of discriminatory application of the death penalty unless he proves that the decisionmakers in his case "acted with discriminatory purpose" that had a discriminatory effect on him.  In McCleskey, the Supreme Court considered a study performed in Georgia (the Baldus study) and decided that use of statistics alone will not show discriminatory charging in criminal cases because

> the application of an inference drawn from the general statistics to a specific decision in a trial and sentencing simply is not comparable to the application of an inference drawn from general statistics to a specific venire-selection or Title VII case.  In those cases, the statistics relate to fewer entities, and fewer variables are relevant to the challenged decisions.

481 U.S. at 294-95.  The Supreme Court noted that the State cannot provide a practical rebuttal to statistical studies in death penalty cases because public policy forbids an inquiry into the decisionmaking process of jurors and because the policy considerations behind a prosecutor's broad discretion makes it improper to require prosecutors to defend their decisions to seek the death penalty.  Id. at 296.  The Court held that it is unnecessary for the State to rebut a statistical study such as that relied upon by McCleskey because it was apparent from the record that McCleskey had committed an act for which the United States Constitution and the laws of Georgia permit imposition of the death penalty, thereby

/////

1   providing a legitimate and unchallenged explanation for the

2   prosecutor's decision.  <u>Id.</u> at 296-97.

3           Respondent also asserts that the Ninth Circuit rejected a

4   similar challenge in 1989 in <u>Harris v. Pulley</u>, where the defendant

5   claimed that California's capital sentencing scheme had been applied

6   discriminatorily based on race, age, and gender and had also been

7   applied arbitrarily and capriciously.  The defendant in that case

8   offered two studies of 238 cases involving both homicides and robbery

9   homicides that resulted in the penalty of death in California between

10  1978 and 1982.  The raw numbers indicated that murders involving

11  white victims accounted for 76.5% of all death sentences for

12  intentional homicides in California during the relevant time period,

13  while only 38.7% of the homicides involved white victims.  The

14  studies concluded that someone whose victim was white had a five

15  times greater possibility of receiving the death penalty than someone

16  whose victim was not white.  The study involving robbery homicides

17  showed that crimes involving white victims accounted for 73% of all

18  death sentences, while only 46.5% of the robbery homicides involved

19  white victims.  The study concluded that someone committing robbery

20  murder on a white victim had approximately three times the

21  possibility of receiving the death sentence as someone committing

22  robbery murder on a nonwhite victim.  The study also analyzed

23  statistical information based on gender and age.  The Ninth Circuit

24  held that the statistical proffer of evidence did not entitle Harris

25  to an evidentiary hearing on his equal protection claim because it

26  was insufficient to show that the decisionmakers in his case acted

with discriminatory purpose.  885 F.2d at 1374-75.  The court also
rejected the claim that California's capital sentencing system is
arbitrary and capricious in its application, holding that the offered
study did not prove that the factors of race, gender, and age entered
into any capital sentencing decision in California or that any of
these elements was a factor in the Harris case.  <u>Id.</u> at 1376.  The
court concluded that the study "does not demonstrate a
constitutionally significant risk of racial, gender or age bias
affecting the California capital sentencing process."  <u>Id.</u> at 1377.

Respondent argues that the courts have effectively
foreclosed the use of statistics to prove discrimination or
arbitrariness in the imposition of the death penalty.  Respondent
reasons that the Supreme Court's rejection of the Baldus study, which
was extensive, complex, and sophisticated, particularly given the
size of the disparities found in the rates in which the Georgia death
penalty was imposed, leads to the conclusion that statistical
evidence of discrimination or arbitrariness must far exceed that
offered in <u>McCleskey</u> to constitute a pattern of discriminatory impact
or a constitutionally significant risk of race bias affecting the
capital sentencing process.  Respondent contends that the evidence
submitted by petitioner in this case -- a mere one page chart listing
thirteen capital cases tried in Sacramento County between 1978 and
1987 -- falls far short of that submitted in either <u>McCleskey</u> or
<u>Harris</u>.

Respondent contends that petitioner has failed to present a
colorable factual basis in support of his claim of discriminatory

163

1   prosecution or to establish the right to an evidentiary hearing.

2   Citing <u>Williams v. Calderon</u>, 52 F.3d 1465, 1484 (9th Cir. 1995),

3   respondent asserts that a hearing is not appropriate even if the

4   court assumes that petitioner's factual allegations are true, if this

5   court concludes that petitioner cannot establish error or prejudice.

6   In assessing the need for an evidentiary hearing, respondent urges

7   the court not to accept as true or consider allegations that are

8   conclusory, vague, or irrelevant and to consider only allegations

9   supported by specific references to the state trial record or by

10  competent evidence such as affidavits, declarations, and reliable

11  exhibits.  Respondent observes that petitioner has not identified

12  with specificity any evidence to be presented at an evidentiary

13  hearing where he would be required to show that the decisionmakers in

14  his case acted with discriminatory purpose.  Respondent argues as

15  well that, even if it is true that eleven of thirteen victims were

16  white in capital offenses in Sacramento County during a nine-year

17  period, that fact does not establish purposeful discrimination

18  against petitioner and does not present a colorable showing that

19  racial considerations actually entered into his prosecution.

20          In conclusion, respondent asserts that the defense motion

21  was not based on specific evidence that the death penalty was imposed

22  in petitioner's case as a result of a discriminatory purpose and that

23  the trial court's ruling on the motion was therefore correct.  For

24  these reasons, respondent argues, petitioner was not denied his

25  /////

26  /////

1  rights to due process and equal protection, and summary judgment

2  should be granted for respondent on Claim Q.[45]

3      Petitioner opposes respondent's motion for summary judgment

4  on the ground that it is premature.  (Opp'n & Cross-Mot. for Summ. J.

5  at 204-06.)  Petitioner agrees that under McCleskey and Harris he

6  cannot prevail on his claim of racially discriminatory imposition of

7  the death penalty unless he shows that the decision to prosecute him

8  was based on the victim's race.  Petitioner claims he did the best he

9  could with what was available, i.e., he showed that in other capital

10  cases during the same period as his case, the same office had

11  obtained death sentences almost exclusively in cases where the

12  victims were white.  Petitioner contends that this evidence leads to

13  a reasonable inference that the race of the victim was a motivating

14  force in the decision to seek the death penalty against him.

15  Petitioner concedes that his evidence was not sufficient to amount to

16  actual proof of the influence of race but argues that it was

17  sufficient "to prove racial influence lay in the hands of the very

18  agencies who were being challenged for bias."  (Id. at 205).

19  Petitioner argues that it was the lack of actual proof that led him

20  to seek the aid of the fact-development processes of the state trial

21  court and that the denial of those processes is the reason why such

22  processes are required in this court before the claim is ripe for

23  summary judgment or an evidentiary hearing.  Petitioner states that

24

25      [45]  Respondent again argues that any relief granted for
   petitioner on this claim would depend on a new rule that may not be
26  applied to petitioner under Teague v. Lane.

1  discovery has been authorized concerning prosecuting agencies'

2  capital case standards in at least two other habeas cases in the

3  Eastern District.  (Id. at 206 (citing Belmontes v. Calderon, CIV S-

4  89-0736 DFL JFM (San Joaquin County district attorney), and Grant v.

5  Vasquez, CIV S-90-0770 DFL JFM (Shasta and San Bernardino County

6  district attorneys)).)

7       Petitioner seeks to distinguish his case from McCleskey and

8  Harris by asserting that there are significant differences between

9  the showing made in this case and those made in McCleskey and Harris.

10  Petitioner notes that the showings in the latter cases involved

11  statewide statistics, while petitioner's deals with a single local

12  prosecuting agency over the same time period as his own case.

13  Petitioner argues that, while it made little sense in McCleskey and

14  Harris to infer from statewide statistics that bias was operating in

15  a particular local agency, it makes sense in this case to draw

16  inferences from the conduct of the very agency responsible for

17  prosecuting petitioner.  (Id. at 206.)

18       In reply, respondent maintains that summary judgment is

19  proper because statistical disparity is insufficient to establish a

20  constitutional violation.  Respondent renews his contention that

21  petitioner's motion was properly denied because it was based solely

22  upon statistical disparity and the sole purpose of the requested

23  continuance and funding was to present statistical evidence to the

24  state trial court.  Respondent argues that petitioner's attempts to

25  distinguish his case factually from McCleskey and Harris are

26  /////

166

1   unavailing because the legal principles of those cases foreclose

2   petitioner's claim.  (Resp't's Reply at 30-31.)

3          In reply to respondent's reply, petitioner asserts that

4   there are no disputed issues of material fact on Claim Q, that the

5   claim is ripe for resolution, and that summary judgment should be

6   granted in petitioner's favor for the reasons alleged in the amended

7   petition.  (Pet'r's Reply at 52.)  However, at oral argument,

8   petitioner's counsel cited Claim Q as a claim requiring further

9   factual development and possibly an evidentiary hearing if further

10  factual development is permitted.  (Tr. of Oral Argument Heard July

11  10, 2001, at 20.)  Respondent argued that the issue is primarily a

12  legal one and that it is unnecessary to get to "the ultimate

13  evidence" if this court agrees that petitioner failed to make a

14  sufficient showing in the trial court to require the court to

15  exercise its discretion in favor of discovery.  (Id. at 39-40.)

16         It bears repeating that petitioner's federal habeas claim

17  is that the state trial court violated petitioner's constitutional

18  rights by rejecting a defense claim that the death penalty was

19  discriminatorily imposed on the basis of the race of petitioner's

20  victim and by denying the defense requests for an evidentiary

21  hearing, a continuance, and funds for an expert witness.

22  Accordingly, this court's analysis must begin with an examination of

23  the defense motion and requests and the trial court's ruling on them.

24         On January 6, 1987, the jury rendered a verdict imposing

25  the death penalty on petitioner, and the case was set for further

26  proceedings on January 13, 1987.  (CT at 1556-58.)  All matters,

including judgment and sentencing, were subsequently continued to

March 12, 1987.  (CT at 1561.)  On March 4, 1987, defense counsel

filed a motion titled "Motion for Evidentiary Hearing Prior to

Judgment and Sentencing."  (CT at 1565.)  The purpose of the motion

was stated as follows:

> . . . the defendant David Anthony Breaux will
> move this Court for an evidentiary hearing on his
> contention that the death penalty is imposed
> discriminatorily because, with all other things
> being equal, white victim crimes are more likely
> to result in the death penalty. . . .
> Mr. Breaux will further move this Court for
> a continuance in judgment and sentencing for a
> minimum of 90 days and for $3,750 for expert
> consultant fees in order to prepare Mr. Breaux's
> effort to persuade this Court that the death
> penalty is discriminatorily imposed in white
> victim crimes.

(CT at 1565-66.)  The motion was supported by the following brief

points and authorities:

> California Constitution; United States
> Constitution, Eight [sic] and Fourteenth
> Amendments (Equal Protection and Due Process of
> Law); <u>McCleskey v. Kemp</u>, 753 F.2d 877 (11th Cir.
> 1985), <u>cert.</u> <u>granted</u>, 92 L.Ed.2d 737 (7/7/86).

(CT at 1566.)  The motion was also supported by defense counsel's

declaration on information and belief that the victim in this case

was white and

> there is (a) a significant statistical
> relationship between the imposition of the death
> penalty in California in general, and Sacramento
> County in particular, and in cases in which the
> crime victim is white, and (b) this statistical
> relationship is the result of the
> unconstitutional impact of the race of the white
> crime victims.

/////

(CT at 1566.)  Counsel declared that he had spoken with Edward J.

Bronson, who was capable of acting as an expert consultant and

preparing the defense for a <u>McCleskey</u> motion, and that Mr. Bronson

was available to work as a consultant in the case.  (CT at 1566-67.)

Counsel's declaration cites two exhibits submitted with the

motion for evidentiary hearing: Exhibit A, a letter dated February

20, 1987, from Mr. Bronson to defense counsel, and Exhibit B, Mr.

Bronson's curriculum vitae.  (CT at 1567-76.[46])  In the letter, Mr.

Bronson states his understanding that defense counsel's "major

concern is that Mr. Breaux's possible death sentence may be the

result of a discriminatory process, particularly the race of the

victim," and that "[e]arlier motions in the case raised the issue of

arbitrariness, focusing on the apparent standardless charging process

of the Sacramento District Attorney's Office by way of a discovery

motion."  (CT at 1569.)  Mr. Bronson describes discrimination as "a

narrower attack" and discusses such an attack as follows:

> The issue of discrimination in the
> imposition of the death penalty was recently
> argued before the United States Supreme Court in
> <u>McCleskey</u> <u>v.</u> <u>Kemp</u>, a decision that could be
> coming down at any time.  In California the
> <u>Jackson</u> case, raising similar issues, is now
> pending before Justice Jefferson, who is taking
> evidence on the discrimination claim, sitting as
> a special master.
> If discrimination in the administration of
> the death penalty can be demonstrated, I assume
> the courts will be willing to strike it down.
> However, since discrimination, if it exists, is

---

[46]  The letter from Mr. Bronson appears first in the record but
is preceded by a cover page indicating "Exhibit 'B.'"  (CT at 1568-
70.)  Mr. Bronson's curriculum vitae appears second but is preceded
by a cover page indicating "Exhibit 'A.'"  (CT at 1571-76.)

hardly likely to be avowed, it must be proved
empirically in a proper evidentiary hearing.
That is not a simple matter.

First of all, one cannot prove
discrimination by reference to a single case
before the court; one must demonstrate the
discrimination by showing a pattern (except in
unusual situations like <u>Wheeler</u>).  However, mere
disproportion is not a sufficient showing, as it
might well be in a jury compositional challenge.
Therefore, the second requirement would be to
show that the disproportion cannot be explained
by non-discriminatory reasons.

Among other factors, one should examine such
matters as number of victims, prior record of the
defendant, relationship of the victim and the
accused, etc.

The pool to be surveyed is not just those
capitally charged, but those capitally eligible
in Sacramento over a period of time, five to
seven years.

While there is a large body of research that
demonstrates that there is discrimination,
especially based on the race of the victim, the
research has all been done outside of California.
Oddly enough the Bureau of Criminal Statistics of
the Department of Justice, which collects a
tremendous amount of data, has never cross
tabulated the data on victims and offenders.
Thus, there is a good deal of information on
offenders and on their victims, but nothing to
connect the two groups.

I have testified on this issue before (in
San Diego), but given the lack of good data, the
argument tends to be demonstrated inferentially
(discrimination) rather than directly.

If the judge in Breaux is willing to
consider evidence on this issue, then I would
propose a two- or three-stage process.  The first
stage would be [to] determine what sources are
available to undertake the collection of the
necessary data, the extent to which that
information is open to me, and its usability.
Such sources would include District Attorney
files, including their homicide log; Public
Defender files; police and probation reports; and
newspapers.  At that point I could report back to
the court on the feasibility of such a study, and
its cost.

Such an approach would avoid an undesirable
open-ended commitment, in time and money, from

1         the court.   If the study does prove feasible, I
        could report back to the court with a preliminary

2         research design and an estimate of time and cost.
        Progress reports could also be included.

3

4 (CT at 1569-70.)

5        When the motion was argued on March 12, 1987, defense

6 counsel submitted an additional exhibit that was made a part of the

7 record as Exhibit C to the motion.   (RT at 7471; CT at 1577.)

8 Counsel described the exhibit as "a one-page sheet that purports to

9 be a compilation of all death penalty verdicts rendered in this

10 county since the law was changed in 1978."   (RT at 7471.)   Counsel

11 explained the exhibit and argued as follows:

12         That sheet breaks down by race and cites the
        victims in each of those cases.   While I don't

13         pretend to this Court to be any expert in knowing
        exactly whether this is precisely all the cases,

14         to the best of my information and belief it is
        with one exception.   It does not include the name

15         of Gerald Gallego, and if it did, it would note
        that the race of the victim, the two victims in

16         that case were also white.
        As the Court can see, there is no exceptions

17         [sic] other than one, which is the case involving
        Steven Ainsworth.   All of the victims are all

18         white in each and every case that I am aware of
        that has resulted in a death verdict in this

19         county, and I would point out to the Court it
        simply buttresses the assertion made in the

20         declaration in support of the motion that there
        appears to be an appropriate factual basis to

21         conduct an evidentiary proceeding to explore
        whether or not the province recited in the

22         Baldwin [sic] study that is discussed in detail
        in the McCleskey opinion.

23         That's the first point I wanted to make is
        simply to have this sheet noted as part of our

24         record.
        The second thing is, as the Court indicated

25         to us in chambers its tentative feelings about
        this motion and it noted a California opinion

26         with which I was not familiar that the Court said

1     would be inconsistent with the position taken by
      Mr. Breaux, I point out only the obvious, without
2     having read that opinion, and that is that the
      U.S. Supreme Court is the final arbiter of the
3     federal constitution, and McCleskey is before the
      U.S. Supreme Court based upon a very divided
4     Court of Appeals decision.
           If the Court has read McCleskey, I am sure
5     it has, it noted that there are eight separate
      opinions within that one citation and that
6     literally not one Associate Justice joined in the
      lead opinion without qualification, and while
7     there is a majority in favor of denying the writ
      filed by Mr. McCleskey, it is only stating the
8     obvious to say that the Court was real divided in
      its feelings about Mr. McCleskey and McCleskey's
9     contentions.  Those factual contentions in that
      opinion have virtually nothing to do with the
10    State of California, and the reason that we filed
      the motion the way we have is that we are not
11    suggesting to this Court that we know for a fact
      there is a problem.  What we do know, we ask this
12    Court to acknowledge, is there seems to be a
      strong basis upon which to go forth with the
13    study.  If in fact this law is applied in the way
      that it's somehow deflected because of the race
14    of the victim, in the words noted even by the
      lead opinion in McCleskey, the entire statute and
15    its application may be unconstitutional.  The
      only way to intelligently get at that is to study
16    this county and this state, and that's exactly
      what Dr. Bronson is available to do, and while he
17    is not the end all in this matter -- it's certain
      that the People would want their own person
18    involved in this, he is the logical and
      appropriate basis to begin.
19         I know the Court has read the motion, so
      this is only repeating what it has a copy of,
20    but, again, we are not asking the Court to make
      any ultimate ruling about what it should do.  We
21    are simply asking for an opportunity to prepare
      for an evidentiary hearing, and that takes time
22    and a modest amount of money, and that's what we
      are here asking this Court to do.
23
24    (RT at 7471-73.)

25         Exhibit C to the defense motion for an evidentiary hearing

26    bears the date of February 18, 1987, is titled "Sacramento County

                                172

Venue Death Judgments," and is subtitled "Race of Defendants/Race &

Gender of Victims."  A footnote indicates that this list includes

four cases in which venue was changed to Sacramento but does not

include two cases in which venue was changed from Sacramento.  The

list presents the names of thirteen defendants, all of whom appear to

be male.  Six of the defendants are identified as white, four as

black, two as Hispanic, and one as Native American.  Ten of the

twenty victims[47] are identified as white females and eight as white

males.  One victim is identified as an Asian female and one as a

Hispanic male.  (CT at 1577.)

          The prosecutor opposed the motion for evidentiary hearing

on the grounds that defense counsel had not made a sufficient factual

showing and that the motion was untimely:

                    The issue that Counsel says he believes
          applies in this case would have been an issue
          that has existed, if it exists at all, for years,
          and I would submit that the motion factually
          should be denied.  There is no support for it.
          Dr. Bronson doesn't say he can really even do
          such a study.  He says in his letter that he
          would like to avoid an undesirable open ended
          commitment in time and money, and I would submit
          that at this point in time the Court should go
          forward with the sentencing of the defendant and
          simply deny the motion.  It's inappropriate.
          Both the victim and the defendant are white.
          Race was not an issue at all in this case.  There
          was no indication whatsoever that race was an
          issue.  There was no allegation of that at any
          time.  There have been numerous motions litigated
          in the case, including a recusal motion, and no
          such allegations were ever made by the defense,
          so I question the timing and the motive of the
          motion other than it's [a] delaying tactic, and I

---

[47] Six victims are shown for one defendant and two each for two
other defendants.

1              would submit that factually the motion should be
               denied.
2

3    (RT at 7473-74.)

4              In response, defense counsel noted that certiorari was not

5    granted in McCleskey until July 6, 1986, while the information was

6    filed in the Breaux case in July of 1984 and the death verdict was

7    not rendered until January of 1987.  (RT at 7474.)  Defense counsel

8    denied that the motion was brought for the purpose of delay, argued

9    that an earlier-filed motion would have been opposed as premature,

10   and disputed the contention that McCleskey was inapplicable.  (Id. at

11   7474-75.)

12             After hearing the parties' arguments, the trial court

13   addressed the motion for evidentiary hearing as follows:

14                 First, the granting of a certiorari by the
                 Supreme Court does not have the effect of
15               changing the law.  It has been held in other
                 cases that the granting of certiorari is not the
16               grounds for a trial court to grant any relief.
                 Specifically, it has been held that it's an abuse
17               of discretion for a trial court to grant relief
                 based on the granting of certiorari where it's
18               looking for it by the Supreme Court is the thing
                 to do [sic].
19                 There are several cases that have raised the
                 issues that have come up in McCleskey, and,
20               frankly, the circuits are going in several
                 directions.  However, you do have the case of
21               Wicker against McCotter, which I think is a Fifth
                 Circuit case, 1986, 798 Federal 2nd 155.  The
22               Court there held where the petitioner was white
                 and also the victim was white, that the
23               petitioner failed to state a claim for relief on
                 the ground he was denied legal protection because
24               the death penalty in Texas here was imposed in
                 race of the victim [sic], specifically saying
25               that the discussions in McCleskey do not apply
                 when you have both the victim and the defendant
26               who is white.

                                  174

1           I'd like to say also that in People against
2     Allen -- see if I can find the citation on that.
      That's 42 Cal. 3rd 1222, a 1986 decision of the
3     California Supreme Court that held that what they
      called "intercase" proportionality review is not
4     required.  This also indicates because of the
      rationale in that particular case that was done,
5     McCleskey would not be applicable in California
      under the California law.
6           I want to say that I have also read and
      considered Moore against Blackburn, which is a
7     1986 case, 806 Federal 2nd 560.  It cited some of
      the studies in this particular area.
8           Of course, in the Federal Supreme Court at
      this time, Pulley against Harris has held that
9     the federal constitution was not in a fair
      proportionality review [sic].
10          Based on the cases that I have read in the
      matter, it appears to me that there is not a
11    sufficient showing here that it is proper to
      grant the motion or for a continuance, and the
      motion is thus denied.
12

13    (RT at 7475-76.)  After the court made its ruling, defense counsel

14    clarified for the record that Dr. Bronson was available and prepared

15    to go forward with the proposed study.   (RT at 7476-77.)

16           This record demonstrates conclusively that the defense

17    motion did not present the trial court with a fully developed claim

18    that the death penalty was discriminatorily imposed upon petitioner

19    on the basis of the race of his victim.   The defense merely

20    speculated that "all other things being equal, white victim crimes

21    are more likely to result in the death penalty" in California, and on

22    that ground sought a continuance and funding to hire an expert to

23    study the matter in preparation for an evidentiary hearing.   (CT at

24    1566.)   Defense counsel freely admitted during oral argument that the

25    factual contentions in the Eleventh Circuit case relied upon by

26    defendant "have virtually nothing to do with the State of California"

                                   175

1    and that "the reason that we filed the motion the way we have is that

2    we are not suggesting to this Court that we know for a fact there is

3    a problem."  (RT at 7472.)  Counsel spoke of the need to "explore"

4    the matter and urged the court to agree that there "seems to be a

5    strong basis upon which to go forth with the study" because the "only

6    way to intelligently get at" possible discrimination in imposing the

7    death penalty "is to study this county and this state."  (RT at 7471-

8    73.)  Indeed, counsel stated, "[W]e are not asking the Court to make

9    any ultimate ruling about what it should do.  We are simply asking

10   for an opportunity to prepare for an evidentiary hearing . . . ."

11   (RT at 7473.)

12          The expert selected by the defense also recognized the

13   speculative nature of the proposed study.  He cited defense counsel's

14   "concern" that petitioner's possible death sentence "may be the

15   result of a discriminatory process" and referred to "discrimination,

16   if it exists."  (CT at 1569.)  The expert cautioned that "mere

17   disproportion is not a sufficient showing" and described the need to

18   survey "not just those capitally charged, but those capitally

19   eligible in Sacramento over a period of time, five to seven years,"

20   along with the need to consider various distinguishing factors in the

21   cases.  (CT at 1569-70.)  The tentative and preliminary nature of the

22   defense contention is further demonstrated in the expert's statements

23   that the research demonstrating discrimination had all been done

24   outside of California, that there was a lack of good data in

25   California, and that his first task would be to determine the

26   feasibility of conducting a study of discrimination in the state and

1  in Sacramento County in particular.  The expert suggested that, if he

2  determined that such a study was feasible, he would then draw up "a

3  preliminary research design and an estimate of time and cost" for the

4  court's consideration.[48]  (CT at 1570.)

5          The record establishes that the state trial court did not

6  rule on the merits of a claim of discrimination.  The court denied

7  only the motion that was before it, finding that the defense had made

8  an insufficient showing to warrant either an evidentiary hearing or a

9  continuance.  The trial court properly declined to speculate on what

10  the Supreme Court's ruling might be in <u>McCleskey</u> and noted that the

11  federal circuit courts were not in agreement on the issues raised in

12  that case.

13          The trial court cited <u>Wicker v. McCotter</u>, 798 F.2d 155 (5th

14  Cir. 1986), in which it was held that the white defendant failed to

15  present a factual issue warranting an evidentiary hearing on his

16  equal protection claim based on allegations that prosecutors in Texas

17  are more likely to charge a defendant with capital murder when the

18  victim is white and that a defendant tried in Texas for the murder of

19  a white person is more likely to be convicted and sentenced to death

20  than a defendant charged with the murder of a person of another race.

21  798 F.2d at 157.

22  /////

23

24      [48]  It appears that when the prosecutor said "Dr. Bronson
    doesn't say he can really even do such a study," he was not referring
25  to Dr. Bronson's availability or willingness to do a study but was
    instead referring to Dr. Bronson's indication that he would begin by
26  determining whether a study was feasible.

1    The trial court also cited <u>Moore v. Blackburn</u>, 806 F.2d 560

2  (5th Cir. 1986), in which the appellate court denied the petitioner's

3  application for a certificate of probable cause to appeal the denial

4  of his third federal habeas petition.  One of the petitioner's claims

5  was that the death penalty is discriminatorily applied in Louisiana.

6  806 F.2d at 563.  Petitioner sought reconsideration based on two

7  studies that purported to show a greater probability for imposition

8  of the death penalty where the victim of the crime is white.  The

9  Fifth Circuit cited its previous decision that no evidentiary hearing

10  was warranted because the statistical tables failed to take into

11  account the statutory aggravating circumstances and were therefore

12  incomplete.  806 F.2d at 564 n.6.  The court ruled that the

13  petitioner's inadequate studies failed to bring his claim within the

14  "ends of justice" exception to the bar against successive petitions.

15  806 F.2d at 564.

16    In addition, the trial judge cited <u>People v. Allen</u>, 42 Cal.

17  3d 1222 (1986), in which the California Supreme Court considered

18  whether the state's death penalty statute is unconstitutional for

19  failing to require intercase proportionality review.  42 Cal. 3d at

20  1285-88.  The state's highest court rejected the argument that equal

21  protection principles mandate application of California's disparate

22  sentencing statute to capital cases.  The court found that the

23  disparate sentencing statute was adopted to promote uniform sentences

24  in the context of California's determinate sentencing law, while in

25  capital cases

26  /////

> the jury has ultimate responsibility for
> determining if death is the appropriate penalty
> for the particular offense and offender.  In
> exercising this essentially normative task, it
> may apply its own moral standards to the
> aggravating and mitigating evidence presented.
> It may reject death if persuaded to do so on the
> basis of "*any* constitutionally relevant evidence
> or observation."  Thus, the "evidence or
> observation[s]" that persuaded juries in
> apparently "comparable" cases *not* to assess the
> death penalty may not be immediately apparent
> from the record.  Under these circumstances, the
> Legislature could properly conclude that
> superficial factual similarities among capital
> cases with opposite sentencing results establish
> no presumption that the cases in which the more
> severe sentence was imposed are "disparate."

Id. at 1287-88 (citations omitted).  In Pulley v. Harris, 465 U.S. 37

(1984), also cited by the state trial court, the United States

Supreme Court had reached the same conclusion, holding that

California's death penalty scheme was not rendered unconstitutional

by the absence of a provision for proportionality review.  See 465

U.S. at 43-44 (ruling that the Eighth Amendment does not require

California appellate courts to compare a particular defendant's death

sentence with the penalties imposed in similar cases to determine

whether the defendant's penalty is disproportionate to the punishment

imposed on others convicted of the same crime).

This record does not support a conclusion that the state

trial court violated any of petitioner's federal constitutional

rights by denying the defense motion for an evidentiary hearing and a

continuance.  Legally, the motion was supported only by broad

constitutional principles and an Eleventh Circuit case in which the

defendant's petition for certiorari had been granted.  In McCleskey,

1  the Eleventh Circuit had reversed the district court's order granting

2  habeas relief and held, inter alia, that (1) "proof of a disparate

3  impact alone is insufficient to invalidate a capital sentencing

4  system, unless that disparate impact is so great that it compels a

5  conclusion that the system is unprincipled, irrational, arbitrary and

6  capricious such that purposeful discrimination-i.e., race is

7  intentionally being used as a factor in sentencing-can be presumed to

8  permeate the system"; (2) increased likelihood of a death sentence

9  for a white victim crime is not sufficient to overcome the

10  presumption that the state's death-sentencing process is operating in

11  a constitutional manner; and (3) the statistical studies offered by

12  the petitioner were insufficient to show that his sentence was

13  determined by the race of his victim or even that the race of his

14  victim contributed to the imposition of the penalty in his case.

15  McCleskey v. Kemp, 753 F.2d 877, 892, 897, 898 (11th Cir. 1985),

16  aff'd, 481 U.S. 279 (1987).  The Eleventh Circuit's conclusions

17  provided no legal support for the defense motion in this case.

18        Factually, the defense motion was founded on mere

19  speculation and supported by scanty information about fourteen cases

20  in which the death penalty had been imposed in Sacramento County

21  since 1978.  Exhibit C to the defense motion indicates the race of

22  each defendant and each victim, but little else.  The list does not

23  account for the distinguishing factors identified by Mr. Bronson as

24  ones that should be examined, such as the prior record of the

25  defendant and the relationship between the victim and the accused.

26  Nor did the defense attempt to place the listed cases in the context

1  of all cases that were capitally eligible during the same time

2  period.   The defense proffer failed to provide a basis for the

3  speculation that "all other things being equal, white victim crimes

4  are more likely to result in the death penalty" in Sacramento County.

5        On this record, the court finds that the state trial court

6  did not err in denying the defense motion for an evidentiary hearing

7  and a continuance.   Respondent is therefore entitled to summary

8  judgment on petitioner's claim of trial court error.

9        To the extent that Claim Q alleges discriminatory

10  application of the death penalty apart from a claim of trial court

11  error, petitioner has not supported such a claim with evidence other

12  than that previously presented.   Even if this court were to deem

13  petitioner's list of thirteen Sacramento County cases, as augmented

14  by the additional name provided at the hearing of petitioner's

15  motion, to be an indication of a discrepancy that correlates to race,

16  the discrepancy is insufficient to support an inference that the

17  decisionmakers in petitioner's case acted with a discriminatory

18  purpose.   Cf. Belmontes, 350 F.3d at 892-94 (expert report analyzing

19  prosecutors' charging decisions in 122 death-eligible homicides

20  committed in San Joaquin County over a nine year period which coded

21  data for over 450 variables and reflected the results of numerous

22  logistic regression tests found to support a prima facie showing of

23  unlawful charging discrimination).   Absent evidence of discriminatory

24  purpose, a petitioner cannot prevail on a claim of discriminatory

25  imposition of the death penalty.   See McCleskey, 481 U.S. at 292-93,

26  312-13; Belmontes, 350 F.3d at 894-95; Jeffers v. Lewis, 38 F.3d 411,

1  419 (9th Cir. 1994) (en banc); <u>Carriger</u>, 971 F.2d at 334; <u>Harris v.</u>

2  <u>Pulley</u>, 885 F.2d at 1373-74.   Petitioner is not entitled to an

3  evidentiary hearing on the issue because he has not alleged facts

4  which, if proved, would entitle him to relief.   <u>See</u> <u>Townsend v. Sain</u>,

5  372 U.S. 293, 312-19 (1963).   Petitioner's claim of discriminatory

6  imposition of the death penalty, to the extent that petitioner has

7  alleged such a claim independent of his claim of trial court error,

8  should therefore be dismissed for failure to state a claim.

9       **R.    Prosecution's Use of Peremptory Challenges**

10           Petitioner alleges that his Fifth, Sixth, Eighth, and

11  Fourteenth Amendment rights were violated by the prosecution's use of

12  peremptory challenges to exclude potential jurors who expressed

13  reservations about the death penalty.   (Am. Pet. at 98-99.)

14  Petitioner claims the prosecutor used his peremptory challenges to

15  produce a jury that was uncommonly willing to condemn a man to death.

16  Petitioner objected during jury selection to the use of peremptory

17  challenges to excuse prospective jurors who expressed reservations

18  about the death penalty, but the trial court overruled the objection

19  on the ground that such persons are not a cognizable group.

20  Petitioner alleges that such persons are a cognizable group which

21  cannot be unfairly excluded from the jury and that the prosecution's

22  misuse of peremptory challenges deprived him of his rights to due

23  process and equal protection of the law, to trial by a fair and

24  impartial sentencer, to not be arbitrarily deprived of life and

25  liberty interests under state law, and to a fair, reliable,

26  individualized, nonarbitrary, and adequately guided determination

1  that death was the appropriate penalty according to the conscience of

2  the community.

3          Respondent denies that the prosecutor used peremptory

4  challenges to obtain a jury which was impermissibly biased in favor

5  of a death verdict and disputes petitioner's contentions.  Respondent

6  asserts that petitioner is not entitled to an evidentiary hearing on

7  this claim because it was the subject of a hearing before the trial

8  court and a decision on appeal.  Respondent contends that he is

9  entitled to summary judgment because petitioner was not denied the

10 right to a fair and impartial trial.  Respondent seeks judgment in

11 his favor on the basis of the material undisputed facts included in

12 the trial record of voir dire and the defense motion to dismiss the

13 jury panel due to alleged discriminatory use of peremptory

14 challenges.  (Alt. Mot. for Summ. J. at 160-66.)

15         Respondent notes that the defense motion to dismiss the

16 jury panel alleged discrimination based on race as well as

17 discrimination based on reservations about the death penalty.  The

18 motion was directed at peremptory challenges exercised with respect

19 to at least eleven prospective jurors.  (Id. at 161-62 & 162 n.86

20 (citing RT at 4139-42 & 4164-70).)  The prosecutor denied that he had

21 excused any prospective juror solely due to the person's feelings

22 regarding the death penalty.  As to each minority prospective juror

23 named by defense counsel, the prosecutor stated reasons for excusing

24 each person that were independent of the person's race or ethnic

25 background and also independent of the person's attitude toward the

26 death penalty.  The prosecutor stated his reasons for excluding some,

but not all, of the non-minority prospective jurors cited by the

defense as having objections to the death penalty. (Id. at 162

(citing RT at 4169-70 & 4175-84).)  The trial court found that people

"leaning" against the death penalty were not a cognizable group.

(Id. (citing RT at 4170-71.)  On appeal, the California Supreme Court

denied this claim on legal grounds, citing cases in which that court

had previously found no constitutional violation for the alleged

defect: People v. Gordon, 50 Cal. 3d 1223, 1263 (1990); People v.

Turner, 37 Cal. 3d 302, 313-15 (1984).  (Alt. Mot. for Summ. J. at

162 (citing Breaux, 1 Cal. 4th at 321).)  In Gordon, the court found

no constitutional infirmity in permitting peremptory challenges by

both sides on the basis of specific juror attitudes on the death

penalty:

> While a statute requiring exclusion of all jurors
> with any feeling against the death penalty
> produces a jury biased in favor of death, we have
> no proof that a similar bias arises, on either
> guilt or penalty issues, when *both parties* are
> allowed to exercise their equal, limited numbers
> of peremptory challenges . . . against jurors
> harboring specific attitudes they reasonably
> believe unfavorable.

50 Cal. 3d at 1263 (quoting Turner, 37 Cal. 3d at 315, and noting

omission of citations).

Respondent argues that peremptory challenges, which are not

required by the Constitution, are a means to achieve the end of an

impartial jury and can ordinarily be exercised by either side without

stating a reason. (Alt. Mot. for Summ. J. at 163-64 (citing Gray v.

Mississippi, 481 U.S. 648, 653 (1987); Swain v. Alabama, 380 U.S.

202, 220 (1965)).)  Respondent contends that the Sixth Amendment

requirement of a fair-cross-section on the venire is another means of

assuring an impartial jury and is not a guarantee of a representative

jury.  (Id. at 164 (citing Holland v. Illinois, 493 U.S. 474, 480

(1990)).  Moreover, respondent argues, women and certain racial

groups are the only groups that have been recognized by the Supreme

Court as distinctive for purposes of determining whether a defendant

has been deprived of a cross-sectional or unbiased jury.  (Id. at 164

(citing Holland, 493 U.S. at 478-85; Lockhart v. McCree, 476 U.S.

162, 177 (1986)).)  Respondent asserts that the removal of

prospective jurors for cause based on their attitudes about the death

penalty does not deprive a defendant of a cross-sectional or unbiased

jury, and a prosecutor's use of peremptory challenges to eliminate a

distinctive group in the community does not deprive the defendant of

the Sixth Amendment right to the fair possibility of a representative

jury.  (Id. at 164 (citing McCree, 476 U.S. at 176-78, and Holland,

493 U.S. at 478).)  Respondent concludes that the Supreme Court has

squarely rejected petitioner's claim concerning peremptory challenges

and that summary judgment in his favor should be granted on this

claim.

In opposition, petitioner contends that he is entitled to

summary judgment on his claim that the prosecutor committed

constitutional error by using peremptory challenges to remove jurors

who expressed reservations about the death penalty insufficient to

permit them to be excluded for cause.  Petitioner states that his

claim alleges two alternative theories, with the first theory being

that "the prosecutor's actions violated the Constitution's fair-

1   cross-section requirement insofar as those actions resulted in the

2   exclusion of a cognizable group." (Opp'n & Cross-Mot. for Summ. J.

3   at 206-07.) Petitioner concedes that this ground for relief is

4   precluded by the Supreme Court's decisions in Lockhart v. McCree and

5   Holland v. Illinois. Petitioner's second theory is that the

6   prosecutor's actions "also violated due process, equal protection and

7   the Eighth Amendment because the prosecutor produced a jury that was

8   biased in favor of death." (Opp'n & Cross-Mot. for Summ. J. at 207.)

9   Petitioner contends that he is entitled to summary judgment because

10  he "can show that peremptory challenges resulted in a jury biased in

11  favor of death under the due process clause and the Eighth

12  Amendment." (Id. at 208.)

13          In support of his alternative theory, petitioner relies on

14  Witherspoon v. Illinois, 391 U.S. 510 (1968), in which the Supreme

15  Court said that a jury from which all persons with reservations about

16  the death penalty have been excluded is "a jury uncommonly willing to

17  condemn a man to die," "a tribunal organized to return a verdict of

18  death," "a hanging jury," and a jury in which the scales are

19  "deliberately tipped toward death." 391 U.S. at 521, 522 n.20, 523.

20  The Supreme Court concluded that the integrity of the process that

21  decided the defendant's fate was necessarily undermined by such a

22  jury and that to execute a death sentence against the defendant in

23  that case would deprive him of his life without due process of law.

24  Id. at 523. Petitioner admits that these pronouncements were made in

25  a case in which prospective jurors had been improperly excluded from

26  the jury by means of challenges for cause rather than by peremptory

186

challenges.  Petitioner argues that the distinction is "of no moment, given what is at stake," and that it cannot matter how the jury came to be a jury uncommonly willing to condemn a man to die.  (Opp'n & Cross-Mot. for Summ. J. at 208-09.)  Petitioner asserts that his jury was as fundamentally skewed as the jury in <u>Witherspoon</u> and that the Constitution cannot be deemed to tolerate a death sentence imposed under such circumstances.

Petitioner dismisses respondent's reliance on <u>Lockhart v. McCree</u>, asserting that respondent has misstated the ruling of the case.  Petitioner asserts that in <u>Witherspoon</u> the Supreme Court determined that a jury was biased at the penalty phase if stripped of jurors who were skeptical of the death penalty but who could judge each case on its merits.  In <u>McCree</u>, petitioner argues, the Court merely answered the question left open in <u>Witherspoon</u>, determining that the exclusion of such jurors did not produce a biased jury at the guilt phase.  <u>McCree</u>, 476 U.S. at 165.  Petitioner argues that no decision of the Supreme Court has rejected or cut back on the holding in <u>Witherspoon</u> that a jury culled of persons skeptical of the death penalty but able to judge the case on its merits is constitutionally biased for purposes of the penalty phase of trial.  Petitioner asserts that it is this principle upon which he relies in seeking summary judgment in his favor on Claim R.

Respondent counters that petitioner's alternative argument is meritless.  Respondent asserts that in <u>McCree</u> the Supreme Court did in fact hold that "death qualification" does not violate the right to an impartial jury.  476 U.S. at 176-78.  Respondent also

1  contends that petitioner's argument goes well beyond the holding of

2  Witherspoon, in which the Court decided that excusing individual

3  prospective jurors for cause due to bias against the death penalty

4  violated the Sixth Amendment right to an impartial jury. Respondent

5  emphasizes that the Court did not decide in Witherspoon that

6  peremptory challenges based on bias against the death penalty would

7  also violate the Sixth Amendment. Respondent notes that there are

8  major constitutional differences between peremptory challenges and

9  excusals for cause and further observes that the Court's

10  clarifications in Witt contradicted statements in Witherspoon

11  regarding the standard for excusals. Respondent argues also that

12  petitioner's Eighth Amendment claim concerning bias at the penalty

13  phase of his trial cannot be sustained on the basis of the decision

14  in Witherspoon, which concerned the Sixth Amendment, because doing so

15  would constitute a new rule barred by Teague v. Lane.

16        Respondent contends that, aside from the legal merits,

17  petitioner's alternative argument lacks factual support because the

18  evidence does not show that petitioner's jury was biased. Respondent

19  points to the trial court's determination that the prosecutor had not

20  discriminated on the basis of prospective jurors' views on the death

21  penalty.

22        In reply, petitioner reiterates both his argument that a

23  jury stripped of all persons with even the slightest skepticism about

24  the death penalty is a "hanging jury" and his argument that McCree is

25  inapplicable to this case because it did not concern the composition

26  of the penalty phase jury. Petitioner denies that a ruling in his

1  favor on Claim R would violate <u>Teague</u>, arguing that such a ruling

2  would not constitute new law in light of <u>Witherspoon</u> and <u>Batson v.</u>

3  <u>Kentucky</u>, 476 U.S. 79 (1986).  Petitioner argues in the alternative

4  that the <u>Teague</u> exception for watershed rules of criminal procedure

5  would apply.

6        The court turns first to respondent's assertion that Claim

7  R lacks factual support.  Respondent has pointed to the state court

8  record of voir dire and the defense motion to dismiss the jury panel

9  due to alleged discriminatory use of peremptory challenges based on

10  prospective jurors' race or opposition to the death penalty.  The

11  prosecutor denied having excused any prospective juror solely due to

12  the person's feelings about the death penalty.  As to each

13  prospective juror who was a member of a minority group, the

14  prosecutor stated reasons independent of the person's race or ethnic

15  background, and independent of the person's attitude toward the death

16  penalty, for excusing the person.  The prosecutor also stated reasons

17  for excluding each of the non-minority prospective jurors cited by

18  the defense as having stated objections to the death penalty.  (RT at

19  4139-42, 4162-89.)  The trial court determined that the prosecutor

20  did not exercise his peremptory challenges for the purpose of

21  excluding a constitutionally cognizable group, that petitioner failed

22  to make a prima facie showing of discrimination on the basis of race

23  or ethnicity, and that the prosecutor provided adequate reasons to

24  rebut any inference of discrimination that might be drawn with regard

25  to his exercise of peremptory challenges.  (RT at 4170-71, 4184,

26  4189.)

1    The court finds that in moving for summary judgment
2 respondent has carried his burden of pointing to those parts of the
3 record that support his contentions with respect to this claim.   The
4 burden shifts to petitioner.   <u>See Matsushita Elec. Indus. Co.</u>, 475
5 U.S. at 586.   Petitioner has not pointed to evidence of
6 discrimination or bias and has not demonstrated that the prosecutor
7 used peremptory challenges to obtain a jury that was biased in favor
8 of a death verdict.   In the absence of factual support for Claim R,
9 petitioner is not entitled to judgment in his favor.

10    Even if petitioner were to come forward with factual
11 support for Claim R, it would be unavailing because the claim is
12 based on a legal theory that lacks merit.   Petitioner relies on
13 language contained in <u>Witherspoon v. Illinois</u>, 391 U.S. 510 (1968),
14 in which the Supreme Court held that the State violates a capital
15 defendant's right under the Sixth and Fourteenth Amendments to trial
16 by an impartial jury when it excuses <u>for cause</u> all members of the
17 venire who express conscientious objections to capital punishment.
18 391 U.S. at 518, 521-22; <u>see also Wainwright</u>, 469 U.S. at 416.

19    The Supreme Court in <u>Witherspoon</u> addressed an Illinois
20 statute that permitted trial courts to excuse for cause any juror
21 that had qualms about the death penalty.   391 U.S. at 512-13.   As
22 petitioner concedes, the Court did not address the use of peremptory
23 challenges to exclude such prospective jurors.   Petitioner does not
24 cite any case, or indeed any legal principle, that justifies the
25 extension of <u>Witherspoon</u>'s holding to the exclusion of prospective
26 /////

1   jurors by peremptory challenge.   Petitioner merely asserts that the

2   distinction is "of no moment, given what is at stake."

3          Petitioner's assertion flies in the face of the cases

4   discussing and applying the holding of Witherspoon as well as the

5   jurisprudence concerning jury impartiality and the exercise of

6   peremptory challenges.   See, e.g., Adams v. Texas, 448 U.S. 38, 45

7   (1980) (describing Witherspoon and its progeny as a line of cases

8   establishing "the general proposition that a juror may not be

9   challenged for cause based on his views about capital punishment

10  unless those views would prevent or substantially impair the

11  performance of his duties as a juror in accordance with his

12  instructions and his oath"); Batson v. Kentucky, 476 U.S. at 89

13  (holding that a prosecutor is ordinarily entitled to exercise the

14  allotted number of peremptory challenges for any reason at all but

15  may not challenge potential jurors solely on account of their race);

16  McCree, 476 U.S. at 177-78 (rejecting an impartiality argument based

17  on the theory that excluding prospective jurors with a particular

18  viewpoint results in an impermissibly partial jury); Gray, 481 U.S.

19  at 652 n.3, 667-68 & nn. 17-18 (observing that "peremptory challenges

20  ordinarily can be exercised without articulating reasons," unless a

21  defendant establishes a prima facie case of purposeful discrimination

22  in the prosecutor's exercise of those challenges); Morgan v.

23  Illinois, 504 U.S. 719, 731 (1992) (describing Witherspoon as "a

24  limitation of a State's making unlimited challenges for cause to

25  exclude those jurors who 'might hesitate' to return a verdict

26  imposing death"); United States v. Annigoni, 96 F.3d 1132, 1138 n.8

191

1  (9th Cir. 1996) (en banc) ("[T]he sole restriction on the use of

2  peremptory challenges is that neither side may exercise a challenge

3  on the basis of the race, gender, or ethnicity of the challenged

4  juror.").   It is neither unconstitutional nor uncommon for a

5  prosecutor to use a peremptory challenge to remove a prospective

6  juror after having unsuccessfully challenged the person for cause on

7  the basis of his or her death penalty views.   See Gray, 481 U.S. at

8  652 & 667-68.   Cf. Ross v. Oklahoma, 487 U.S. 81, 85 (1988).

9        Petitioner has not provided factual or legal support for

10 Claim R.   Respondent has carried his burden in pointing to portions

11 of the record that demonstrate the lack of a factual basis for the

12 claim and has shown that petitioner's legal argument lacks merit.

13 Accordingly, petitioner's motion for summary judgment should be

14 denied, and respondent's motion should be granted on Claim R.

15 **S.   California Death Penalty Statutory Scheme**

16        In this claim petitioner presents a sweeping constitutional

17 challenge to the 1978 California Death Penalty Law both on its face

18 and as applied to him at trial and on appeal.   (Am. Pet. at 99-111.)

19 Specifically petitioner alleges that: (1) the penalty phase jury

20 instruction as to the consideration of aggravating and mitigating

21 factors was unconstitutionally vague; (2) the penalty phase jury

22 instruction as to Factor (b) aggravating factors was

23 unconstitutional; (3) California law allowing the prosecution to

24 relitigate the facts of his prior felony convictions as aggravating

25 evidence is unconstitutional; (4) the penalty phase instructions

26 improperly allowed the jury to double count his capital offense as an

192

aggravating factor under both Factor (a) and Factor (b); (5) to the extent the 1978 California Death Penalty law permits the jury not to be instructed that any aggravating factor relied upon must be established beyond a reasonable doubt it is unconstitutional; (6) it was constitutional error not to require the jury to designate the aggravating factors relied upon; (7) it was constitutional error not to require the jury to unanimously agree as to the aggravating factors relied upon; (8) the penalty phase instruction failed to adequately convey to the jury the meaning of "mitigation"; (9) to the extent the 1978 California Death Penalty law invests the power of sentencing to the District Attorney and fails to provide guidance in making the decision of whether to seek the death penalty it is unconstitutional; (10) to the extent the 1978 California Death Penalty law fails to give prisoners sentenced to death the same type of disparate sentence review afforded non-capitol felons it violates the Equal Protection Clause of the Constitution; (11) the California Supreme Court fails to provide fair and meaningful review in capital cases in violation of the Constitution; (12) California law provides no discernible, uniform standard by which a jury is to decide whether to impose the sentence of death; (13) the 1978 California Death Penalty law fails to narrow the class of offenders eligible for the death penalty; and (14) petitioner's death sentence predicated upon the triple use of the felony-murder doctrine was unconstitutional. (Id.)

Respondent has moved for summary judgment in its favor as to each aspect of this claim.  In his cross-motion for summary

judgment petitioner seeks summary judgment in his favor while
conceding that under precedent binding on this court he is not
entitled to prevail as to several aspects of the claim.  Below, the
court will address each subpart of this claim and will summarize the
arguments of the parties where necessary.

     1.   Jury Instruction Regarding Consideration of Aggravating and
          Mitigating Factors

     In his opposition and cross-motion (Opp'n & Cross-Mot. for
Summ. J. at 210) petitioner acknowledges that relief on this claim
has been foreclosed by the United States Supreme Court's decision in
Tuilaepa v. California, 512 U.S. 967, 978 (1994).  See also Williams
v. Calderon, 52 F.3d 1465, 1481-82 (9th Cir. 1995).  Accordingly,
respondent is entitled to summary judgment on this sub-claim.

     2.   Jury Instruction as to Factor (b) Aggravating Factors

     Likewise, petitioner acknowledges that relief on this claim
has also been foreclosed by the Supreme Court pursuant to Tuilaepa,
512 U.S. at 976-78.  (Opp'n & Cross-Mot. for Summ. J. at 210.)
Accordingly, respondent is entitled to summary judgment on this sub-
claim as well.

     3.   Facts of Prior Felony Convictions as Aggravating Evidence

     Petitioner concedes that the Ninth Circuit has previously
rejected the argument presented by this claim in McDowell v.
Calderon, 107 F.3d 1351, 1366 (9th Cir.), vacated in part on other
grounds on reh'g en banc, 130 F.3d 833 (9th Cir. 1997), and that this
court is bound by that decision.  (Opp'n & Cross-Mot. for Summ. J. at
/////

194

1 | 210.)  Accordingly, respondent is entitled to summary judgment on

2 | this sub-claim.

3 |     4.   Consideration of Petitioner's Capital Offense as an

4 |         Aggravating Factor Under Both Factor (a) and Factor (b)

5 |         Petitioner concedes that the Ninth Circuit has rejected

6 | this argument in Gerlaugh v. Stewart, 129 F.3d 1027, 1044 (9th Cir.

7 | 1997), and that this court is bound by that decision.  (Opp'n &

8 | Cross-Mot. for Summ. J. at 211.)  Accordingly, respondent is entitled

9 | to summary judgment on this sub-claim.

10 |     5.   Aggravating Factors Relied Upon and Proof Beyond a

11 |         Reasonable Doubt

12 |         In this claim petitioner alleges that, in accordance with

13 | California's 1978 Death Penalty Law, the jury was not instructed that

14 | any aggravating circumstance relied upon in imposing the death

15 | penalty had to be established beyond a reasonable doubt.  Indeed,

16 | petitioner argues that the instructions failed to specify any burden

17 | of proof or persuasion in this regard.  (Am. Pet at 101-02.)

18 | Respondent moves for summary judgment on this sub-claim, arguing that

19 | because a jury may be given complete discretion in determining the

20 | penalty once death-eligibility has been established (Tuilaepa, 512

21 | U.S. at 979-80) claims regarding any burden of proof, written

22 | findings or unanimous agreements are precluded.  Respondent also

23 | notes that since a burden of proof on a defendant of establishing

24 | mitigating circumstances by a preponderance of the evidence is not

25 | unconstitutional (Walton v. Arizona, 497 U.S. 639, 649-51 (1990)), no

26 | higher burden should be placed on the prosecution.  Finally,

1    respondent generally argues that this aspect of California's 1978

2    Death Penalty Law has been found to be constitutional.

3            Petitioner counters that the question of whether federal

4    law requires that all aggravating circumstances in a death penalty

5    case be proven beyond a reasonable doubt is an open one.  See

6    Woratzeck v. Stewart, 97 F.3d 329, 335-36 (9th Cir. 1996).

7    Petitioner also argues that neither of the Supreme Court decisions

8    relied upon by respondent addresses the issue presented here.

9            Although the parties have submitted exhaustive briefing on

10   many claims presented by petitioner, this sub-claim has not been

11   adequately addressed.  It appears that the question of whether the

12   federal Constitution requires aggravating circumstances to be found

13   beyond a reasonable doubt is an open one.  Beaty v. Stewart, 303 F.3d

14   975, 986 (9th Cir. 2002) (citing Woratzeck, 97 F.3d at 335), cert.

15   denied sub nom. Ryan v. Beaty, ___ U.S. ___, 123 S. Ct. 2073 (2003).

16   Although respondent relies upon the decision in Walton v. Arizona,

17   497 U.S. 639 (1990), in that case the Supreme Court merely rejected a

18   constitutional challenge to a death penalty that failed to require

19   the state to prove both the appropriateness of a death sentence and

20   the absence of mitigating circumstances beyond a reasonable doubt.

21   497 U.S. at 3054-56.

22           It may be that petitioner cannot prevail on this claim.

23   See Tuilaepa, 512 U.S. at 979 (rejecting a challenge to the

24   California death penalty law based upon the fact that the jury is

25   provided no instruction on how to weigh any of the facts it finds in

26   deciding the ultimate sentence); Williams v. Calderon, 48 F. Supp. 2d

979, 1030 (C.D. Cal. 1998), aff'd in part and vacated in part on other grounds, 306 F.3d 665 (9th Cir. 2002).  (See also CT at 1531 (instruction informing the jury that it must find a sentence of death "appropriate" beyond a reasonable doubt).)  However, based upon the arguments submitted to date neither party has established its entitlement to judgment in its favor as a matter of law on this sub-claim.  Accordingly, the court will recommend that the cross-motions for summary judgment on sub-claim S-5 be denied.

6.   Designation of the Aggravating Factors Relied Upon

Petitioner acknowledges that the Ninth Circuit has rejected an identical claim in Williams v. Calderon, 52 F.3d at 1484-85, and Harris v. Pulley, 692 F.2d at 1195-96, and that this court is bound by those decision.  (Opp'n & Cross-Mot. for Summ. J. at 212.)  Again, petitioner's concession is well-taken and respondent is entitled to summary judgment on this sub-claim.

7.   No Requirement of Unanimous Agreement As to the Aggravating
     Factors Relied Upon

In this claim petitioner argues that the Constitution was violated when his jury was not required to agree unanimously on the existence and aggravating nature of any factor relied upon in returning a verdict of death.  Summary judgment in favor of respondent should be granted with respect to this sub-claim.  See Williams v. Calderon, 48 F. Supp. 2d at 1030 (granting summary judgment in favor of respondent on an identical claim); Turner v. Calderon, 970 F. Supp. 781, 792 (E.D. Cal. 1997), aff'd 281 F.3d 851 (9th Cir. 2002); Bonin v. Vasquez, 807 F. Supp. 589, 623 (C.D. Cal.

1992) ("The Court holds that the Constitution does not require jury unanimity on aggravating factors."), <u>aff'd</u>, 59 F.3d 815 (9th Cir. 1995).

8.   <u>Penalty Phase Instructions Adequately Conveyed the Meaning of Mitigation</u>

In this claim petitioner argues that while his jury was instructed to consider and weigh mitigating factors, the instruction failed to adequately convey to the jury of laypersons the meaning of the concept of mitigation.  (Am. Pet. at 102.)  Respondent moves for summary judgment on this sub-claim, arguing that petitioner's jury was told that it could consider several specific mitigating factors and one general mitigating factor.  Citing the United States Supreme Court's decision in <u>Buchanan v. Angelone</u>, 522 U.S. 269 (1998), respondent contends that there was no constitutional error in that the jury's consideration of mitigating factors was in no way limited. Petitioner counters with a detailed argument based upon a number of empirical studies allegedly suggesting that the catch-all mitigation instruction given to California jurors is actually misunderstood by a significant number of jurors.

Petitioner has not suggested that the jury was led to believe by the instructions given that it could not consider the mitigation evidence presented on his behalf.  <u>See</u> <u>Belmontes</u>, 350 F.3d at 896-98.  Here, the jury was instructed that it "shall" consider all of the evidence in determining which sentence to impose. (CT at 1527-31, 1534, 1537.)  By so instructing the jury the trial court performed its duty of conveying to the jury that all mitigating

1  evidence must be considered in determining the appropriateness of a

2  sentence of death.  Buchanan, 522 U.S. at 276.  Accordingly,

3  respondent is entitled to summary judgment on this sub-claim.

4      9.   The 1978 California Death Penalty Law and the Power of the

5          District Attorney In Making the Charging Determination

6          Respondent moves for summary judgment on this sub-claim,

7  arguing that the "issue is one of state government." (Alt. Mot. for

8  Summ. J. at 174-75.)  More to the point, respondent argues that the

9  United States Supreme Court has confirmed broad prosecutorial

10  discretion in seeking the death penalty.  (Id. at 175 (citing

11  McCleskey, 481 U.S. at 311-12, and Gregg v. Georgia, 428 U.S. 153,

12  199-200, 224-26 (1976)).)  In response, petitioner submits this sub-

13  claim on the allegations of the petition.[49]

14          The decision of whether or not to prosecute and what charge

15  to bring generally rests entirely in the discretion of the

16  prosecutor.  Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978);

17  Belmontes, 350 F.3d at 892.  Nonetheless, "the decision to charge the

18  death penalty cannot rest on criteria that offend the Constitution."

19  Belmontes, 350 F.3d at 893.  See also McCleskey, 481 U.S. at 293.

20  Here, petitioner claims that the unfettered charging discretion of

21  the District Attorney "results in imposition of the death penalty in

22  an arbitrary and uncontrolled manner."  (Am. Pet. at 103.)  Such a

23

24      [49]  Petitioner notes that in Claim Q he has challenged the trial
court's summary rejection of his claim that the death penalty was
25  discriminatorily imposed on the basis of race and makes clear that he
is not conceding that claim by submitting this sub-claim on the
26  allegations of the petition.

claim has previously been rejected.  See Belmontes, 350 F.3d at 896

(citing McCleskey, 481 U.S. at 306-12).  Accordingly, respondent is

entitled to summary judgment on this sub-claim.

      10.   The 1978 California Death Penalty Law and Equal Protection

              with Respect to Disparate Sentence Review

        In sub-claim S-10 petitioner alleges that California's 1978

Death Penalty Law violates equal protection principles in that it

fails to provide to those sentenced to death the same type of

disparate sentence review afforded to non-capital felons.  (Am. Pet.

at 103.)  Proportionality review within California's death penalty

scheme is not constitutionally mandated.  See Pulley v. Harris, 465

U.S. 37 (1984).  Moreover, this same equal protection-based claim

with respect to the denial of proportionality review to death

sentences as opposed to non-capital offenses has previously been

rejected.  Williams, 48 F. Supp. 2d at 1030-31.  Petitioner has

presented no new arguments nor has he factually or legally developed

the claim.  Accordingly, respondent is entitled to summary judgment

on this sub-claim.

      11.   The California Supreme Court and the Fair and Meaningful

              Review of Capital Cases

        Here, petitioner alleges that the review of death judgments

undertaken by the California Supreme Court is not the full, fair and

good faith review contemplated by the United States Constitution.

(Am. Pet. at 104-07.)

        Respondent perfunctorily moves for summary judgment on this

sub-claim, simply stating that "the state appeal process provides for

1  review for legal error." (Alt. Mot. for Summ. J. at 176.)

2  Petitioner, on the other hand, argues in some detail that both

3  statistics and specific examples establish that the California

4  Supreme Court for years has failed to provide meaningful appellate

5  review in death cases, rendering the death judgment in his case

6  invalid. (Opp'n & Cross-Mot. for Summ. J. at 216-22.)

7  Such evidence aside, the court is not persuaded that the

8  review that petitioner actually received on his automatic appeal was

9  so deficient as to effectively deprive him of his automatic appeal

10  rights. Petitioner's claim must be analyzed by assessing the appeal

11  rights afforded in his specific case. See, e.g., Campbell v.

12  Blodgett, 997 F.2d 512, 523 (9th Cir. 1992).[50] Here, the California

13  Supreme Court considered extensive briefing on petitioner's direct

14  appeal and in connection with his petitions for writ of habeas

15  corpus. That court issued a lengthy published opinion addressing

16  _____

17  [50] In Campbell, the habeas petitioner argued that the Washington Supreme Court's failure to provide meaningful appellate review of his sentence deprived him of a liberty interest protected

18  by the Due Process Clause of the Fourteenth Amendment. 997 F.2d at 522. The appellate court found that relevant sections of the

19  Washington Code created a liberty interest in having the state high court review and make particular findings before affirming

20  petitioner's death sentence. Id. at 521-22. The court noted, however, that the review required under the cited statutes was not

21  extensive, and that the review which was in fact afforded, as reflected in the Washington Supreme Court's opinion, was statutorily

22  adequate. Id. at 522. Reasoning that "[t]he amount of ink expended in disposing of an issue bears no necessary correlation with the

23  degree of care lavished upon it in reaching that conclusion," the court rejected petitioner's claim that the review was "so deficient"

24  as to "effectively deprive[]" him of his right to review. Id. at 522-23. The court further noted that any alleged error "less

25  egregious" than a wholesale refusal to afford him his right to review, would amount to a mere claim of error under state law, not

26  cognizable in federal habeas corpus proceedings. Id. at 522.

both state law and constitutional claims with respect to the guilt and penalty phases of petitioner's trial. Petitioner's statistical and case-by-case analysis is insufficient to show that petitioner's own appellate rights were abrogated in such a "wholesale" fashion as to amount to a constitutional violation.

Accordingly, respondent is entitled to summary judgment on this sub-claim.

12. <u>California Law and a Uniform Standard for the Jury's Death Penalty Determination</u>

In this claim petitioner contends that California has no discernible, reasonably uniform standard by which a jury is to decide whether to impose a sentence of death because the California Supreme Court has failed to clearly and consistently articulate the role of the jury in making the sentencing determination. (Am. Pet. at 107-08.) The result, petitioner argues, is the arbitrary and unconstitutional imposition of the death penalty. (<u>Id.</u> at 110-11.) Respondent moves for summary judgment arguing that under Supreme Court precedent, "no standards are required." (Alt. Mot for Summ. J. at 176.) Petitioner responds by arguing that the Supreme Court has required that a jury's eligibility and selection decisions with respect to the death penalty "must ensure that the process is <u>neutral and principled</u> so as to guard against bias or caprice in the sentencing decision." (Opp'n & Cross-Mot. for Summ. J. at 223 (quoting <u>Tuilaepa</u>, 512 U.S. at 973)(emphasis added).)

Petitioner essentially claims that California juries are not provided sufficient guidance in reaching the death penalty

determination, thus allowing for arbitrary application of the death penalty.  Such a claim has been rejected.  <u>Harris</u>, 465 U.S. at 53.  <u>See also</u> <u>Williams</u>, 48 F. Supp. 2d at 1023; <u>Williams v. Vasquez</u>, 817 F. Supp. 1443, 1471 (E.D. Cal. 1993), <u>aff'd</u> 52 F.3d 1465 (9th Cir. 1995).[51]  Accordingly, respondent is entitled to summary judgment on this sub-claim.

    13.  <u>Whether California Law Genuinely Narrows the Class of Death-Eligible Offenders</u>

In this claim petitioner contends that his death sentence is invalid because the statutory scheme in California fails to narrow the class of offenders eligible for the death penalty in violation of the Eighth Amendment. (Am. Pet. at 108-110.)

Respondent moves for summary judgment in his favor, arguing that the Supreme Court has found that the California Death Penalty Law adequately narrows the class of death-eligible defendants.  (Alt. Mot for Summ. J. at 177 (citing <u>Harris</u>, 465 U.S. at 53).)  Relying on the decisions in <u>Zant v. Stephens</u>, 462 U.S. 862 (1983) and <u>Lowenfield v. Phelps</u>, 484 U.S. 231 (1988), respondent asserts that both a felony-murder special circumstance and a penalty factor that duplicates an eligibility factor adequately narrow the class of convicted murderers eligible for the death penalty.

Petitioner counters that the empirical evidence reflected in a study conducted by Professor Steven F. Shatz of the University

_____

[51]  To the extent petitioner's sub-claim can be construed as arguing that the death penalty was arbitrarily imposed in his case, such a claim is also foreclosed.  <u>Belmontes</u>,350 F.3d at 896 (citing <u>McCleskey</u>, 481 U.S. at 306-12).

1   of San Francisco School of Law proves that the death sentence ratios

2   under the California scheme do not comply with the Eighth Amendment.

3   (Opp'n & Cross-Mot. for Summ. J. at 223, 234-35).   Petitioner argues

4   that the California scheme is unconstitutional under <u>Furman v.</u>

5   <u>Georgia</u>, 408 U.S. 238 (1972), in failing to genuinely narrow the

6   class of death eligible defendants in light of the number and breadth

7   of the special circumstances categories. (Opp'n & Cross-Mot. for

8   Summ. J. at 224-36).

9        In <u>Pulley v. Harris</u> the Supreme Court reviewed the

10  California death penalty scheme and stated:

> By requiring the jury to find at least one
> special circumstance beyond a reasonable doubt,
> the statute limits the death sentence to a small
> sub-class of capital-eligible cases.   The
> statutory list of relevant factors, applied to
> defendants within this sub-class, "provide[s]
> jury guidance and lessen[s] the chance of
> arbitrary application of the death penalty,"
> <u>Harris v. Pulley</u>, 692 F.2d, at 1194,
> "guarantee[ing] that the jury's discretion will
> be guided and its consideration deliberate," <u>id.</u>,
> at 1195.   The jury's "discretion is suitably
> directed and limited so as to minimize the risk
> of wholly arbitrary and capricious action."
> <u>Gregg</u>, 428 U.S., at 189, 96 S.Ct., at 2932.   Its
> decision is reviewed by the trial judge and the
> State Supreme Court.   On its face, this system,
> without any requirement or practice of
> comparative proportionality review, cannot be
> successfully challenged under <u>Furman</u> and our
> subsequent cases.

22  465 U.S. at 53.   <u>See also</u> <u>California v. Brown</u>, 479 U.S. 538, 540

23  (1987); <u>Williams v. Vasquez</u>, 817 F. Supp. at 1471.

24       Petitioner argues that several justices concurring in and

25  dissenting from the Court's decision in <u>Tuilaepa v. California</u>

26  implicitly invited consideration of whether California's death

1  penalty scheme satisfied the constitutional narrowing requirement.

2  See, e.g., 512 U.S. at 992-95 (Justice Blackmun, dissenting).

3  Although it has been suggested that the Court would "be well advised

4  to reevaluate its decision in Pulley v. Harris," id. at 995, the

5  Court has not done so.  The holding of the Supreme Court in Harris

6  precludes the relief petitioner seeks.  Accordingly, respondent is

7  entitled to summary judgment on this sub-claim.

8        14.   Petitioner's Death Sentence Predicated Upon the Use of the

9              Felony-Murder Doctrine

10        Petitioner acknowledges that relief on this claim has been

11  foreclosed by the Supreme Court's decision in Lowenfield, 484 U.S. at

12  241-46 (1988).  (Opp'n & Cross-Mot. for Summ. J. at 236.)  The

13  concession is appropriate.  See Tuilaepa, 512 U.S. at 976-78.

14  Accordingly, respondent is entitled to summary judgment on this sub-

15  claim.

16  **T.   Bias and Prejudice of Trial Jurors**

17        In Claim T petitioner alleges that bias and prejudice on

18  the part of jurors resulted in the violation of his rights under the

19  Fifth, Sixth, Eighth and Fourteen Amendments to the United States

20  /////

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

Constitution.[52]   Petitioner presents three sub-claims with respect to his allegation of juror bias.[53]

First, petitioner contends that juror Peinado failed to provide accurate answers on his juror questionnaire.  Petitioner argues that juror Peinado did not disclose the following information called for by the questionnaire: (1) that his three sons had pled guilty in a case involving a 1985 shooting of two police officers and that one of the officers, Mike Lopez, was listed as a prospective witness at petitioner's trial; (2) that his son Joseph Peinado pled guilty to a 1981 robbery of a Kwik Stop Market; (3) that officer Lopez had filed a personal injury suit against his sons as a result of the 1985 shooting; (4) that Mr. Peinado knew people who used drugs and alcohol and believed that such people know what they are doing and should be held responsible for the crimes they commit; (5) that he believed that the fact that a person is subjected to abuse during childhood is not relevant in determining the person's guilt or the

---

[52]   Petitioner also alleges that he received ineffective assistance of counsel in that his trial attorneys failed to conduct a meaningful voir dire of the prospective jurors and failed to challenge certain jurors for cause or remove them through use of peremptory challenges.  This aspect of petitioner's claim T has been addressed in Section C, <u>supra</u>.

[53]   Petitioner has also presented a fourth sub-claim, asserting that juror Alvarado falsely declared under oath that neither he nor his spouse had ever been involved in a lawsuit (criminal or civil).  (Am. Pet. at 122.)  Juror Alvarado's wife had obtained a temporary restraining order preventing him from "'annoying, harassing, threatening or molesting [his wife] . . . .'"  (<u>Id.</u>)  Petitioner now states that he does not oppose respondent's motion for summary judgment in this regard.  (Opp'n & Cross-Mot. for Summ. J. at 134-35.)  Therefore, respondent's motion should be granted as to this sub-claim.

appropriate penalty; and (6) that he did not trust lawyers based on the experiences of his sons. (Am. Pet. at 113-15.) Petitioner contends that if this information had been disclosed, juror Peinado would have been excused for cause. (Id. at 115.)[54]

Second, petitioner claims that several jurors (including jurors Alvarado, Wight, and Long) were biased in favor of the death penalty. (Id.) Petitioner argues that if the views of these jurors had become during voir dire, they would have been excused for cause. (Id. at 116-17.)

Third, petitioner contends that during voir dire jurors were asked whether there was any information that had not been disclosed by their answers to the questions posed that in fairness should be disclosed. (Id. at 120.) One juror disclosed to the other jurors during penalty phase deliberations that he had killed someone in the line of duty. (Id. at 120-21.) Petitioner claims that if the juror had disclosed this information, it would have been grounds for a challenge for cause. (Id. at 121.) In this regard, petitioner claims that "[t]he fact that the juror had killed someone in a manner in which the juror believed was justified rendered him unable to be impartial in a case where the killing was not justified." (Id.)

Below, the court will first address the legal standards applicable to this claim and will then summarize and address the

/////

---

[54] Petitioner argues that bias should be presumed because the crimes committed by juror Peinado's sons are closely connected to the crimes for which petitioner was tried. (Id. at 116.)

arguments of the parties with respect to each of petitioner's sub-claims.

### 1. Legal Standards Governing Claims of Juror Bias

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). See also Ross v. Oklahoma, 487 U.S. at 85 (1988); Green v. White, 232 F.3d 671, 676 (9th Cir. 2000). Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982). See also United States v. Plache, 913 F.2d 1375, 1377-78 (9th Cir. 1990).

Jurors are objectionable if they have formed such deep and strong impressions that they will not listen to testimony with an open mind. Irvin, 366 U.S. at 722 n.3. A defendant is denied the right to an impartial jury if even one juror is biased or prejudiced. Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir.), amended 315 F.3d 1062 (9th Cir. 2002); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc). Thus, "[t]he presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice." United States v. Gonzalez, 214 F.3d 1109, 1111 (9th Cir. 2000) (quoting Dyer, 151 F.3d at 973 n.2).[55]

---

[55] Challenges for cause are the means by which biased jurors should be eliminated. United States v. Gonzalez, 214 F.3d at 1111. "A prospective juror must be removed for cause if his views would prevent or substantially impair the performance of his duties as a juror." Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir.), amended 315 F.3d 1062 (9th Cir. 2002).

1   Courts have analyzed juror bias under two theories, actual
2   bias and implied (or presumed) bias, either of which may support a
3   challenge of a prospective juror for cause. <u>Fields</u>, 309 F.3d at 1103
4   (citing <u>Gonzalez</u>, 214 F.3d at 1111). Actual bias is "'bias in fact'
5   – the existence of a state of mind that leads to an inference that
6   the person will not act with entire impartiality." <u>Gonzalez</u>, 214
7   F.3d at 1112 (quoting <u>United States v. Torres</u>, 128 F.3d 38, 43 (2d
8   Cir. 1997)). A trial judge's conclusion, after a hearing, that a
9   juror does or does not harbor "actual bias" is a finding of fact to
10  which the presumption of correctness applies. <u>Dyer</u>, 151 F.3d at 973.
11  This is because such a decision "depends heavily on the trial court's
12  superior ability to appraise witness credibility and demeanor."
13  <u>Thompson v. Keohane</u>, 516 U.S. 99, 99-100 (1995). <u>See also</u>
14  <u>Wainwright</u>, 469 U.S. at 428 ("[T]he question whether a venireman is
15  biased has traditionally been determined through voir dire
16  culminating in a finding by the trial judge concerning the
17  venireman's state of mind . . . such a finding is based upon
18  determinations of demeanor and credibility that are peculiarly within
19  a trial judge's province.").

20  "Although actual bias is the more common grounds for
21  excusing jurors for cause, '[i]n extraordinary cases, courts may
22  presume bias based upon the circumstances.'" <u>Gonzalez</u>, 214 F.3d at
23  1112 (quoting <u>Dyer</u>, 151 F.3d at 981). <u>See also</u> <u>McDonough Power</u>
24  <u>Equipment, Inc. v. Greenwood</u>, 464 U.S. 548, 556-57 (1984) (Blackmun,
25  Stevens and O'Connor, JJ., concurring) (accepting that "in
26  exceptional circumstances, that the facts are such that bias is to

1  inferred"); id. at 558 (Brennan and Marshall, JJ., concurring in the

2  judgment) (agreeing that "[t]he bias of a prospective juror may be

3  actual or implied; that is, it may be bias in fact or bias

4  conclusively presumed as [a] matter of law") (alterations in

5  original) (quotations omitted); Smith, 455 U.S. at 221-24 (O'Connor,

6  J, concurring) ("there are some extreme circumstances situations that

7  would justify a finding of implied bias").  Thus, the Ninth Circuit

8  has presumed bias from "the 'potential for substantial emotional

9  involvement, adversely affecting impartiality,' inherent in certain

10 relationships."  Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir. 1990)

11 (quoting United States v. Allsup, 566 F.2d 68, 71 (9th Cir. 1977)).

12 See also Green, 232 F.3d at 676; Gonzalez, 214 F.3d at 1112-14; Dyer,

13 151 F.3d at 981-82; Eubanks, 591 F.2d at 517.

14        In McDonough Power Equip., Inc. v. Greenwood, the Supreme

15 Court explained the importance of voir dire in obtaining a panel of

16 impartial jurors.

17            *Voir dire* examination serves to protect that
               right [right to a fair trial] by exposing
18            possible biases, both known and unknown, on the
               part of potential jurors.  Demonstrated bias in
19            the responses to questions on *voir dire* may
               result in a juror being excused for cause; hints
20            of bias not sufficient to warrant challenge for
               cause may assist parties in exercising their
21            peremptory challenges.  The necessity of truthful
               answers by prospective jurors if this process is
22            to serve its purpose is obvious.

23 464 U.S. at 554.  See also Fields, 309 F.3d at 1103.  Thus, a juror

24 "who lies materially and repeatedly in response to legitimate

25 inquiries about her background introduces destructive uncertainties

26 into the process."  Dyer, 151 F.3d at 983.  Accordingly, while many

1  irregularities during voir dire are immaterial to the fairness of a
2  trial, a juror who lies in order to secure a seat on a jury may be
3  found to be presumptively biased.  <u>Green</u>, 232 F.3d at 677-78; <u>Dyer</u>,
4  151 F.3d at 984.

5       Against these standards the court will consider each of
6  petitioner's three sub-claims.

7       2.  <u>Juror Peinado</u>

8       As noted above, petitioner alleges that juror Santos
9  Peinado failed to provide accurate information on his juror
10 questionnaire compelling the conclusion that he was biased.  In this
11 regard petitioner alleges that: (1) although Mr. Peinado had three
12 sons (Santos Peinado, Jr., Joseph Louis Peinado, and Joseph Rudy
13 Peinado) he provided no response on the jury questionnaire when asked
14 if he had any children and if so to list their sex, age, education
15 level, and occupation; (2) juror Peinado affirmatively answered "no"
16 to questions regarding whether he, his spouse, a relative or close
17 friend had ever been witness to or been accused or convicted of a
18 crime even though his three sons had pled guilty to charges involving
19 the shooting of two police officers resulting in a five year prison
20 sentence for Santos, Jr., a three year sentence for Joseph Rudy, and
21 a one year county jail term for Joseph Louis and even though one of
22 his sons was charged in 1981 with the robbery of a Kwik Stop Market;
23 (3) Mr. Peinado affirmatively answered "no" to the question inquiring
24 whether he, his spouse, a relative or close friend had ever been
25 interested in or involved in any criminal or civil lawsuit even
26 though his sons were sued by police officer Mike Lopez for injuries

1    suffered in the 1985 shooting incident; (4) juror Peinado responded

2    "no" to questions regarding whether he knew any judge, lawyer or any

3    person who works for a district attorney's or a public defender's

4    office even though he knew lawyers as a result of his sons' criminal

5    cases and as a result did not trust attorneys; (5) Mr. Peinado

6    responded "no" when asked whether he knew anyone who has had a

7    problem with alcohol or drugs when in fact he knew people who used

8    drugs and alcohol and believed such people know what they are doing

9    and should be held responsible for crimes committed while under the

10   influence; and (6) juror Peinado failed to disclose his belief that a

11   person's difficult childhood and any abuse they may have suffered as

12   a child is not relevant to their responsibility for crimes committed

13   as an adult.  (Am. Pet. at 112-115.)

14          In support of these allegations petitioner relies primarily

15   upon the 1995 declaration of juror Peinado submitted originally in

16   support of petitioner's state habeas petition.  (Am. Pet., Ex. G;

17   Opp'n & Cross-Mot. for Summ. J., Ex. CC.)  In that declaration,

18   executed approximately eight years after petitioner's trial, juror

19   Peinado stated that he: (1) "used to have a lot of trouble

20   understanding the English language;" (2) "did not understand the

21   question 'Have you or your spouse, a relative, a close friend, or an

22   acquaintance ever been accused or convicted of a crime?'" and because

23   his sons had gone to prison for certain crimes, he would have told

24   the truth if the question had been explained to him; (3) never told

25   the judge or any attorneys about his sons' criminal records but had

26   he been asked about his children he would have divulged the

information; (4) knew police officer Mike Lopez who came to his house after his sons were arrested and was concerned when his son Santos, Jr. got out of prison because Officer Lopez harassed him; (5) doesn't "trust lawyers very much" because when his sons were in trouble a lawyer told him that for ten thousand dollars he would guarantee that his sons would go free and believed that if his sons had better lawyers they would not have gone to prison; (6) and his wife were very concerned for their sons' safety while the boys were in prison; (7) felt "very strongly that drugs and alcohol are not an excuse for committing crimes" and that from his "own experience, knowing people who use drugs or alcohol, I believe that people know exactly what they're doing when they take drugs or alcohol and should be responsible for any crimes they commit;" and (8) felt "that a person's bad childhood does not excuse any crimes he commits," that "parents can no longer be held responsible for what the child does" and that if any evidence was presented showing that the defendant's father did bad things to his children it would not have made a difference to him in deciding whether the defendant should get the death penalty.  (Id. at 1-4.)

In moving for summary judgment respondent argues in conclusory fashion that Mr. Peinado was not dishonest in his responses but rather simply did not understand the questions asked in the juror questionnaire and during voir dire.  (Alt. Mot. for Summ. J. at 191.)  Respondent also argues that bias should not be presumed or implied because there is little similarity between petitioner's

/////

1  case and the criminal cases involving Mr. Peinado's sons.  (Id. at

2  191-92.)

3        Petitioner argues that juror Peinado's failure to disclose

4  this information shows his lack of impartiality and a predisposition

5  in favor of the death penalty.  (Opp'n & Cross-Mot. for Summ. J. at

6  143.)  Petitioner also argues that the fact that juror Peinado's sons

7  had criminal convictions gave juror Peinado "a strong bias and motive

8  to reject out of hand a key component of petitioner's penalty-phase

9  case, which was to mitigate punishment on the basis of the

10 shortcomings of petitioner's father."  (Id. at 144.)

11       The jury questionnaire specifically asked if the

12 prospective juror had any children. (Am. Pet., Ex. F at 3; Opp'n &

13 Cross-Mot. for Summ. J., Ex. Z at 3.)  Juror Peinado did not answer

14 the question.  (Id.)  Prospective jurors were also asked whether

15 they, their spouse, a relative, a close friend, or an acquaintance

16 had been accused or convicted of a crime.  Juror Peinado explicitly

17 answered this question "no." (Id. at 5.)  In his post-trial

18 declaration juror Peinado's states only that he didn't understand the

19 latter question and that if "anyone had asked me about my children, I

20 would have told them."  (Am. Pet., Ex. G at 2; Opp'n & Cross-Mot. for

21 Summ. J., Ex. CC at 2.)  That explanation would appear at least

22 potentially inconsistent with juror Peinado's failure to answer the

23 very specific question seeking to determine whether he had any

24 children.

25       In addition, Mr. Peinado specifically stated on his juror

26 questionnaire that he did not know any lawyers or any person who

1   worked in a public defender's office.  (Am. Pet., Ex. F at 8; Opp'n &

2   Cross-Mot. for Summ. J., Ex. Z at 8.)  However, his post-trial

3   declaration establishes that he had met with at least one defense

4   attorney in connection with the prosecution of his sons and that the

5   experience was not a good one.  (Am. Pet., Ex. G at 3-4; Pet'r's

6   Opp'n & Cross-Mot. for Summ. J., Ex. CC at 3-4.)  As a result, Mr.

7   Peinado did not "trust lawyers very much and believed that if his

8   sons had had better lawyers they would not have gone to prison."

9   (Id.)  Likewise, on his jury questionnaire juror Peinado specifically

10  denied knowing any person who has or had a problem with drugs or

11  alcohol.  (Am. Pet., Ex. F at 10; Opp'n & Cross-Mot. for Summ. J.,

12  Ex. Z at 10.)  However, his post-trial declaration indicates that he

13  not only knew people with drug or alcohol problems but from that

14  experience harbored strong feeling that such individuals know what

15  they are doing and should be held responsible for their crimes. (Am.

16  Pet., Ex. G at 3; Opp'n & Cross-Mot. for Summ. J., Ex. CC at 3.)

17  Those inconsistent responses cannot be reconciled on the basis of the

18  present record.

19          Summary judgment should not be granted for either party on

20  this sub-claim alleging bias on the part of juror Peinado.  Further

21  development of the facts will be needed to determine whether juror

22  Peinado was intentionally misleading and/or biased.  Dyer, 151 F.3d

23  at 974 ("[a] court confronted with a colorable claim of juror bias

24  must undertake an investigation of the relevant facts and

25  circumstances.")  Thus, an evidentiary hearing is likely necessary to

26  resolve this aspect of Claim T.  See Williams v. Taylor, 529 U.S.

420, 441 (2000) (evidentiary hearing to determine partiality required where one of juror's responses to voir dire question was not forthcoming and another was factually misleading); <u>Fields</u>, 309 F.3d at 1105-06 (evidentiary hearing appropriate where it was unclear whether juror intentionally concealed information or gave a misleading response to voir dire question regarding his background); <u>see also</u> <u>Smith</u>, 455 U.S. at 215.[56]

3.   <u>Jurors Alvarado, Wight, and Long</u>[57]

As noted above, petitioner claims that several jurors were biased in favor of the death penalty and that if the views of these jurors had become known during voir dire, they would have been excused for cause.   (Am. Pet. at 116-17.)   Petitioner relies in part on the post-trial declarations of jurors Wight and Long in support of

---

[56]   Petitioner also argues that because juror Peinado did not disclose information about his sons' criminal history, defense counsel did not have the opportunity to discover Mr. Peinado's "strong bias and motive to reject out of hand a key component of petitioner's penalty-phase case, which was to mitigate punishment on the basis of the shortcomings of petitioner's father." (Opp'n & Cross-Mot. for Summ. J. at 144.)   Finally, petitioner claims that juror Peinado falsely answered the jury questionnaire inquiry of whether he, his spouse, a relative or a close friend had ever been interested in or involved in any civil or criminal lawsuit (Am. Pet., Ex. F at 5; Opp'n & Cross-Mot. for Summ. J., Ex. Z at 5) given the fact that his sons had been criminally prosecuted and   Officer Lopez had filed a civil suit against them stemming from that same incident. These matters can be fully explored at the anticipated evidentiary hearing.

[57]   Petitioner claims:   "Several jurors, including, but not limited to, Alvarado, Wight, and Long, were biased due to their views about the death penalty which prevented those jurors from rendering a reliable, impartial, individualized, and fair penalty determination." (Am. Pet. at 116.)   However, petitioner has only presented arguments regarding jurors Alvarado, Wight, and Long.   Therefore, the court will consider his claim only with respect to these three jurors.

this sub-claim. (Am. Pet., Exs. K & L; Opp'n & Cross-Mot. for Summ. J., Exs. S & X.) In her declaration, Ms. Wight acknowledged that after she determined petitioner's guilt, she never considered a sentence of life without parole. (Am. Pet., Ex. L at 2; Opp'n & Cross-Mot. for Summ. J., Ex. S at 2.) However, Ms. Wight also stated that the jurors carefully weighed the aggravating and mitigating factors in reaching their penalty phase verdict. (Id.) In her declaration, Ms. Long indicated that she "reviewed some of the evidence presented at the guilt phase . . . to confirm the conclusions [she] had *tentatively* reached from listening to the evidence presented during the trial." (Am. Pet., Ex. K at 1; Opp'n & Cross-Mot. for Summ. J., Ex. X at 1.)

In moving for summary judgment respondent argues that the personal belief of some jurors that the death penalty should be imposed for intentional murders is not remarkable and that the only relevant inquiry is whether prospective jurors would consider all evidence, including mitigating evidence, in reaching their verdict. (Alt. Mot. for Summ. J. at 180.) Respondent points out that during voir dire: juror Alvarado indicated that he would be able to vote for the death penalty or life imprisonment without the possibility of parole (RT at 2080); juror Wight expressed her strongly support for the death penalty but indicated that she remained open to the possibility of imposing a life sentence without the possibility of parole (id. at 3390-91, 3400, 3407); and juror Long stated that while she felt the death penalty was a necessary thing "when called for,"

/////

217

1   she was open to considering life without the possibility of parole

2   for an intentional murder (id. at 3717, 3719-20).

3       In opposing respondent's summary judgment motion,

4   petitioner contends that the ultimate question is whether a juror's

5   view about the death penalty would prevent or substantially impair

6   the juror from performing his or her duty, including consideration of

7   mitigating evidence.  (Opp'n & Cross-Mot. for Summ. J. at 149.)

8   Petitioner argues that the three jurors in question did not

9   "meaningfully consider any punishment less than death, once they

10  determined at the guilt phase that the murder was intentional." (Id.)

11      As noted above in addressing petitioner's Claim P regarding

12  the exclusion of jurors for cause, "a juror may not be challenged for

13  cause based on his views about capital punishment unless those views

14  would prevent or substantially impair the performance of his duties

15  as a juror in accordance with his instructions and his oath."

16  Wainwright, 469 U.S. at 420 (quoting Adams, 448 U.S. at 45).

17  Petitioner has failed to make such a showing here.  Even considering

18  the post-trial declarations of the jurors describing their mental

19  processes and the jury's deliberations (see Fed. R. Evid. 606(b)),

20  the evidence submitted indicates that the three jurors in question

21  were not substantially impaired in the performance of their duties as

22  a result of their views and that they kept an open mind until the

23  case was submitted to them for decision.

24      In this regard, Juror Abelardo Alvarado was initially

25  questioned on the morning of November 7, 1986, in a group of three

26  prospective jurors.  (RT at 2068.)  The defense did not question Mr.

1  Alvarado.   However, the following exchange took place between juror

2  Alvarado and the prosecutor:

>  Q [Mr. Druliner]:  Are you satisfied that if you
>  were selected as a juror, if we got to the
>  penalty phase, that you would be able to listen
>  to all the evidence, and if you felt it
>  appropriate based on the evidence and the
>  guidelines from the Court that you would be able
>  to render a verdict, a finding, if it was your
>  opinion that the defendant deserved the death
>  penalty, that you would be able to so vote?
>
>  A [Mr. Alvarado]:  I will assume that
>  responsibility, yes.
>
>  Q:  And, likewise, if you felt the appropriate
>  sentence was life without possibility of parole,
>  would you be able to vote that way?
>
>  A:  Yes.

13  (Id. at 2080.)  Mr. Alvarado's responses did not demonstrate that he

14  would be substantially impaired or unable to perform his duties as a

15  juror.

16        Juror Wight was initially questioned on the morning of

17  November 19, 1986, in a group of four prospective jurors.  (RT at

18  3333.)  In response to defense counsel's questions, Ms. Wight stated

19  that she thought the death penalty was appropriate where there was a

20  premeditated murder, even though such a belief was contrary to that

21  held by her church.  (Id. at 3392, 3394.)

>  Q [Defense Counsel]:  Now the question, bottom
>  line question really I want to ask you is that do
>  you feel so strongly about that that it really
>  wouldn't matter what other evidence was presented
>  to you, it wouldn't matter he had a prior record,
>  it wouldn't matter about some factor in
>  mitigation; is that an accurate - -
>
>  A [Ms. Wight]:  Yes

219

1   (Id. at 3395.)  However, Ms. Wight later responded that she would

2   consider mitigating factors.

3            Q [Defense Counsel]:  - - some more evidence may
             be, some evidence to show you that Mr. Breaux is
4            even worse than the crime that he was convicted
             of or there may be some evidence to show you he
5            has some redeeming quality, and my question is do
             you have feelings so strongly about your view
6            that in the case of a premeditated first degree
             murder you feel so strongly that you really
7            wouldn't consider the other information about his
             background?

8
             A [Ms. Wight]:  No.
9
             Q:  Pardon me?
10
             A:  No.
11
             . . . .
12
             Q:  Okay.  A minute ago, you told me that, in the
13           case of premeditated murder, you felt that the
             death penalty was appropriate.
14               And then you said that it would depend on,
             maybe, his background and that sort of thing.
15               Can you explain your view on that?

16           A:  Well, no.
                 I - - I - - I- - I - - I - - I believe in
17           the death penalty.
                 But I think that sometimes when you hear
18           things about a person, or - - or that you may
             change - -  change your mind.
19               I don't - - I don't know.
                 I have never been in this position. So . . .
20

21   (Id. at 3396, 3398.)

22        Later, Ms. Wight twice indicated that she would take into

23   consideration a person's "background" in deciding whether the

24   appropriate penalty was death or life in prison without the

25   possibility of parole.  (Id. at 3399-3400.)  Outside Ms. Wight's

26   presence, defense counsel challenged her for cause because she was

                                   220

1    according to his description "an automatic death penalty proponent

2    under the law[.]"  (Id. at 3404.)   The trial court denied the

3    challenge and indicated that neither Ms. Wight's demeanor nor

4    credibility provided cause to believe that she would be substantially

5    impaired.  (Id. at 3408.)   This court finds that the record supports

6    the trial court's decision not to excuse Ms. Wight for cause.  United

7    States v. Long, 301 F.3d 1095, 1101 (9th Cir. 2002) (The trial court

8    "has the discretion to determine whether jurors are telling the

9    truth, whether they can proceed fairly, and whether they should be

10   excused or replaced."), cert. denied, 537 U.S. 1216 (2003); see also

11   Bashor v. Risley, 730 F.2d at 1237.  Ms. Wight voiced her belief that

12   the death penalty was appropriate for premeditated murder, she also

13   repeatedly stated that she would consider a person's background and

14   mitigating factors in deciding on the appropriate penalty.

15        Juror Gloria Long was initially questioned during the

16   afternoon session on November 20, 1986, with a group of four

17   prospective jurors.  (RT at 3683.)   She was specifically asked by

18   defense counsel about her views on the death penalty.  Ms. Long

19   responded:  "I believe the death penalty, when it's called for, is a

20   necessary thing."  (RT at 3717.)   Ms. Long explained that her views

21   were not based on "religious feelings", but on her belief that since

22   the death penalty was approved by the citizens of California, it was

23   an appropriate "retribution" for a person who had killed with "no

24   proven reason."  (Id. at 3718-20.)   Ms. Long was questioned about her

25   willingness to consider both the death penalty and life imprisonment

26   without the possibility of parole following a guilt phase verdict.

1    Q [Mr. Fathy]:  Did you understand that means
     before you ever even consider the appropriateness
2    of death or life in prison - -

3    A:   (Nodding in the affirmative.)

4    Q:   - - without possibility of parole, you will
     have concluded there has been an intentional
5    killing - -

6    A:   Yes.

7    Q:   - - for no legally excusable reason?

8    A:   (Nodding in the affirmative.)

9    Q.   Since you do understand that, let me ask you
     whether or not, given the view you just expressed
10   - -

11   A:   (Nodding in the affirmative)

12   Q:   - - about - - about retribution - -

13   A:   Un -huh.  (In the affirmative.)

14   Q:   - -  whether you would be open, truly open to
     imposing some punishment other than death?
15         And in this case the other alternative is
     life in prison without possibility of parole.
16
     A:  I definitely would.  I mean I - - I'm not
17   saying that I'm out to get rid of everybody that
     has done something wrong.  I don't believe that.
18         But I do think there are instances where - -
     where it is appropriate.
19         That's all I was trying to say.
           But, yes, I would have no problem.
20
     Q:  You'd be willing to listen to whatever
21   evidence - -

22   A:   (Nodding in the affirmative.)

23   Q:   - - the defense wanted to present and what is
     admissible under our system of law - -
24
     A:   (Nodding in the affirmative.)
25

26   (RT at 3720-21.)

1    When Ms. Long expressed some confusion about whether a

2 person sentenced to life imprisonment without the possibility of

3 parole could still be paroled, the trial court clarified that for

4 crimes committed after 1977, such a sentence actually precluded the

5 possibility of parole.  (RT at 3722.)  Ms. Long then responded that

6 she did not have further concerns given the judge's clarification.

7 (RT at 3723.)

8    Petitioner relies on Ms. Long's post-trial declaration in

9 arguing that she was unwilling to consider mitigating factors once

10 she concluded that petitioner had intentionally committed the murder.

11 (Am. Pet., Ex. K; Opp'n to Mot. for Summ. J. & Cross-Mot. for Summ.

12 J., Ex. X.)  Even if that declaration is considered even though it

13 describes Ms. Long's mental processes during deliberations (see Fed.

14 R. Evid. 606(b)), the court finds that petitioner has failed to

15 demonstrate that Ms. Long's views regarding the death penalty

16 substantially impaired her ability to perform her duties as an

17 impartial juror.  Juror Long stated in that post-trial declaration

18 that she and the other jurors took the penalty phase verdict decision

19 very seriously and that during those deliberations she reviewed

20 penalty phase evidence to confirm the conclusions she had tentatively

21 reached.  (Am. Pet., Ex. K at 1-2; Opp'n to Mot. for Summ. J. &

22 Cross-Mot. for Summ. J., Ex. X at 1-2.)

23    4.  Unidentified Juror Who Killed in the Line of Duty

24    Finally, petitioner alleges that one of the jurors

25 commented to the others during penalty phase deliberations that he

26 had killed someone in the line of duty, that it was something he had

1  to do and would do again and that, unlike petitioner, he felt

2  remorse.  (Am. Pet. at 120-21.)  Petitioner relies on upon the post-

3  trial declarations of two jurors to support this allegation.  (Am.

4  Pet., Exs. M at 5, O at 3; Opp'n to Mot. for Summ. J. & Cross-Mot.

5  for Summ. J., Ex. O at 5; P at 3.)  Petitioner claims that had that

6  juror disclosed this information in voir dire it would have provided

7  grounds to exclude the juror for cause based on bias.  (Id.)

8  Petitioner points out that all prospective jurors were asked whether

9  there was any information not elicited by the jury questionnaire that

10 in fairness should be disclosed and that this information was not

11 disclosed.  (Am. Pet. at 120.)

12       Respondent argues that the post-trial declarations from two

13 jurors submitted in support of this allegation by petitioner are

14 inadmissible because they do not reflect any extraneous influence on

15 the jury.  (Alt. Mot. for Summ. J. at 182.)  Respondent also argues

16 that a reasonable juror would conclude that the disclosure of such

17 information was not required by any question put to prospective

18 jurors either in the questionnaire or during voir dire.  (Id. at

19 183.)  Respondent asserts that even if the juror declarations are

20 considered, this juror's apparent personal experience was not so

21 closely related to the litigation at issue to create a presumption of

22 juror bias since petitioner's case did not involve a defense that the

23 homicide was justifiable or excusable.  (Id.)  Lastly, respondent

24 argues that the past personal experiences of jurors are properly part

25 of the jury's deliberation, and that this juror's remorse over having

26 /////

1 | taken a life is a normal feeling that most people would have in that

2 | situation.  (<u>Id.</u> at 184.)

3 |       Petitioner argues that juror who did not disclose that he

4 | had killed someone on the job was intentionally dishonest.  (Opp'n &

5 | Cross-Mot. for Summ. J. at 137.)   In this regard, petitioner notes

6 | that the jury questionnaire had asked:

7 |       (1) whether they [jurors] "had ever been the
victim of a crime,"

8 |       (2) whether they had "ever been the witness to a
crime,"

9 |       (3) whether they had "ever given a statement . .
. to law enforcement officers," and

10 |       (4) whether there [was] any "information about
yourself, not covered by the questionnaire, that

11 | in fairness should be known."

12 | (<u>Id.</u> at 135.)   Petitioner argues that all of these questions should

13 | have compelled the juror to disclose his experience.   Since a person

14 | does not normally forget such a dramatic experience, petitioner

15 | asserts that the juror's non-disclosure demonstrates his dishonesty.

16 | (<u>Id.</u> at 137-38.)   Lastly, petitioner argues that although jurors may

17 | rely on past personal experiences in their deliberations, they may

18 | not rely on such experiences relating to issues involved in the

19 | litigation.   (<u>Id.</u> at 139.)

20 |       Petitioner also asserts that respondent's argument that the

21 | juror's killing could have occurred during combat or military service

22 | is unreasonable.   (Pet'r's Reply at 35.)   In this regard, petitioner

23 | points to a declaration of juror Sharon Lee, formerly Sharon McBride,

24 | in which she states that she was the jury foreperson and recalls the

25 | following:

26 | /////

1     In the January 1995 declaration, I stated that
      during the penalty deliberations, one male juror
2     stated that he had killed someone once, that the
      killing was job related, and that he felt it was
3     something he had to do.  I did not recall the
      juror's name, but I did remember that he acted in
4     a very authoritative manner.  I still do not
      remember his name today, but I do still recall
5     his discussion of the killing he had done.  He
      said that the shooting happened when he was
6     chasing a person on a train and that he had had
      to shoot the person.

7

8   (Pet'r's Reply, Ex. DDD ¶ 2.)

9          Even considering the post-trial declarations of the jurors

10  describing the comments of this juror (see Fed. R. Evid. 606(b)), the

11  evidence submitted fails to make even a preliminary showing of bias

12  on the part of the juror in question.  The court finds that, contrary

13  to petitioner's allegation, the unnamed juror was not dishonest in

14  his answer to any question put to him during the voir dire process.

15  He was not asked a question that could be fairly said to have called

16  for him to disclose this apparent experience from his past.  The

17  general request to disclose anything that in fairness that should be

18  disclosed is far too vague to pin a claim of juror dishonesty upon.

19  Accordingly, petitioner's allegations and evidence presented in

20  support thereof fail to entitle him to relief.  See McDonough Power

21  Equipment, Inc., 464 U.S. at 555-56.

22         Moreover, it is well-established that a juror may rely on

23  their past experiences in reaching a decision and that in doing so

24  they are not improperly considering extrinsic evidence.  Price, 200

25  F.3d at 1255; Hard v. Burlington Northern Railroad, 812 F.2d 482, 486

26  (9th Cir. 1987).  All petitioner has pointed to is that while

226

discussing petitioner's lack of emotion at trial the unnamed juror

commented to the other jurors that, unlike petitioner, he felt

remorse for having taken a life.  As previously noted, a defendant's

courtroom demeanor is evidence that a jury may properly consider.

Williams, 52 F.3d at 1483; Schuler, 813 F.2d at 981 n.3; see also

Bates, 308 F.3d at 421.

      Finally, the court is persuaded that even if this juror had

such an experience in his past, the fact that a juror's job-related

actions resulted in the death of another person bears little

similarity to the facts of petitioner's case.  Accordingly, the

unnamed juror did not present the "potential for substantial

emotional involvement" that would inherently adversely affect

impartiality.  Price, 200 F.3d at 1255, n.18 (quoting Tinsley, 895

F.2d at 527).  Under these circumstances bias has not been

demonstrated, nor should it be presumed.  Price, 200 F.3d at 1255,

n.18.  Accordingly, respondent is entitled to summary judgment in his

favor on this sub-claim.

      5.  Conclusion

      The court will recommend that respondent's motion for

summary judgment be denied with respect to the sub-claim involving

juror Peinado and granted with respect to the sub-claims involving

jurors Alvarado, Wight, Long and the unnamed juror.  The court will

also recommend that petitioner's cross-motion for summary judgment in

his favor on claim T be denied.

/////

/////

227

U.    Incompetence of Trial Juror

In this claim petitioner argues that juror Peinado "was incompetent due to his significant intellectual disability and his failure to possess sufficient knowledge of the English language . . . ." (Am. Pet. at 123, 126.) Accordingly, petitioner alleges, juror Peinado's service on the jury resulted in the violation of petitioner's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Id. at 123-24.) In support of this claim petitioner points to juror Peinado's lack of formal English training, his inappropriate or incomprehensible responses on his juror questionnaire, his inability to comprehend the judge's instructions or to deliberate effectively with the other jurors, and his lack of present memory about being a juror in a murder trial which resulted in a death sentence. (Id. at 126.)[58]

In moving for summary judgment on this claim respondent restates his arguments concerning the admissibility of juror declarations and, in the alternative, argues that juror Peinado was qualified to be a juror. (Alt. Mot. for Summ. J. at 82-84, 187.) As to competency, respondent contends that juror Peinado responded appropriately to the prosecutor's questions during voir dire, and that the court and counsel had the opportunity to observe juror Peinado's demeanor and how he responded to the questions. (Id. at

_____

[58] Petitioner also argues that the trial judge and defense counsel failed to adequately question juror Peinado during voir dire to ensure that he was competent to discharge his duties as a juror. (Am. Pet. at 126-28.) This claim has been addressed in section C, supra.

187-88.)  Respondent also notes that at the time of trial, juror Peinado had lived in the United States for thirty-two years and that for eighteen years at his job he conversed in English with his boss. (Id. at 188.)  Mr. Peinado's juror questionnaire indicates that he reads and understands English, although his handwriting and spelling are poor.  (Id. at 189.)  As for juror Peinado's competence based on his lack of recall, respondent argues that it is Mr. Peinado's memory at the time of the trial that is relevant, not his memory as reflected in his 1995 declaration submitted by petitioner in support of this claim.  (Id. at 190.)

In response petitioner argues that Federal Rule of Evidence 606(b) does not bar consideration of the declarations submitted in support of this claim.  (Opp'n & Cross-Mot. for Summ. J. at 141.) Petitioner contends that the evidence is part of the state court record, that respondent agreed to the admissibility of this evidence in state court, and that Rule 606(b) does not prohibit consideration of juror statements during voir dire or of statements used to show deceit during voir dire.[59]  (Id.)

Petitioner argues that if juror Peinado's responses to the voir dire questionnaire were not intentionally dishonest, then they reflect his incompetence to serve as a juror because of his lack of comprehension of the English language.  (Id. at 144.)  According to petitioner, juror Peinado failed to accurately answer the

---

[59]   Whether Mr. Peinado's responses during the voir dire were deceitful has been addressed by the court in its discussion of Claim T, supra.

1 questionnaire when he: (1) denied that he, his spouse, a relative, a
2 close friend, or an acquaintance had ever been accused or convicted
3 of a crime; (2) denied that he, his spouse, a relative, a close
4 friend, or an acquaintance had been interested in or involved in any
5 type of criminal or civil lawsuit; (3) stated that he was from Reno,
6 Nevada; (4) denied that he knew any lawyers; (5) denied that he knew
7 any person who work for a district attorney's or a public defender's
8 office; and (6) denied that he knew any person who has had a problem
9 with alcohol or drugs.  (Am. Pet., Ex. F; Opp'n & Cross-Mot. for
10 Summ. J., Ex. Z.)

11      Contrary to these responses reflected on his questionnaire,
12 petitioner contends that in his post-trial declaration juror Peinado
13 acknowledged that in fact his sons had suffered criminal convictions
14 and were involved in a civil lawsuit, he was born in Mexico, he knew
15 lawyers, and he knew people who had an alcohol or drug problem.
16 (Opp'n & Cross-Mot. for Summ. J. at 140-41, 147; see also Am. Pet.,
17 Ex. G; Opp'n & Cross-Mot. for Summ. J., Ex. CC.)

18      Petitioner also argues that juror Peinado has admitted to
19 having difficulty with English.  (Opp'n & Cross-Mot. for Summ. J. at
20 145.)  In his declaration, juror Peinado acknowledges "having some
21 trouble understanding what was being said by the judge, the lawyers
22 and the witnesses at the trials for which I was a juror."  (Am. Pet.,
23 Ex. G at 2; Opp'n & Cross-Mot. for Summ. J., Ex. CC at 2.)  According
24 to petitioner, juror Peinado left thirty questions entirely or
25 partially blank and in his 1995 declaration he admitted, "I often
26 left the answers blank or guessed at what the right answer was."

1 (Id. at 1.)  Petitioner contends that during voir dire questioning,

2 juror Peinado gave brief responses and thirteen times merely nodded

3 his head and later admitted that he would do so if he did not

4 understand what was being asked.  (Id.)  Petitioner also submits a

5 declaration from Salvador Bernal who worked with Mr. Peinado, stating

6 that juror Peinado's English was very limited at the time of

7 petitioner's trial.  (Opp'n & Cross-Mot. for Summ. J., Ex. MM.)[60]

8 Petitioner argues that this evidence demonstrates that juror Peinado

9 should not have served on the jury due to his limited comprehension

10 of the English language.  (Opp'n & Cross-Mot. for Summ. J. at 147-

11 48.)

12      The court must first determine the extent to which Mr.

13 Peinado's declaration may be considered to support this claim.

14 Statements by jurors have traditionally been inadmissible to impeach

15 the verdict.  Tanner, 483 U.S. at 115.  The exception is with respect

16

17      [60]  Salvador Bernal states:

18          I remember that about 10 or 15 years ago, Santos
            [Peinado] told me and other workers that he was
19          serving on a jury in a death penalty case.  At
            the time, Santos' English comprehension and
20          speaking were very poor, and I found it quite
            amusing that he would be serving on a jury.  In
21          fact, there were ongoing jokes among the workers
            about Santos being on the jury, although no one
22          ever said anything about it when Santos was
            nearby.  At the time, Santos had learned the very
23          limited English needed to do his job, but I do
            not believe that he understood enough to be on a
24          jury.  I know that when I really wanted Santos to
            understand me, I always spoke to him in Spanish.
25          Otherwise, he did not seem to get it.

26 (Opp'n & Cross-Mot. for Summ. J., Ex. MM at ¶ 2.)

to statements alleging that a jury has been subject to extraneous influence. <u>Id.</u> at 118. Federal Rule of Evidence 606(b) incorporates that common law rule and limits the court's ability to consider a juror's statements to impeach a verdict. As discussed above with respect to claims D and T, under Federal Rule of Evidence 606(b), the admissibility of juror Peinado's declaration thus turns on whether the declaration concerns matters external or internal to the jury process. <u>Hard v. Burlington Northern Railroad</u>, 870 F.2d 1454, 1460 (9th Cir. 1989). Statements regarding matters that are internal to the jury process are not admissible under Rule 606(b). <u>United States v. Pimental</u>, 654 F.2d 538, 542 (9th Cir. 1981). The Supreme Court has noted that "[c]ourts wisely have treated allegations of a juror's inability to hear or comprehend at trial as an internal matter." <u>Tanner</u>, 483 U.S. at 117-18. <u>See also</u> <u>Virgin Islands v. Nicholas</u>, 759 F.2d 1073, 1074-75 (3d Cir. 1985 (ability to hear or comprehend is internal to the jury process); <u>United States v. Dioguardi</u>, 492 F.2d 70, 78-80 (2d Cir. 1974) (physical competency of a juror considered internal).

In his post trial declaration juror Peinado addresses his comprehension of the English language, his memory, and his decision-making process. (Am. Pet., Ex. G; Opp'n & Cross-Mot. for Summ. J., Ex. CC.) These subjects are matters internal to the jury process. <u>Tanner</u>, 483 U.S. at 117-18; <u>Virgin Islands</u>, 759 at 1074-75. Accordingly, juror Peinado's post-trial declaration is inadmissible under Rule 606(b) for purposes of supporting petitioner's claim.

/////

1    The only remaining evidence submitted with respect to this
2  claim by petitioner is juror Peinado's juror questionnaire and the
3  declaration of Mr. Bernal.  First, it is true that juror Peinado left
4  several questions on the seventeen-page juror questionnaire
5  unanswered, including question number five which asked if he had "any
6  problem reading or speaking the English language?"  (Am. Pet., Ex. F
7  at 1; Opp'n & Cross-Mot. for Summ. J., Ex. Z at 1.)  However, juror
8  Peinado responded appropriately to other questions requiring more
9  than basic English-language skills.  For example he answered the
10  following questions in the manner indicated:

11             30.  How many years of formal schooling have you
                completed?
12             Answer:  5
                . . . .
13
               56.  Do you or our spouse own a firearm?
14             Answer:  Yes
               If yes, what type?
15             Answer:  30.6 chagan [sic]
                . . . .
16
               73.  Do you describe yourself as a follower or a
17             leader?
               Answer:  FOLLOWER
18

19  (<u>Id.</u> at 2-11.)

20             Likewise, as the following exchange suggests, during voir
21  dire juror Peinado demonstrated a degree of competency in the
22  English language.

23             Q [Deputy District Attorney Druliner]:  Do you
                recall the remarks made by the Court yesterday
24             concerning this case?

25             A [Peinado]:  Yes, sir.

26             Q:  Did you follow along pretty well with what

                                233

1     the Court was saying?

2     A:  Yes

3     Q:  This case, as you now know, involves a
charge, among other charges, but one of the
4     charges is murder.
         And the Court said with regard to Count
5     Number One, that the charge is murder with two
special circumstances.

6

     A:  (Nodding in the affirmative.)
7

8     Q:  And it was not further described, but let me
tell you, the special circumstances, what the
allegations are concerning the murder, is that in
9     1984 a woman named Connie Decker was murdered
during the course of a robbery of Mis Decker,
10    okay?

11    A.  Uh-huh.  (In the affirmative.)

12    Q.  Now you follow along with that?

13    A.  Yeah.

14    .  .  .  .

15    Q:  My question is what are your feelings about
the death penalty?
16

     A:  I say - - I don't know.  Death.
17         It is, uh (pause) pretty bad.  Very hard.
But it would be necessary, I guess.
18

     THE COURT:  I'm sorry.  I didn't hear the answer.
19

     PROSPECTIVE JUROR PEINADO:  I said if it
20    necessary.

21    MR. FATHY:  I believe he said if it is necessary,
yes.
22

     Q (By MR. DRULINER):  If you were a juror, and we
23    were in the penalty phase of the case, would you
hear evidence presented on the subject of what
24    the appropriate penalty should be?
         Evidence would be presented.
25

     A:  (Nodded head.)
26

1    Q:  And his Honor would describe for you the law.

2    A:  (Nodded head.)

3    Q:  Concerning what penalties are available.

4    A:  (Nodded head.)

5    Q:  Okay.  But the judge would tell you, in those
     instructions, what things or what factors you
6    could consider in arriving at your decision as to
     which penalty would be appropriate.
7            Do you understand that idea?

8    A:  Yeah.

9    Q:  That the Court would tell you the thing, the
     type of things that you could consider?
10
     A:  (Nodded head.)
11
     Q:  But the Court will not tell you which way to
12   vote.  Okay?

13   A:  (Nodded head.)

14   Q:  The vote, the choice as to which penalty
     would be appropriate, would be your choice.
15   Yours and the choice of the other eleven jurors.
             Would you be able to make that choice based
16   on the evidence presented to you?

17   A:  Yeah.  Definitely.

18   (RT at 3186, 3190-91.)

19        Lastly, although Mr. Bernal's declaration raises concerns

20   about juror Peinado's abilities with the English language, it does

21   not constitute strong evidence of Mr. Peinado's incompetence to serve

22   as a juror.  "[T]he statutory qualifications for jurors require only

23   a minimal competency in the English language."  McDonough Power

24   Equipment, Inc., 464 U.S. at 555.  Accordingly, courts have generally

25   denied post-verdict relief in non-habeas cases based on claims of

26   juror incompetence due to limited English language skills.  See

1   United States v. Gonzalez-Soberal, 109 F.3d 64, 69 (1st Cir. 1997)

2   ("Although those portions of the transcript quoted suggest that the

3   juror's command of the English language was less than that of a

4   native speaker, they do not warrant the conclusion that the juror was

5   unable to follow the proceedings or understand the evidence and

6   therefore do not merit reversal."); United States v. Gray, 47 F.3d

7   1359, 1368 (4th Cir. 1995) (holding that juror's allegation that

8   "eighty percent I know, just two percent confuse me," was not

9   extraordinary or sufficient to show incompetence); United States v.

10  Silverman, 449 F.2d 1341, 1344 (2nd Cir. 1971) (holding that juror's

11  inability to read or write English was not prejudicial to the

12  defendant where the juror had no difficulty understanding oral

13  testimony).  This same conclusion would be appropriate even were the

14  court to consider juror Peinado's own post-trial declaration.

15          Finally, this court notes that as a result of the voir dire

16  process, including the use of the juror questionnaire, petitioner's

17  trial counsel and the trial court were aware that juror Peinado had

18  some difficulty with the English language.  (See RT at 4175.)

19  Despite this knowledge petitioner's trial counsel elected not to

20  challenge juror Peinado for cause and did not use a peremptory

21  challenge to excuse him from petitioner's jury.

22          For all of these reasons the court will recommend that

23  respondent's motion for summary judgment be granted as to this claim

24  and that petitioner's cross-motion be denied.

25  /////

26  /////

1      **V.   Jury's Consideration of Extraneous Evidence**

2           In this claim, petitioner contends that the jury's

3  consideration of extraneous evidence during both the guilt and penalty

4  deliberations violated his constitutional rights.   (Am. Pet. at 129.)

5  Petitioner identifies six sources of extrinsic evidence to which at

6  least one juror was exposed during deliberations: (1) a map drawn by

7  some jurors; (2) a gun demonstration by the bailiff; (3) jurors'

8  comments about petitioner's potential criminal conduct in the future

9  and the trial and appellate courts' ability to overrule or overturn

10 the jury's verdict; (4) a newspaper article concerning the parole of

11 the so-called "Onion Field" killer; (5) a juror's consultations with

12 ministers regarding the penalty phase verdict; and (6) a juror's

13 comments about his feeling of remorse after killing someone in the

14 line of duty.   (<u>Id.</u> at 130-36.)

15          On habeas the petitioner bears the burden of establishing

16 that extrinsic evidence had a substantial and injurious effect on the

17 jury's verdict.   <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 949 (9th Cir.

18 2002); <u>Rodriguez v. Marshall</u>, 125 F.3d 739, 745 (9th Cir. 1997);

19 <u>Lawson v. Borg</u>, 60 F.3d 608, 613 (9th Cir. 1995).[61]  In <u>Lawson</u>, the

20 court set forth the applicable legal standards as follows:

21 /////

22 _____

23    [61]  Were the matter on direct appeal rather than on collateral
   review, the government would appear to bear the burden of showing
   beyond a reasonable doubt that extrinsic evidence did not contribute
24 to the verdict.   <u>See</u> <u>United States v. Keating</u>, 147 F.3d 895, 901-02 &
   n.3 (9th Cir. 1998); <u>cf</u>. <u>Mach v. Stewart</u>, 137 F.3d 630, 634 (9th Cir.
25 1998) (questioning whether the harmless error standard should be
   applied in the context of a claim that prejudicial extrinsic evidence
26 was introduced by a juror during voir dire).

1
2
3
4
5
6
7
8
9
10
11
12
13

> Jury exposure to facts not in evidence deprives a
> defendant of the rights to confrontation, cross-
> examination and assistance of counsel embodied in
> the Sixth Amendment. Dickson v. Sullivan, 849
> F.2d 403, 406 (9th Cir. 1988); see also Jeffries
> v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993)
> (introduction of extraneous prior bad acts
> evidence during deliberations constitutes error of
> constitutional proportions), cert. denied, 510
> U.S. 1191, 114 S. Ct. 1294, 127 L. Ed.2d 647
> (1994). However, a petitioner is entitled to
> habeas relief only if it can be established that
> the constitutional error had "substantial and
> injurious effect or influence in determining the
> jury's verdict." Brecht v. Abrahamson, 507 U.S.
> 619, ___ & n.9, 113 S. Ct. 1710, 1722 & n.9, 123
> L. Ed.2d 353 (1993). Whether the constitutional
> error was harmless is not a factual determination
> entitled to the statutory presumption of
> correctness under 28 U.S.C. § 2254(d). Dickson,
> 849 F.2d at 405; Marino v. Vasquez, 812 F.2d 499,
> 504 (9th Cir. 1987). Therefore, we do not defer
> to the California Third Appellate District's
> finding that Lawson suffered no prejudice. . . .

14 Id. at 612.

15    In this vein, "[j]uror misconduct typically occurs when a

16 member of the jury has introduced into its deliberations matter which

17 was not in evidence or in the instructions." Thompson v. Borg, 74

18 F.3d 1571, 1574 (9th Cir. 1996). See also Rodriguez, 125 F.3d at 744;

19 Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir. 1997). The interest at

20 stake is the constitutionally protected right to have the jury decide

21 the case based on evidence subject to confrontation, cross-

22 examination, and the assistance of counsel. See Jeffries v. Wood, 114

23 F.3d at 1490 ("When a juror communicates objective extrinsic facts

24 regarding the defendant . . . to other jurors, the juror becomes an

25 unsworn witness within the meaning of the Confrontation Clause.");

26 Lawson, 60 F.3d at 612. A juror's personal knowledge or experience

constitutes extrinsic evidence when that juror has personal knowledge regarding the parties or issues involved in the litigation or where the juror interjects his or her past personal experiences into deliberations in the absence of any record evidence on a given fact. Mancuso, 292 F.3d at 951; Navarro-Garcia, 926 F.2d at 821-22; see also United States v. Swinton, 75 F.3d 374, 381 (8th Cir. 1996).

Several factors, none dispositive, are to be considered in determining whether the introduction of extrinsic evidence constitutes reversible error:

> (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of . . . whether the introduction of extrinsic material [substantially and injuriously] affected the verdict.

Mancuso, 292 F.3d at 951-52. See also United States v. Keating, 147 F.3d 895, 902 (9th Cir. 1998); Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993). Additional factors falling within this fifth category that should be considered have been identified as well: (1) whether the prejudicial statement was ambiguously phrased; (2) whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; (3) whether a curative instruction was given or some other step taken to ameliorate the prejudice; (4) the trial context; and (5) whether the statement was insufficiently prejudicial given the issues and evidence in the case.

/////

1  Mancuso, 292 F.3d at 952; Keating, 147 F.3d at 902-03; Jeffries v.

2  Wood, 114 F.3d at 1491-92.

3         As indicated by these various relevant factors, "[t]here is

4  no bright line test for determining whether a defendant has suffered

5  prejudice from an instance of juror misconduct." Rodriquez, 125 F.3d

6  at 744 (citing Marino, 812 F.2d at 505). See also Mancuso, 292 F.3d

7  at 950. However, in assessing a claim of prejudice in this context,

8  the court is to place great weight on the nature of the extraneous

9  information introduced into deliberations. See Mancuso, 292 F.3d at

10 950; Rodriquez, 125 F.3d at 744; Jeffries v. Wood, 114 F.3d at 1490

11 ("[T]he appropriate focus should be on the nature of the information

12 itself."); Lawson, 60 F.3d at 612. "'[R]eversible error commonly

13 occurs where there is a direct and rational connection between the

14 extrinsic material and a prejudicial jury conclusion, and where the

15 misconduct relates directly to a material aspect of the case."'

16 Lawson, 60 F.3d at 612-13 (quoting Marino, 812 F.2d at 506). See also

17 Mancuso, 292 F.3d at 953 ("Juror misconduct cases in which habeas

18 relief has been granted often involve the jury's receipt of

19 information excluded from trial as unduly prejudicial [].");

20 Rodriquez, 125 F.3d at 744.  (Id.)  On the other hand, the

21 introduction of cumulative extraneous material may render juror

22 misconduct harmless.  See Rodriquez, 125 F.3d at 744; Jeffries v.

23 Wood, 114 F.3d at 1491.

24        Finally, in considering such a claim, a juror's testimony

25 regarding the deliberative process or the subjective effects of the

26 extraneous information cannot be considered by the court.  See

1 <u>Jeffries v. Wood</u>, 114 F.3d at 1491 ("[j]urors' testimony that
2 extrinsic evidence is not harmful is not controlling"); <u>United States</u>
3 <u>v. Maree</u>, 934 F.2d 196, 201 (9th Cir. 1991); <u>Hard</u>, 870 F.2d at 1460.
4 Rather, the reviewing court must apply an objective test in evaluating
5 the potential impact of the evidence on the jury.  See <u>Mancuso</u>, 292
6 F.3d at 953; <u>Rodriguez</u>, 125 F.3d at 744; <u>Jeffries</u>, 5 F.3d at 1191.
7 Thus, the proper inquiry is whether there was a direct and rational
8 connection between the extrinsic material and the prejudicial jury
9 conclusion, and whether the misconduct relates directly to a material
10 aspect of the case.  See <u>Mancuso</u>, 292 F.3d at 953; <u>Rodriguez</u>, 125 F.3d
11 at 744; <u>Jeffries</u>, 5 F.3d at 1190; <u>Dickson v. Sullivan</u>, 849 F.2d 403,
12 406 (9th Cir. 1988).  Against these legal standards, the court will
13 consider the parties' arguments and the facts underlying each aspect
14 of petitioner's claim.

15          1.  <u>Map</u>

16          Petitioner alleges that during the guilt phase deliberations
17 jurors familiar with the crime scene locations and with the route
18 allegedly used by petitioner, drew a map for at least one juror who
19 was unfamiliar with the area.  (Am. Pet. at 130.)  Petitioner claims
20 that this hand-drawn map was improper extraneous evidence and that it
21 is likely that the map misled the jury into believing that petitioner
22 had not reached a place of temporary safety before shooting Ms.
23 Decker.  (<u>Id.</u> at 130-31.)

24          In moving for summary judgment respondent argues generally
25 that no aspect of this claim involves "extraneous influences" because
26 in support of the claim petitioner is relying solely on evidence

1 relating to the jury's deliberative process.   (Alt. Mot. for Summ. J.

2 at 198-99.)   In particular, respondent argues that the hand-drawn map

3 was used to show the distance from the point where Ms. Decker was

4 kidnapped to the scene of the murder[62], and that discussions of time

5 and distance involved matters of common knowledge in the community.

6 (<u>Id.</u> at 199.)   Furthermore, according to respondent, evidence was

7 introduced at trial showing the distance and driving times in question

8 as well as to other locations involved in the crime.   (<u>Id.</u>)

9 Respondent contends that petitioner has failed to show that the

10 jurors' hand-drawn map was inconsistent with the evidence introduced

11 at trial or that consideration of the map by the jury was prejudicial.

12 (<u>Id.</u> at 199-200.)

13 /////

---

14

15    [62]   In a post-trial declaration submitted by petitioner Juror
Curvin Hunt states:

16

17        One thing that made it easier for me to
understand the evidence was my familiarity with
the crime scenes.  Because I was a reservist in

18 the Air Force, I knew the area around Mather Air
Force Base, where the victim was killed, very
well.  I believe only one other juror was

19 familiar with that crime scene because the area
wasn't very developed at the time.  But everyone

20 on the jury, except for one person, was familiar
with most of the other crime scenes.  I remember

21 some jurors drawing a map for that one juror, to
make it easier to understand what happened.

22 Because I was familiar with crime scenes, like
the liquor store where the defendant picked up

23 the victim, it was easy for me to imagine exactly
how long the drive was from point to point, and

24 what a horrible experience it must have been for
the victim to sit in the car, probably at

25 gunpoint the whole time.

26 (Am. Pet., Ex. M, ¶ 5; Opp'n & Cross-Mot. for Summ. J., Ex. O. ¶ 5.)

1    Petitioner opposes respondent's motion and contends that an

2 evidentiary hearing is required on this issue.[63]  In this regard,

3 petitioner argues that consideration of the map was prejudicial

4 because

> [t]he facts concerning petitioner's actions from
> the time he kidnaped the victim to the time the
> victim was killed were material to petitioner's
> defense that he had reached a place of temporary
> safety and that therefore the robbery had
> terminated for purposes of felony murder and the
> robbery special circumstance.  There is at least
> grave doubt whether the map misled the jury into
> determining that petitioner had not reached a
> place of temporary safety and provided other false
> information about the route petitioner drove.

11 (Opp'n & Cross-Mot. for Summ. J. at 130.)  Petitioner disputes

12 respondent's argument that the map merely reflected matters of common

13 knowledge in the community.  (Id. at 131.)  In addition, petitioner

14 argues that the map was not cumulative of trial evidence.  He asserts

15 that the jurors must have believed the locations and distances were

16 different than those reflected by the trial exhibits since they felt

17 compelled to draw a map.  (Id.)

18    Respondent's arguments are persuasive on this point.

19 Petitioner has failed to demonstrate that the map exposed jurors to

20 evidence not already introduced at trial.  Prosecution witness

21 Detective Robert Bell testified regarding People's Exhibits 44, a map

22 of Rancho Cordova.  (RT at 4873-74.)  Detective Bell identified on

23 that exhibit both the location where Ms. Decker's body was recovered

24 and the location of the dumpster at 10631 White Rock Road.  (RT at

25 _____

26    [63] Petitioner has not moved for summary judgment in his favor
on this sub-claim.

4874-75).  Using People's Exhibit 45, Detective Bell identified the locations of the other locations involved in petitioner's crimes and ultimate apprehension including Stewart's Liquor, Ms. Decker's house, the business known as Food and Liquor, and the petitioner's mother's residence.  (RT at 4875-79.)  In addition, Detective Bell testified regarding the distance from Stewart's Liquor to the Circle K store located at Mather Field Road and El Mercado, from the Circle K store to 10631 White Rock Road, and from White Rock Road and Zinfandel to where the body was recovered. (RT at 4880-83.)

Petitioner has not demonstrated that the map drawn by the jurors during their deliberation differed in any material respect from this evidence introduced at trial.  Moreover, there has been no showing suggesting that the hand-drawn map had a substantial and injurious effect or influence in determining the jury's verdict. Therefore, respondent's motion for summary judgment should be granted as to this sub-claim.

2.  <u>Bailiff's Demonstration</u>

Petitioner claims that during guilt phase deliberations, a juror asked the bailiff about the operation of the .32 caliber gun allegedly used by petitioner in the murder.  (Am. Pet. at 131.)  The bailiff demonstrated to the jurors how the gun was loaded and fired. (<u>Id.</u>)  One juror commented that the .32 was not a common model.  (<u>Id.</u>) According to petitioner, the ease with which the gun could be operated and its uncommon nature were material facts with respect to petitioner's defense.  (<u>Id.</u> at 131-32.)

/////

1          In support of this sub-claim petitioner has submitted the

2 post-trial declaration of juror Curvin Hunt wherein he states in

3 relevant part:

> The bailiff was probably most helpful when he
> showed us how to operate the .32 caliber gun used
> by the defendant.  We had the gun in the
> deliberations room, and I remember one of the
> women on the jury, during the guilt deliberations,
> raising a question about how the gun worked.  The
> bailiff was very helpful and showed us exactly how
> to load and fire it.  Even though I was very
> familiar with firearms from my military training,
> I didn't understand how a .32 caliber gun worked.
> The mechanism was complex, and not something I was
> used to.  After the bailiff's demonstration, I
> remember thinking, and telling the other jurors,
> how it was unlikely that a gun as uncommon and
> complicated as a .32 would be carried by someone
> who didn't intend to use it.
>
> I knew that a .32 does more damage than a .25,
> especially at close range, and that therefore it
> wasn't something someone would carry just for
> protection.  I also knew from some of my police
> officer friends that it was more common for people
> on the streets to carry .25 calibers, which are
> cheap, fairly available, easy to shoot and easy to
> buy ammunition for.  Given the defendant's choice
> of weapon, it was hard to believe the defense
> argument that the killing was simply a heat of the
> moment act committed by a drugged out man.  During
> deliberation, we discussed the likelihood that the
> defendant premeditated and deliberated based on
> the fact that a .32 is very complicated to
> operate, is relatively hard to get ammunition for,
> and isn't the normal type of gun carried by the
> average street junkie.

22 (Am. Pet., Ex. M, ¶¶ 8-9; Opp'n & Cross-Mot. for Summ. J., Ex. O, ¶¶

23 8-9.)

24          Respondent argues that petitioner's claim involves only the

25 "ordinary manipulation of a trial exhibit" and that, in any event,

26 there is no prejudice.  (Alt. Mot. for Summ. J. at 200.)  Respondent

1  contends that although juror Hunt may have thought the operation of
2  the gun was complicated, the trial evidence does not suggest either
3  that the gun was difficult to fire or had to already be loaded prior
4  to the time the victim was shot. (Id. at 200-01.)  Furthermore, the
5  prosecutor did not argue that the ease or difficulty in loading the
6  gun was relevant to premeditation.  Rather, according to respondent,
7  premeditation was established by the circumstances of the kidnapping,
8  the victim's attempt to summon help, petitioner's motive of stealing
9  the car and the fact that petitioner shot Ms. Decker twice in the
10  head, "inferably taking careful aim separately for each shot." (Id.
11  at 201.)

12      Petitioner disputes respondent's contention that the
13  bailiff's demonstration was the ordinary manipulation of a trial
14  exhibit. (Opp'n & Cross-Mot. for Summ. J. at 127.)  Petitioner argues
15  that the demonstration went to the essence of petitioner's defense to
16  the first-degree charge. (Id. at 128.)  "[T]he more complicated the
17  gun was to operate, the less likely it was that petitioner's abilities
18  were impaired as the result of his cocaine and heroin use at the time
19  he killed the victim, Connie Decker." (Id.)  Petitioner also
20  disagrees with respondent's assertions that the gun was uncomplicated
21  and was probably loaded and ready to fire when Ms. Decker was
22  kidnapped. (Id. at 128-29.)  Instead, petitioner argues that a
23  reasonable interpretation of the jury's interaction with the bailiff
24  is that some jurors found the operation of the gun to be relevant to
25  petitioner's mental-state defense. (Id. at 129.)  Petitioner argues
26  that the jury's improper consideration of this extrinsic evidence had

1  a prejudicial impact on the jury's deliberations and that he is

2  entitled to summary judgment in his favor as to this sub-claim.   (Id.)

3         The court is not persuaded by respondent's argument that the

4  bailiff's demonstration was merely an ordinary manipulation of a trial

5  exhibit and that, in any event, petitioner suffered no prejudice from

6  the jury's consideration of this information.  The bailiff's

7  demonstration would appear to be extraneous information since the

8  operation of the gun was not demonstrated to the jury at trial and the

9  jurors were apparently unable to determine how the gun was operated by

10 examining it themselves.  At least according to juror Hunt, an outside

11 source (the bailiff) had to be consulted for that purpose.  However,

12 there are a number of questions left unanswered given the current

13 state of the record.  For instance, it is not clear: (1) to what

14 extent the jury discussed or considered this extrinsic evidence; (2)

15 when the bailiff's demonstration occurred during the jury's

16 deliberation; (3) whether this information related directly to a

17 material aspect of the defense; and (4) whether there are any other

18 matters which may bear on the issue of whether the information had a

19 substantial and injurious effect on the jury's verdict.  See Mancuso,

20 292 F.3d at 951-52; Keating, 147 F.3d at 902; Jeffries v. Blodgett, 5

21 F.3d at 1190.

22        This sub-claim is not ripe for summary judgment at this

23 time.  Instead an evidentiary hearing may be necessary to resolve this

24 claim.  See United States v. Vasquez, 597 F.2d 192, 194 (9th Cir.

25 1979) (where bailiff left court files in the jury room exposing the

26 jury to inadmissible evidence an evidentiary hearing was required to

1 ascertain the extent, if any, that jurors saw or discussed the
2 prejudicial extrinsic evidence or other circumstances surrounding the
3 jury breach).  Accordingly, both motions for summary judgment should
4 be denied in this respect.

5        3.  <u>Jury Comments</u>

6       Petitioner next argues that during the penalty phase
7 deliberations the jury considered the following information which was
8 misleading, speculative and not based on evidence introduced at trial:
9 (1) if petitioner were released from jail he might seek retribution
10 against the jurors; (2) if petitioner were serving a life sentence
11 without the possibility of parole he might commit crimes in prison;
12 (3) that the trial judge could overrule the jury's penalty verdict if
13 it was erroneous; and (4) that the death sentence could be overturned
14 by a higher court.  (Am. Pet. at 132-33.)  In support of these
15 allegations petitioner relies upon the post-trial declarations of
16 several jurors.  (Am. Pet., Exs. C, K, L, M & O ; Opp'n & Cross-Mot.
17 for Summ. J., Exs. O, P, R, S & X.)  Petitioner argues that the jury
18 was prejudiced because it was led to believe that they did not have
19 full responsibility for his sentence and because the extraneous
20 information they considered in coming to that belief was incomplete
21 and misleading.  (Am. Pet. at 133.)

22       In moving for summary judgment respondent argues that these
23 are matters of deliberation which are internal to the jury process and
24 are immune from attack.  (Alt. Mot. for Summ. J. at 201.)  Respondent
25 also argues that jurors could properly consider the possible
26 consequences of their penalty phase decision in reaching a verdict.

1  (Id. at 202.)   As for the trial judge's authority to overrule the

2  jury's decision and a higher court's ability to overturn a death

3  sentence, respondent argues that these are accurate propositions under

4  the law.   (Id.)

5        Petitioner argues that respondent has failed "to take into

6  account that the jury's discussions were all completely speculative

7  and unsupported by any evidence or arguments presented at the trial."

8  (Opp'n & Cross-Mot. for Summ. J. at 132.)   In addition, petitioner

9  claims that respondent does not address the jury's belief that the

10  trial judge could overrule their decision, and that the death sentence

11  could be overturned on appeal.   (Id.)   Petitioner contends that these

12  are not matters of common knowledge and that the jury's understanding

13  was inaccurate because a California judge has no authority to overrule

14  a jury's verdict imposing life without possibility of parole, and

15  limited authority to overturn a death verdict.   (Id.)

16        As discussed above with respect to claims D, T and U, under

17  Federal Rule of Evidence 606(b), the admissibility of juror

18  declarations turns on whether they concern matters external or

19  internal to the jury process.   Statements regarding matters that are

20  internal to the jury process are not admissible.   Hard, 870 F.2d at

21  1460.   The post-trial juror declarations submitted by petitioner in

22  support of this claim recount statements made during the deliberations

23  and address the jurors' mental processes.   These subjects are matters

24  internal to the jury process.   See Belmontes, 350 F.3d at 891 (habeas

25  petitioner not entitled to relief on claim that the jury based its

26  penalty decision on the view that life without parole did not

249

1  necessarily mean life in prison because this "concerns intrinsic jury
2  processes").   The declarations do not present extraneous information.
3  Accordingly, they are inadmissible under Rule 606(b).

4       Therefore, respondent's motion for summary judgment should
5  be granted, and petitioner's cross-motion for summary judgment should
6  be denied as to this sub-claim.

7       4.   <u>Newspaper</u>

8       Petitioner alleges that during the trial and jury
9  deliberations, a juror brought a newspaper into the jury room which
10  was read by other jurors.   (Am. Pet. at 134.)   According to
11  petitioner, on December 30, 1986, the front page of the Sacramento Bee
12  bore the following banner headline, "State High court [sic] Orders
13  Parole For 'Onion Field' Killer."   (<u>Id.</u>)   Petitioner argues that
14  "[t]he possibility that petitioner's death sentence could be reversed,
15  and the fact that he could be released on parole if given a life
16  sentence were discussed by the jury during penalty phase
17  deliberations, and played a substantial role in the penalty verdict."
18  (<u>Id.</u>)

19       In support of this sub-claim petitioner relies on post-trial
20  declarations of jurors Hunt and Lee but without specific citation.
21  (Am. Pet. at 134-35.)   In juror Hunt's declaration he states merely
22  the following regarding the jury's exposure to a newspaper during the
23  trial:

24          We also occasionally worked on the crossword
              puzzle in the newspaper, and once we asked the
25          bailiff if the judge was good at crossword
              puzzles.  He responded that the judge didn't know
26          the answers to the puzzle.

1                            * * *

2            The penalty deliberations seemed to drag on for
             quite a while.  I remember someone bringing in a
3            newspaper to the deliberations room.  We passed it
             around, working on the crossword and reading the
4            sports section.  There wasn't anything about our
             case in the paper, but I do remember one article
5            that had something to do with the police.

6   (Am. Pet., Ex. M, ¶¶ 7 & 13, 5-6; Opp'n & Cross-Mot. for Summ. J., Ex.

7   O, ¶¶ 7 & 13.)  In her declaration, juror Lee makes absolutely no

8   mention of a newspaper. (Am. Pet., Ex. O; Opp'n & Cross-Mot. for Summ.

9   J., Ex. P.)

10           Respondent argues that juror Hunt's declaration provides no

11  evidence that the jury had before them the front page of the December

12  30, 1986, Sacramento Bee, or any other newspaper front page.  (Alt.

13  Mot. for Summ. J. at 202.)  Furthermore, respondent argues that even

14  if it could be speculated that the jurors saw the "Onion Field" killer

15  article as alleged by petitioner, the jury was entitled to consider

16  the possibility that petitioner might be released on parole in

17  reaching its penalty phase verdict.  (Id.)

18           In response petitioner argues that the evidence does not

19  support summary judgment for either party as to this sub-claim.

20  (Opp'n & Cross-Mot. for Summ. J. at 133.)  Petitioner asserts that

21  there is circumstantial evidence that jurors saw the newspaper article

22  and that it impacted their consideration of a sentence of life without

23  parole.  (Id.)  Petitioner argues that the jury could conclude based

24  on the article that petitioner could be granted parole even if

25  sentenced to life without the possibility of parole.  (Id. at 134.)

26  Petitioner also argues that, contrary to respondent's suggestion, in

                              251

1  California a jury may not consider the possibility that a capital
2  defendant might be released in the future.  (Id.)

3       The court finds that there is no evidence to support
4  petitioner's allegation that the jurors had before them the front page
5  of the December 30, 1986, issue of the Sacramento Bee with the
6  headline and article regarding the parole of the "Onion Field" killer.
7  The court is not persuaded by petitioner's argument that there is
8  circumstantial evidence that jurors were exposed to the newspaper
9  article in question.  Petitioner's claim is based purely upon
10 speculation and is unsupported by any evidence whatsoever.

11      Therefore, respondent's motion for summary judgment should
12 be granted as to this sub-claim, and petitioner's cross-motion should
13 be denied.

14      5.  <u>Consultations with Ministers</u>

15      Petitioner claims that juror Abelardo Alvarado engaged in
16 prejudicial misconduct by discussing petitioner's case with several
17 ministers to confirm the propriety of voting to impose the death
18 penalty and by informing the jury about the advice he received.  (Am.
19 Pet. at 135.)

20      Respondent argues that petitioner has not provided any
21 evidence to support his allegation that "'religious leaders had
22 approved the death sentence for Petitioner.'"  (Alt. Mot. for Summ. J.
23 at 203) (quoting Am. Pet. at 136.)  Respondent also asserts that the
24 juror's post-trial declarations filed in support of petitioner's state
25 habeas petition are not admissible in these proceedings.  (Resp't's
26 Reply at 15-16.)  As for juror Alvarado, respondent argues that his

                                252

1   discussions with ministers did nothing more than allow him to fulfill

2   his oath as a juror in considering the two possible penalties without

3   coming into conflict with the principles of his religion.   (Alt. Mot.

4   for Summ. J. at 203.)

5           In response, petitioner relies upon the post-trial

6   declaration from juror Stephen McEnerney submitted in support of his

7   second state habeas petition in which the juror states:

8           I remember [juror Alvarado] telling us during the
            penalty deliberations that he had sought
9           counseling from some ministers about his decision
            to vote for death.  He suggested that we try the
10          same if any of us were having trouble making up
            our minds.

11

12   (Opp'n & Cross-Mot. for Summ. J., Ex. T at 2.)   Petitioner asserts

13   that juror McEnerney's statements regarding the jury being exposed to

14   extrinsic information from ministers are corroborated by the

15   declarations of Linda Lye and Jeffrey Kim, both of whom state that

16   they were present at a February 2, 1995, interview of juror Alvarado

17   in which he recounted consulting with several ministers to help him

18   feel comfortable with his penalty phase decision and how he shared

19   that experience with other jurors.   (Opp'n & Cross-Mot. for Summ. J.,

20   Ex. T at 2.)[64]   Both Lye and Kim indicate that after providing this

21   interview, juror Alvarado was unwilling to speak to them further and

22   /////

23

24       [64]   In his supplemental memorandum following oral argument on
     the pending motions, petitioner argues that respondent never moved to
25   strike these declarations and that they are either not hearsay or
     reflect statement against interest falling within an  exception to
26   the hearsay rule.  (Suppl. Mem. at 4-5.)

                                    253

1  thus they were unable to obtain a declaration from juror Alvarado

2  himself with respect to this issue.  (<u>Id.</u>)

3          Petitioner argues that juror Alvarado's ex parte

4  consultations with ministers involved matters central to the jury's

5  decision in petitioner's case.  He asserts that in penalty phase

6  deliberations a juror is required to make "a reasoned moral response"

7  to the defendant's background, character, and crime.  (Opp'n & Cross-

8  Mot. for Summ. J. at 123-24.)  Petitioner claims that "the moral,

9  subjective nature of the task" makes ex parte contacts particularly

10 serious when the outsider contacted is "a minister, a person who is

11 generally understood to be an expert in moral decisions."  (<u>Id.</u> at

12 124.)

13         Finally, petitioner argues that not only was juror Alvarado

14 prejudiced as a result of this improper consultation with ministers

15 but the jurors whom Alvarado talked to about his ex parte contacts

16 were prejudiced as well.  (<u>Id.</u>)  According to petitioner, the outside

17 advice juror Alvarado received and shared with the other jurors

18 addressed the ultimate material aspect of the case because it involved

19 the jury's life-or-death decision.  (<u>Id.</u>)  Thus, petitioner asserts,

20 this extrinsic information was directly prejudicial to petitioner and

21 likely had a substantial and injurious affect on the jury's penalty

22 phase verdict.  (<u>Id.</u> at 124-25.)  Petitioner notes that there was a

23 substantial and injurious impact on juror Alvarado because he sought

24 such consultation despite his usual non-involvement in religious

25 activities, and was clearly influenced by the advice because he shared

26 the information with other jurors.  (<u>Id.</u> at 125.)  The fact that juror

1   Alvarado remembered his consultation with ministers nearly ten years
2   after the trial and the fact that juror McEnerney also remembered the
3   extrinsic information provided by juror Alvarado eight years later
4   demonstrates, according to petitioner, that the extrinsic information
5   was important to the deliberations.  (Id.)  Petitioner asserts that
6   this jury misconduct requires that the penalty decision be vacated.
7   (Id. at 126.)[65]

8        The court concludes that neither party is entitled to
9   summary judgment on this sub-claim.  Even if the court accepted as
10  true petitioner's contention that juror Alvarado spoke to at least one
11  minister and informed the jury that he had done so, there are  many
12  necessary questions left unanswered under the present record.     For
13  instance, it is not clear: (1) what advice, if any, juror Alvarado
14  received and shared with the other jurors; (2) the extent of his
15  extrajudicial contacts; (3) whether his conversations with ministers
16  were purely philosophical or based on the facts of petitioner's case;
17  (4) whether and to what extent juror Alvarado's statements were
18  discussed by the other jurors; (5) the timing of juror Alvarado's
19  comments in relation to the jury's deliberations and the return of the
20  penalty phase verdict; and (6) whether there are any other matters

21

22       [65]  Petitioner contends that, contrary to respondent's position,
    the declarations relied upon by petitioner in support of this claim
23  are part of the state court record and are properly considered by
    this court.  (Pet'r's Reply at 28-30.)  Petitioner also contends that
24  respondent's suggestion that juror Alvarado has recanted his
    statement to petitioner's investigators must be rejected because on
25  June 1, 2000 juror Alvarado reconfirmed that he did in fact have
    extrajudicial contact with clergy during petitioner's trial.  (Id. at
26  32 and Exs. BBB, CCC.)

1 which may bear on the issue of whether the information had a

2 substantial and injurious effect on the jury's verdict.  See Mancuso,

3 292 F.3d at 951-52; Keating, 147 F.3d at 902; Jeffries v. Blodgett, 5

4 F.3d at 1190.  Therefore, the court cannot find that either party is

5 entitled to summary judgment at this time.

6       6.  Remorse

7       Finally, petitioner again claims that during the penalty

8 phase deliberations, one of the jurors disclosed that he had killed

9 someone in the line of duty and that unlike petitioner, he had felt

10 remorse.  (Am. Pet. at 136.)  In this claim petitioner asserts that

11 the jurors comment constituted improper extrinsic information to which

12 the jury should not have been exposed.  In this vein he argues that

13 because there was no evidence introduced at trial concerning

14 petitioner's remorse or lack thereof, remorse was not a proper factor

15 in the jury's determination of the appropriate penalty and such

16 consideration made it easier for the jury to vote for death.  (Id. at

17 137.)  Petitioner again relies upon the post-trial declarations of two

18 jurors to support this allegation.  (Am. Pet., Exs. M at 5, O at 3;

19 Opp'n to Mot. for Summ. J. & Cross-Mot. for Summ. J., Ex. O at 5; P at

20 3.)

21       Respondent argues that this is an intrinsic matter of

22 deliberation and that the juror's disclosure of his involvement in a

23 killing was nothing more than an expression of  common knowledge that

24 someone involved in taking a life normally feels some remorse.  (Alt.

25 Mot. for Summ. J. at 203.)  Respondent argues that a juror's sharing

26 of past personal experiences is an appropriate part of jury

1  deliberation.  (<u>Id.</u>)  Lastly, respondent argues that the juror's
2  statement was not prejudicial and "concerned a normal human reaction,
3  which was well within the range of common experience."  (<u>Id.</u> at 205.)

4       As discussed above, the admissibility of a juror declaration
5  turns on whether the declaration concerns matters external or internal
6  to the jury process.  Statements regarding matters that are internal
7  to the jury process are not admissible.  <u>Hard</u>, 870 F.2d at 1460.  The
8  post-trial juror declaration submitted by petitioner in support of
9  this claim address statements made during the deliberations concerning
10  the jurors' mental processes.  These subjects are matters internal to
11  the jury process.  <u>See</u> <u>Belmontes</u>, 350 F.3d at 891 (habeas petitioner
12  not entitled to relief on claim that the jury based its penalty
13  decision on the view that life without parole did not mean necessarily
14  mean life in prison because this "concerns intrinsic jury processes").
15  Because the declarations relied upon by petitioner in support of this
16  sub-claim do not address the jury's consideration of extraneous
17  information, they are inadmissible under Rule 606(b).

18       Moreover, jurors may rely on their past experiences in
19  reaching a decision and in doing so they are not improperly
20  considering extrinsic evidence.  <u>Price</u>, 200 F.3d at 1255; <u>Hard</u>, 812
21  F.2d at 486.  Finally, as previously noted, a defendant's courtroom
22  demeanor is evidence that a jury may properly consider.  <u>Williams</u>, 52
23  F.3d at 1483; <u>Schuler</u>, 813 F.2d at 981 n.3; <u>see</u> <u>also</u> <u>Bates</u>, 308 F.3d
24  at 421.

25  /////
26  /////

1        For all of these reasons respondent's motion for summary

2   judgment should be granted as to this sub-claim and petitioner's

3   cross-motion for summary judgment should be denied.

4   **W.   Ineffective Assistance of Counsel/Petitioner's Mental
         Condition, Family History, Upbringing and Injuries**

5

6        This claim has been fully addressed in section, C, <u>supra</u>

7   with the court concluding that the cross-motions for summary judgment

8   should be denied.

9   **X.   Cumulative Error**

10       Petitioner claims that the cumulative effect of the errors

11  at both the guilt and penalty phases of his trial denied him his

12  constitutional rights to a fair trial on the issue of guilt or

13  innocence and a fair, reliable, individualized and adequately-guided

14  determination of the appropriateness of the death penalty.

15       Respondent moves for summary judgment on this claim on the

16  grounds that petitioner has failed to establish either any error

17  sufficiently substantial to generate the accumulation of prejudicial

18  error or an undermining of the adversarial process.  Respondent

19  concludes by arguing that summary judgment on this claim is

20  appropriate because "[t]he fact that many claims . . . are pressed

21  does not alter fundamental math - a string of zeros still adds up to

22  zero."  (Alt. Mot. for Summ. J. at 210) (quoting <u>Hunt v. Smith</u>, 856 F.

23  Supp. 251, 258 (D. Md. 1994), <u>aff'd</u>, 57 F.3d 1327 (4th Cir. 1995)).

24       Where asserted constitutional errors have been established,

25  but findings of no prejudice as to the individual errors are made, the

26  errors en toto may nonetheless present a claim for cumulative error

1  sufficient to overturn a death sentence.  <u>Mak v. Blodgett</u>, 970 F.2d
2  614 (9th Cir. 1992); <u>United States v. Tucker</u>, 716 F.2d 576, 595 (9th
3  Cir. 1983).  Moreover, while individual errors looked at separately
4  may not rise to the level of constitutional error, the cumulative
5  effect of such errors may so prejudice the defendant's right to a fair
6  trial that reversal is warranted.  <u>See</u> <u>United States v. Berry</u>, 627
7  F.2d 193, 200-01 & n.7 (9th Cir. 1980); <u>see</u> <u>also</u> <u>United States v.</u>
8  <u>Nadler</u>, 698 F.2d 995, 1002 (9th Cir. 1983).

9       Because the court is recommending denial of summary judgment
10 on petitioner's ineffective assistance and other claims, it indeed
11 appears that summary judgment on the cumulative error claims would be
12 premature.  <u>See</u> <u>Mak</u>, 970 F.2d at 622 (prejudice in ineffective
13 assistance claims may be found from consideration of "the totality of
14 counsel's errors and omissions").  Therefore, respondent's motion for
15 summary judgment should be denied as to this claim.

16                              **CONCLUSION**

17       For the reasons set forth above, the court HEREBY RECOMMENDS
18 that:

19       1.  Respondent's motion for summary judgment or to dismiss
20 be granted in part and denied in part.

21       2.  Summary judgment be granted in respondent's favor on the
22 following claims A, B, D, E, F, G, H, I, J, K, M, P, Q, R, S (except
23 as to sub-claim S-5), T (in part), U, and V (in part).

24       3.  Respondent's motion be denied with respect to the
25 following claims: C, L, N, O, S-5, T (in part), V (in part), W and X.
26 /////

1        4.  Petitioner's cross-motion for summary judgment be denied

2 in its entirety.

3        5.  That claim Q be dismissed for failure to state a claim.

4        6.  Respondent be ordered to file an answer to the remaining

5 claims of the second amended federal petition within sixty days after

6 the district court's ruling with respect to these findings and

7 recommendations, after which time the undersigned will set a status

8 conference to schedule the remaining proceedings in this litigation.

9       These findings and recommendations are submitted to the

10 United States District Judge assigned to the case, pursuant to the

11 provisions of 28 U.S.C. § 636(b)(1).  Within thirty days after being

12 served with these findings and recommendations, any party may file

13 written objections with the court.  Such a document should be

14 captioned "Objections to Magistrate Judge's Findings and

15 Recommendations" and shall not exceed fifty pages in length.  Any

16 reply to the objections shall be served and filed within fifteen days

17 after service of the objections and shall not exceed twenty pages in

18 length.  The parties are advised that failure to file objections

19 within the specified time may waive the right to appeal the District

20 Court's order.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

21 DATED: January **6**, 2004.

22

23                              DALE A. DROZD
                             UNITED STATES MAGISTRATE JUDGE

24

25 dad1/orders.capital
breauxsjf&r

26

United States District Court
for the
Eastern District of California
January 6, 2004


* * CERTIFICATE OF SERVICE * *


2:93-cv-00570


Breaux

    v.

Vasquez

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  January 6, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


    Quin Denvir                        HV/DFL
    Federal Defender
    801 I Street                       PB/DAD
    Third Floor
    Sacramento, CA  95814-2510

    Michael G Millman
    California Appellate Project
    Federal Court Docketing
    101 Second Street
    Suite 600
    San Francisco, CA  94105-2752

    Linda Fox
    California Appellate Project
    Federal Court Docketing
    101 Second Street
    Suite 600
    San Francisco, CA  94105-2752

    Richard C Neuhoff
    Law Offices of Richard C Neuhoff
    11 Franklin Square
    New Britain, CT  06051-2604

George M. Hendrickson

Attorney General's Office
PO Box 944255
1300 I Street
Suite 125
Sacramento, CA  94244-2550

Jack L. Wagner, Clerk

BY: _____
Deputy Clerk